No. 25-14263

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ISIS BENJAMIN, et al.,
*Plaintiffs-Appellees,*

v.

COMMISSIONER TYRONE OLIVER, in his official capacity, et al.,
*Defendants-Appellants.*

Appeal from the U.S. District Court for the
Northern District of Georgia, No. 1:25-cv-04470 (Calvert, J.)

# OPENING BRIEF OF APPELLANTS

Christopher M. Carr
 *Attorney General*
John Henry Thompson
 *Solicitor General*
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408
jhthompson@law.ga.gov

Jeffrey M. Harris
Rachael C.T. Wyrick
Julius Kairey
Zachary P. Grouev\*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

\**Supervised by principals of the firm admitted to practice in Virginia*

*Counsel for Appellants*

# AMENDED CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 and 26.1-2, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. Benjamin, Isis (Yohansan Jovan Stewart)[1] – Appellee

2. Bentley, Michael J. – Counsel for Defendant Centurion of Georgia, LLC

3. Bondurant Mixson & Elmore, LLP – Counsel for Appellees

4. Bradley Arant Boult Cummings, LLP-MS – Counsel for Defendant Centurion of Georgia, LLC

5. Calvert, Honorable Victoria Marie – Judge for the United States District Court for the Northern District of Georgia

6. Center For Constitutional Rights – Counsel for Appellees

7. Centurion of Georgia, LLC – Defendant

8. Consovoy McCarthy PLLC – Counsel for Appellants

9. Doe, John – Appellee

10. Early, Emily – Counsel for Appellees

11. Ezie, Andrea Chinyere – Counsel for Appellees

12. Felder, Korbin – Counsel for Appellees

13. Frankson, Michael Geoffrey – Counsel for Defendant Centurion of Georgia, LLC

14. Grouev, Zachary P. – Counsel for Appellants

---

[1] Plaintiffs' complaint uses self-declared names that differ from the names in their official GDC records. Defendants will refer to them by their names in official records.

No. 25-14263, *Benjamin v. Oliver*

15.   Harris, Jeffrey M. – Counsel for Appellants

16.   Huff, Powell & Bailey, LLC – Counsel for Defendant Centurion of Georgia, LLC

17.   **Horton, Fantasia (Sylvester Horton) – Appellee**

18.   Kairey, Julius – Counsel for Appellants

19.   Madison, Naeomi (Terrell Montiel Madison) – Appellee

20.   Mardis, Dr. Marlah – Appellant

21.   Oliver, Tyrone – Appellant

22.   Petrany, Stephen J. – Counsel for Appellants

23.   Sauls, Randy – Appellant

24.   Seals, Amanda Kay – Counsel for Appellees

25.   Sellers, Matthew – Counsel for Appellees

26.   **Thompson, John Henry, Counsel for Appellants**

27.   **Vinson, Kayla – Counsel for Appellees**

28.   Wilson, Brynn – Appellee

29.   Wyrick, Rachael C.T. – Counsel for Appellants

30.   Zhu, Celine – Counsel for Appellees

Appellants are government officials of the State of Georgia, and Appellees are individuals. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Per Circuit Rule 26.1-2(c), Appellants certify that this CIP is complete.

Dated: January 2, 2026                     */s/ Jeffrey M. Harris*
                                           Counsel for Appellants

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This case is of exceptional importance because the district court's class-wide permanent injunctions are preventing the Georgia Department of Corrections from implementing SB185—a democratically enacted state law prohibiting the use of taxpayer dollars for controversial and unproven sex-change interventions in prisons. The district court supplanted the Georgia General Assembly's reasoned policy judgment and replaced it with judicial micromanagement of Georgia's prison system, all based on a constitutional theory that this Court and the Supreme Court have rejected in similar contexts. This appeal also raises important issues of the scope of remedies under the Prison Litigation Reform Act, class certification, and standing. Oral argument would assist the Court's resolution of these important issues.

# TABLE OF CONTENTS

Amended Certificate of Interested Persons.................................................. C-1 of 2

Statement Regarding Oral Argument.................................................................i

Table of Authorities.........................................................................................iv

Jurisdictional Statement...................................................................................1

Introduction .....................................................................................................1

Statement of the Issues ...................................................................................3

Statement of the Case......................................................................................4

    I.      Policymakers across the country have enacted numerous laws regulating sex-change interventions, including cross-sex hormones. ................................4

    II.    The General Assembly enacted SB185 to prohibit using public funds to facilitate unproven sex-change interventions in prisons. ................................7

    III.   Procedural history. ...........................................................................8

Standard of Review.......................................................................................11

Summary of Argument..................................................................................12

Argument.......................................................................................................16

    I.      The Eighth Amendment does not mandate public funding of unproven and controversial sex-change interventions in prison......................................16

        A.    *Skrmetti* and *Eknes-Tucker* underscore that courts should not second-guess legislative judgments in this area. ..................................16

        B.    The Eighth Amendment deliberate indifference standard gives state officials even greater deference than rational basis review, and SB185 easily passes muster...........................................................21

        C.    The district court's refusal to consider the Cass and Baker Reviews flouted the parties' agreement and was inconsistent with the Supreme Court and this Court's treatment of similar evidence. ...............................................................................30

        D.    The district court's conclusions regarding "medical necessity" rest on the same arguments rejected by the Supreme Court and this Court and give undue weight to GDC's prior policies. ..............34

        E.    Neither Defendants nor the General Assembly acted with subjective recklessness.......................................................................38

F.　　Defendants' implementation of SB185 was a reasonable response to the risks posed by Plaintiffs' gender dysphoria................................39

G.　　At minimum, this Court should reverse the decision below, vacate the entry of partial summary judgment for Plaintiffs, and remand for further proceedings. ...........................................42

II.　Certifying a pair of Rule 23(b)(2) injunctive classes and entering class-wide injunctive relief violated the PLRA. .........................................43

III.　Certifying the "requesting class" and issuing a permanent injunction covering inmates not currently receiving cross-sex hormones violated Article III. ...................................................................................47

Conclusion ........................................................................................................50

Certificate of Compliance ...............................................................................51

Certificate of Service.......................................................................................52

iii

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) ...................................................................................43

*Bayse v. Ward*,
147 F.4th 1304 (11th Cir. 2025) ................................................... 22, 35

*Benjamin v. Oliver*,
No. 25-13060 (11th Cir. Sept. 8, 2025) ................................................ 10, 11

*Benjamin v. Oliver*,
No. 25-14263 (11th Cir. Dec. 19, 2025) ................................................11

*Berrocal v. Att'y Gen.*,
136 F.4th 1043 (11th Cir. 2025) ...................................................47, 48, 49

*Boe v. Marshall*,
603 F. Supp. 3d 1131 (M.D. Ala. 2022) ................................................ 16, 35

*Brito v. Garland*,
22 F.4th 240 (1st Cir. 2021) ................................................................44

*Bucklew v. Precythe*,
587 U.S. 119 (2019) ................................................................ 22, 23

*Clark v. Valletta*,
157 F.4th 201 (2d Cir. 2025) ................................................................35

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ................................................................12

*Eknes-Tucker v. Governor of Ala.*,
80 F.4th 1205 (11th Cir. 2023) ...................................................2, 16, 17

*Eknes-Tucker v. Governor of Ala.*,
114 F.4th 1241 (11th Cir. 2024) ................................................. 2, 17, 30, 32, 33, 36, 37

*Estelle v. Gamble*,
429 U.S. 97 (1976) ................................................................24

*Ga. Advoc. Off. v. Jackson*,
4 F.4th 1200 (11th Cir. 2021) ...................................................43, 44, 46

*Ga. Advoc. Off. v. Jackson*,
33 F.4th 1325 (11th Cir. 2022) ................................................................44

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ................................................................. 45, 46

*Gibson v. Collier,*
    920 F.3d 212 (5th Cir. 2019) ........................................ 22, 23, 35, 37

*Green-Cooper v. Brinker Int'l, Inc.,*
    73 F.4th 883 (11th Cir. 2023) ............................................... 47, 48

*Harmelin v. Michigan,*
    501 U.S. 957 (1991) ......................................................................23

*Hoffer v. Sec'y, Fla. Dep't of Corr.,*
    973 F.3d 1263 (11th Cir. 2020) .........................2, 21, 22, 24, 25, 29, 40, 42

*Ireland v. Prummell,*
    53 F.4th 1274 (11th Cir. 2022) ....................................................21

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.,*
    121 F.4th 604 (7th Cir. 2024) ......................................................35

*Keohane v. Fla. Dep't of Corrections, Sec'y.,*
    952 F.3d 1257 (11th Cir. 2020) .....................................................3

*KH Outdoor v. Clay Cnty.,*
    482 F.3d 1299 (11th Cir. 2007) ...................................................49

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006) ...................................................11

*Klay v. United Healthgroup, Inc.,*
    376 F.3d 1092 (11th Cir. 2004) ...................................................49

*Koe v. Noggle,*
    No. 23-cv-2904 (N.D. Ga. June 29, 2023) ....................................37

*Kosilek v. Spencer,*
    774 F.3d 63 (1st Cir. 2014) .........................................................35

*L.W. by and through Williams v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023) ............................................18, 31, 34

*L.W. by and through Williams v. Skrmetti,*
    679 F. Supp. 3d 668 (M.D. Tenn. 2023) ................................. 17, 18

*Lange v. Houston Cnty.,*
    152 F.4th 1245 (11th Cir. 2025) ..................................................20

*Lewis v. Governor of Ala.,*
    944 F.3d 1287 (11th Cir. 2019) ...................................................48

v

*Marcum v. Crews*,
   2025 WL 2630922 (E.D. Ky. Sept. 12) ........................................................ 5, 39

*Marcum v. Crews*,
   No. 25-5840 (6th Cir. Oct. 23, 2025) ..........................................................5

*NYSRPA v. Bruen*,
   597 U.S. 1 (2022) ....................................................................................13

*Prado-Steiman ex rel. Prado v. Bush*,
   221 F.3d 1266 (11th Cir. 2000) ................................................................12

*Shook v. El Paso Cnty.*,
   386 F.3d 963 (10th Cir. 2004) ..................................................................45

*SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*,
   40 F.4th 1320 (11th Cir. 2022) .................................................................11

*United States v. Skrmetti*,
   605 U.S. 495 (2025) ....................2, 4, 6, 13, 17-21, 23, 25, 29-30, 32-33, 34, 36-38, 42

*Vacco v. Quill*,
   521 U.S. 793 (1997) .................................................................................18

*Wade v. McDade*,
   106 F.4th 1251 (11th Cir. 2024) ....................................... 2, 14, 25, 38, 39

*Wilderness Soc'y v. Alcock*,
   83 F.3d 386 (11th Cir. 1996) ....................................................................49

*Williams v. Reckitt Benckiser*,
   65 F.4th 1243 (11th Cir. 2023) ........................................................... 47, 49

*Yates v. Collier*,
   868 F.3d 354 (5th Cir. 2017) ....................................................................45

## Statutes

18 U.S.C. §3626 ...........................................................9, 15, 43, 44, 45, 46

28 U.S.C. §1292 .............................................................................................1

28 U.S.C. §1343 .............................................................................................1

Ga. Code Ann. §42-5-2 ........................................................................... 7-8

H.B. 1080, 2023 S.D. Reg. Sess. (S.D. 2023) ......................................5

H.B. 1125, 2023 Miss. Reg. Sess. (Miss. 2023) .................................5

H.B. 1254, 68th Leg. Assemb., 2023-2024 N.D. Reg. Sess. (N.D. 2023) .......................5

H.B. 1570, 93d Gen. Assemb., 2021 Ark. Reg. Sess. (Ark. 2021) ..................................... 5

H.B. 2007, 2023 W. Va. Reg. Sess. (W. Va. 2023) .......................................................... 5

H.B. 377, 2025 N.H. Reg. Sess. (N.H. 2025) ................................................................. 5

H.B. 4624, 125th Gen. Assemb., 2023-2024 S.C. Reg. Sess. (S.C. 2024) ........................ 5

H.B. 495, 2025 Ky. Reg. Sess. (Ky. 2025) ..................................................................... 5

H.B. 501, 2025 Ky. Reg. Sess. (Ky. 2025) ..................................................................... 5

H.B. 648, 2023 La. Reg. Sess. (La. 2023) ...................................................................... 5

H.B. 668, 67th Leg., 2d Idaho Reg. Sess. (Idaho 2024) .................................................. 5

H.B. 68, 135th Gen. Assemb., 2023-2024 Ohio Reg. Sess. (Ohio 2024) ........................ 5

H.B. 71, 67th Leg., 1st Idaho Reg. Sess. 2023 (Idaho 2023) ........................................... 5

H.B. 808, 2023-2024 N.C. Reg. Sess. (N.C. 2023) ....................................................... 5

Ky. Rev. Stat. Ann. §197.280 .............................................................................. 5, 39

National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159 §708,
138 Stat. 1945 (2024) ...................................................................................... 6

S.B. 1, 113th Gen. Assemb., 2023-2024 Tenn. Reg. Sess. (Tenn. 2023) ........................ 5

S.B. 14, 88th Leg. Sess., (Tex. 2023) ............................................................................ 5

S.B. 140, 2023-2024 Ga. Reg. Sess. (Ga. 2023) ........................................................... 5

S.B. 150, 2023 Ky. Reg. Sess. (Ky. 2023) ..................................................................... 5

S.B. 184, 2022 Ala. Reg. Sess. (Ala. 2022) ................................................................... 5

S.B. 2, 2025 Ky. Reg. Sess. (Ky. 2025) ......................................................................... 5

S.B. 254, 2023 Fla. Reg. Sess. (Fla. 2023) .................................................................... 5

S.B. 2861, 113th Gen. Assemb., 2023-2024 Tenn. Reg. Sess. (Tenn. 2023) ................... 5

S.B. 480, 123d Gen. Assemb., 2023 Ind. Reg. Sess. (Ind. 2023) .................................... 5

S.B. 49, 2023 Mo. Reg. Sess. (Mo. 2023) ..................................................................... 5

S.B. 613, 2023 Okla. Reg. Sess. (Okla. 2023) ............................................................... 5

S.B. 63, 2025-2026 Kan. Reg. Sess. (Kan. 2025) .......................................................... 5

S.F. 538, 90th Gen. Assemb., 2023-2024 Iowa Reg. Sess. (Iowa 2023) ......................... 5

S.F. 99, 67th Wyo. Leg., 2024 Budget Sess. (Wyo. 2024) ............................................. 5

**Other Authorities**

Br. of Respondents L.W., et al.,
   *United States v. Skrmetti*, No. 23-477 (U.S. Aug. 27, 2024) ...........................................34

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 42 U.S.C. §1983 and the Eighth Amendment, 28 U.S.C. §1343. R.1 at 5.[1]

This Court has appellate jurisdiction under 28 U.S.C. §1291 because the district court entered partial final judgment in favor of Plaintiffs and issued a pair of class-wide permanent injunctions preventing enforcement of SB185's restrictions on the use of taxpayer funds for hormonal interventions. R.94 at 27-29 & n.14; R.95; *see also* 28 U.S.C. §1292(a)(1) (permitting appeals from orders granting injunctive relief). Defendants timely appealed the entry of partial final judgment and the class-wide permanent injunctions on December 5, 2025. R.96.

## INTRODUCTION

This appeal is about whether inmates have a constitutional right to taxpayer-funded sex-change interventions. In May 2025, the General Assembly enacted, and Governor Kemp signed, SB185, which prohibits the use of taxpayer funds for certain sex-change interventions in the correctional system. Plaintiffs Yohansan Jovan Stewart, Sylvester Horton, Terrell Montiel Madison, Brynn Wilson, and John Doe, five inmates in the custody of the Georgia Department of Corrections, sued under §1983 and the Eighth Amendment, claiming that SB185 is unconstitutional because it does not comport with treatment protocols endorsed by various advocacy groups. The district court

---

[1] Citations of the district court docket are formatted as R.X at Y or R.X ¶Y. Citations of this Court's or other courts' dockets are formatted as Dkt.X at Y or Dkt.X ¶Y. All citations reference internal pagination and paragraph numbers.

agreed, entered partial final judgment for Plaintiffs, certified two classes, and permanently enjoined prison officials from enforcing SB185 with respect to cross-sex hormones.

The district court's order must be reversed. This Court's decision in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), *rehearing denied* 114 F.4th 1241 (2024), and the Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025), already rejected Equal Protection and Due Process claims seeking to override state laws restricting sex-change interventions. To avoid those rulings, Plaintiffs fashioned an Eighth Amendment claim instead. But the outcome is the same: Nothing in the Constitution authorizes federal courts to encroach on a state's traditional police powers and override the policy choices of a state legislature with respect to controversial and unproven sex-change interventions.

The Eighth Amendment deliberate indifference standard ensures that inmates' care is not "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020). If anything, the Eighth Amendment standard is even *more deferential* to state legislatures than the rational basis standard applied in *Skrmetti* and *Eknes-Tucker*, as it requires subjective recklessness in addition to objectively conscience-shocking treatment. *Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc).

Under that standard, this should be an easy case. Many of the arguments Plaintiffs advance—such as the notion that the Constitution requires the adoption of

2

World Professional Association for Transgender Health (WPATH) treatment protocols for cross-sex hormones—were squarely considered and rejected in *Skrmetti* and *Eknes-Tucker*. Indeed, the upshot of the district court's reasoning is that inmates have a greater constitutional right to sex-change interventions than the public at large. But it "cannot possibly be the law" that the state's power to regulate controversial medical interventions stops at the front door of a correctional facility. *Keohane v. Fla. Dep't of Corr., Sec'y.*, 952 F.3d 1257, 1278 (11th Cir. 2020).

The district court enjoined SB185 only by misapplying the reasoning of *Skrmetti* and *Eknes-Tucker*, blinding itself to medical studies acknowledging the weak (or nonexistent) evidence supporting cross-sex hormones, and effectively incorporating WPATH standards into constitutional law. And the class certification and permanent injunction orders exceed important limits imposed by the Prison Lititgation Reform Act and Article III. This Court should reverse the decision below, vacate the permanent injunctions, and remand with orders to enter partial final judgment for Defendants.

## STATEMENT OF THE ISSUES

The issues presented for appeal are:

1. Whether the Eighth Amendment's prohibition on cruel and unusual punishments requires states to fund and facilitate unproven and controversial sex-change interventions in prisons.

2. Whether the district court's Rule 23(b)(2) class certifications and corresponding class-wide permanent injunctions violate the PLRA's limitations on the scope of equitable relief in prison conditions cases.

3. Whether permitting inmates not receiving cross-sex hormones before SB185 to seek injunctive relief without showing that they were entitled to such hormones or that an injunction would make it substantially likely they would ever receive them violated Article III.

## STATEMENT OF THE CASE

### I.      Policymakers across the country have enacted numerous laws regulating sex-change interventions, including cross-sex hormones.

In recent years, the extent to which governments should ban, prohibit the use of public funds for, or otherwise regulate sex-change interventions like the provision of cross-sex hormones has been a hotly contested question of public policy. *See United States v. Skrmetti*, 605 U.S. 495, 525 (2025). Faced with "an ongoing debate among medical experts regarding the risks and benefits associated with administering … hormones to treat gender dysphoria, gender identity disorder, and gender incongruence," many state legislatures "respond[ed] directly to [the] uncertainty" by banning the interventions outright, at least in certain circumstances (*e.g.*, for minors and young adults). *Id.* at 523.

The Supreme Court has acknowledged this trend, noting that in the last three years alone "more than 20 States have enacted laws banning the provision of sex transition treatments to minors, while two have enacted near total bans." *Id.* at 504. Put

differently, more than twenty states currently ban the administration of the precise hormonal interventions at issue in this appeal—estrogen, testosterone, and testosterone blockers given for sex reassignment purposes—in at least some circumstances.[2]

Many of these states' laws expressly prohibit the use of public funds to facilitate the banned interventions.[3] And at least one of them both explicitly applies to prisons and has been upheld against a similar Eighth Amendment challenge. *See* Ky. Rev. Stat. Ann. §197.280 (implementing S.B. 2 (2025)); *Marcum v. Crews*, 2025 WL 2630922 (E.D. Ky. Sept. 12) (denying motion for preliminary injunction in Eighth Amendment challenge); *Marcum v. Crews*, No. 25-5840, Dkt.26 (6th Cir. Oct. 23, 2025) (denying plaintiff's motion for an injunction pending appeal).

---

[2] *See, e.g.*, S.B. 184, 2022 Ala. Reg. Sess. (Ala. 2022); H.B. 1570, 93d Gen. Assemb., 2021 Ark. Reg. Sess. (Ark. 2021); S.B. 254, 2023 Fla. Reg. Sess. (Fla. 2023); S.B. 140, 2023-2024 Ga. Reg. Sess. (Ga. 2023); H.B. 71, 67th Leg., 1st Idaho Reg. Sess. 2023 (Idaho 2023); H.B. 668, 67th Leg., 2d Idaho Reg. Sess. (Idaho 2024); S.B. 480, 123d Gen. Assemb., 2023 Ind. Reg. Sess. (Ind. 2023); S.F. 538, 90th Gen. Assemb., 2023-2024 Iowa Reg. Sess. (Iowa 2023); S.B. 63, 2025-2026 Kan. Reg. Sess. (Kan. 2025); S.B. 150, 2023 Ky. Reg. Sess. (Ky. 2023); H.B. 495, 2025 Ky. Reg. Sess. (Ky. 2025); H.B. 501, 2025 Ky. Reg. Sess. (Ky. 2025); S.B. 2, 2025 Ky. Reg. Sess. (Ky. 2025); H.B. 648, 2023 La. Reg. Sess. (La. 2023); H.B. 1125, 2023 Miss. Reg. Sess. (Miss. 2023); S.B. 49, 2023 Mo. Reg. Sess. (Mo. 2023); H.B. 377, 2025 N.H. Reg. Sess. (N.H. 2025); H.B. 808, 2023-2024 N.C. Reg. Sess. (N.C. 2023); H.B. 1254, 68th Leg. Assemb., 2023-2024 N.D. Reg. Sess. (N.D. 2023); H.B. 68, 135th Gen. Assemb., 2023-2024 Ohio Reg. Sess. (Ohio 2024); S.B. 613, 2023 Okla. Reg. Sess. (Okla. 2023); H.B. 4624, 125th Gen. Assemb., 2023-2024 S.C. Reg. Sess. (S.C. 2024); H.B. 1080, 2023 S.D. Reg. Sess. (S.D. 2023); S.B. 1, 113th Gen. Assemb., 2023-2024 Tenn. Reg. Sess. (Tenn. 2023); S.B. 2861, 113th Gen. Assemb., 2023-2024 Tenn. Reg. Sess. (Tenn. 2023); S.B. 14, 88th Leg. Sess., (Tex. 2023); H.B. 2007, 2023 W. Va. Reg. Sess. (W. Va. 2023); S.F. 99, 67th Wyo. Leg., 2024 Budget Sess. (Wyo. 2024).

[3] *See, e.g.*, Ark. H.B. 1570 (2021); Fla. S.B. 254 (2023); Kan. S.B. 63 (2025); Ky. H.B. 495 & 501 (2025); Ky. S.B. 2 (2025); Mo. S.B. 49 (2023); Miss. H.B. 1125 (2023); N.C. H.B. 808 (2023); Ohio H.B. 68 (2024); S.C. H.B. 4624 (2024); Tex. S.B. 14 (2023).

The federal government has also taken significant steps to restrict the use of public funding to facilitate sex-change interventions. In 2024, Congress prohibited Tricare, the U.S. military's health insurance program, from paying claims for the provision of cross-sex hormonal interventions to minors. *See* National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159 §708, 138 Stat. 1945 (2024).

In sum, the national policy environment has shifted overwhelmingly towards stricter regulation of sex-change interventions and less public funding for the interventions that remain. A key driver of this shift has been a growing awareness among policymakers that the purported benefits of these interventions are unproven and rest on what even their proponents concede to be low-quality evidence (such as studies with biased designs, small sample sizes, and potential confounding factors). *See, e.g.*, *Skrmetti*, 605 U.S. at 523.

In particular, multiple systematic reviews of the medical evidence have been sharply critical of the strength of evidence underlying the treatment guidelines offered by advocacy groups such as WPATH. *See, e.g.*, R.72-2 (Baker Review); R.72-3 (Cass Review). For example, proponents of sex-change interventions often claim they are needed to prevent suicide, but a 2021 systematic review by Dr. Kellan Baker and a team of physicians from Johns Hopkins found that it could not "draw any conclusions … about whether hormone therapy affects death by suicide among transgender people." R.72-2 at 12. The Baker Review also found that the "strength of evidence" for purported benefits to quality of life, depression, and anxiety "is low." *Id.* at 8.

6

The high-profile Cass Review from the United Kingdom (which has been cited by both this Court and the Supreme Court), similarly found that "we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." R.72-3 at 13. The Cass Review confirmed that "[t]he quality of the evidence base for interventions for gender incongruence and gender dysphoria is a source of debate and contention." *Id.* at 47.

## II.     The General Assembly enacted SB185 to prohibit using public funds to facilitate unproven sex-change interventions in prisons.

On March 3, 2025, the Georgia Senate voted to pass SB185. About a month later, the House of Representatives followed suit. Governor Brian Kemp signed the bill into law on May 8, upon which SB185 became immediately effective. R.81 ¶87.

SB185 amended the Georgia Code to prohibit the use of state funds or resources "for the following treatments for state inmates: (A) Sex reassignment surgeries or any other surgical procedures that are performed for the purpose of altering primary or secondary sexual characteristics; (B) Hormone replacement therapies; and (C) Cosmetic procedures or prosthetics intended to alter the appearance of primary or secondary sexual characteristics." Ga. Code Ann. §42-5-2(e)(1).

Like the Alabama law in *Eknes-Tucker* and SB1 in *Skrmetti*, SB185 draws lines solely based on the medical use of the interventions at issue. Specifically, SB185's funding prohibition turns on whether a covered intervention is administered for the purpose of sex reassignment. SB185 does not apply to other "medical conditions where such

7

treatments are considered medically necessary, provided that such condition is not gender dysphoria or the purpose of such treatment is not for sex reassignment"; to treat "individuals born with a medically verifiable disorder of sex development"; to treat "individuals with partial androgen insensitivity syndrome"; and when provided as treatment "solely for the purpose of transitioning [existing recipients] off such therapy." Ga. Code Ann. §42-5-2(e)(2).

### III.    Procedural history.

After the new law took effect, Defendants began planning its implementation, with GDC beginning the process of tapering off inmates currently receiving hormones in early July 2025. R.81 ¶¶31, 89. On August 8, 2025—three months after the law was enacted and roughly a month into GDC's implementation of the tapering process—Plaintiffs filed suit. R.81 ¶87-88.

Horton, Wilson, and Doe had been receiving hormones before SB185 became law and were being tapered off those hormones at the time of the suit. R.84-1 ¶¶1-15. Stewart and Madison claimed to be seeking (but hadn't yet received) similar interventions. R.84-1 ¶¶16-21. Because *Eknes-Tucker* and *Skrmetti* foreclosed any Equal Protection or Due Process theory, Plaintiffs raised the same basic arguments under the Eighth Amendment.

Although Plaintiffs' complaint challenges all aspects of SB185, they moved for injunctive relief solely with respect to hormones (and that remains the only piece of the case currently before this Court). Plaintiffs moved for provisional class-certification, a

class-wide preliminary injunction, and extremely expedited consideration. RR.2-4. The

district court granted the motion to expedite and required Defendants to respond to

hundreds of pages of briefing and exhibits and two expert reports within six business

days. R.10. In response, Defendants cited high-profile studies including the Baker Re-

view and Cass Review, which cast serious doubt on the claimed benefits of cross-sex

hormones. R.25 at 13-14. Defendants also provided direct evidence of the care available

to Plaintiffs in the form of declarations from Dr. Gerald Wynne, Statewide Medical

Director for GDC's contractor, and Dr. Kathyrn Haynes Owen, GDC's Statewide

Mental Health Director. *See* R.25-2 (Owen Decl.), R.28-1 (Wynne Decl.), R.46-1 (Suppl.

Wynne Decl.).

The district court held a hearing in late August and issued an order on September

4, 2025, certifying two provisional Rule 23(b)(2) classes: a "receiving class" covering all

inmates who had been receiving cross-sex hormones before SB185's effective date and

a "requesting class" covering all transgender-identifying inmates requesting to receive

similar interventions. R.50 at 50. The same order granted Plaintiffs' request for class-

wide preliminary injunctive relief preventing Defendants and GDC from enforcing

SB185's hormonal provisions for 90 days. R.50 at 62-63; 18 U.S.C. §3626(a)(2).

The district court held that SB185 violated the Eighth Amendment because it

prohibited the interventions favored by Plaintiffs' experts and advocacy groups like

WPATH, framing the law as a "[b]lanket refusal to provide a medically indicated treat-

ment." R.50 at 34. The court gave "controlling weight to [Plaintiffs'] experts' testimony"

9

that these interventions were medically necessary, ignoring the State's evidence to the contrary and effectively creating a rule that advocacy groups and professional associations dictate the constitutional standard.

Defendants timely appealed the preliminary injunction order and sought a stay from this Court. *Benjamin v. Oliver*, No. 25-13060, Dkt.7 (11th Cir. Sept. 8, 2025). While the stay motion remained pending, the district court directed the parties to engage in expedited briefing on class certification, summary judgment, and permanent injunctive relief, using a set of agreed-upon procedures to allow the preliminary injunction to be made final before it expired as a matter of law on December 3. R.67, 70. The parties agreed "that the record is complete," that they would not "submit additional evidence," and that they would "stipulate to the admissibility of all evidence submitted to date." R.69 ¶3.

After the second round of expedited briefing, the district court issued an order finalizing class certification, granting Plaintiffs partial final judgment on their claims regarding cross-sex hormones, and issuing corresponding class-wide permanent injunctions. R.94. The district court's permanent injunction order "largely incorporate[d] the legal conclusions of the Preliminary Injunction Order by reference" and stated that review of the earlier order was "therefore critical to obtain a full understanding of the Court's conclusions." R.94 at 3-4.

Remarkably, although the district court accepted Plaintiffs' medical evidence at face value, it refused to consider the Cass and Baker Reviews, the landmark systematic

10

reviews questioning the evidence supporting cross-sex hormonal interventions. R.94 at 14-17. The court agreed with Plaintiffs that the Reviews were not "submitted" as evidence in the preliminary injunction record, despite being discussed extensively in Defendants' briefing, the hearing, and the preliminary injunction order. *Id.* at 14-16. The court further concluded that it would not consider the Reviews for purposes of determining SB185's constitutionality anyway because the State cited them directly rather than funneling them through an expert report. *Id.* at 16-17.

Because the entry of partial final judgment and issuance of a permanent injunction mooted the pending appeal and stay motion, Defendants appealed again and filed a motion to expedite, which this Court granted. *See Benjamin v. Oliver*, No. 25-13060, Dkt.32 (11th Cir. Dec. 18, 2025) (dismissing appeal and denying stay motion as moot); *Benjamin v. Oliver*, No. 25-14263, Dkt.21 (11th Cir. Dec. 19, 2025) (granting motion to expedite).

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment underlying a permanent injunction *de novo. SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1325 (11th Cir. 2022). Though a permanent injunction itself is reviewed for abuse of discretion, this Court reviews the district court's "findings of fact for clear error, and its application of the law *de novo*, premised on the understanding that application of an improper legal standard is never within a district court's discretion." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006) (cleaned up). Orders granting

class certification under Rule 23 are reviewed for abuse of discretion, with claims of legal error reviewed *de novo*. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1275 n.9, 1278 (11th Cir. 2000). Finally, issues of Article III standing are always reviewed *de novo*. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009).

## SUMMARY OF ARGUMENT

The district court's decision severely understates the importance of *Skrmetti* and *Eknes-Tucker*. Those cases hold that rational basis review applies to bans on the same sex-change interventions at issue here and permit state legislatures to ban those interventions outright for large segments of the general public. The Eighth Amendment's Cruel and Unusual Punishment Clause does not impose a stricter standard in the prison context. If anything, the Eighth Amendment standard is *even more deferential* because deliberate indifference requires both objectively conscience-shocking treatment and subjective recklessness; therefore, state legislatures can constitutionally decline to fund the same interventions in prisons.

The district court brushed aside these precedents in its preliminary injunction order because, in its view, they "involved issues of constitutional interpretation that did not rely on factual determinations about the medical standard of care." R.50 at 38. It made the same mistake in the permanent injunction order. R.94 at 20-23. But *Skrmetti* and *Eknes-Tucker* show how this Court and the Supreme Court have analyzed even more restrictive regulations on sex-change interventions in the context of constitutional claims governed by a deferential standard of review. And they further emphasize the

12

importance of deferring to state policy judgments in this hotly contested and ever-evolving area. Defendants' "reasoning by analogy" from *Skrmetti* and *Eknes-Tucker* is a "commonplace task for any lawyer or judge," *NYSRPA v. Bruen*, 597 U.S. 1, 28 (2022), yet the district court blinded itself to the importance of these critical precedents.

The district court also ignored highly relevant evidence that the interventions at issue are unproven and that the so-called "standards of care" published by advocacy groups like WPATH are unreliable. Defendants submitted and extensively discussed two systematic reviews, one commissioned by WPATH and published in the Journal of the Endocrine Society (the Baker Review, R.72-2) and the other commissioned by the United Kingdom's National Institute of Health (the Cass Review, R.72-3). Together, these Reviews demonstrate the "ongoing debate" that the Supreme Court recognized in *Skrmetti*, 605 U.S. at 523, by concluding that the purported benefits of the interventions Plaintiffs seek are supported by either low-quality evidence or no evidence at all. As the Cass Review put it, "we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." R.72-3 at 13.

Although both studies were cited and discussed in the briefing, hearing, and order at the preliminary injunction phase (as well as in stay briefing before this Court), the district court found that they had not been "submitted" for purposes of a stipulation deeming such evidence admitted at the summary judgment phase. It also refused to consider the Cass and Baker Reviews because Defendants had not funneled them

13

through a retained outside expert. The first ruling is a shockingly inaccurate representation of the parties' stipulation. And the second creates a special evidentiary rule inconsistent with how this Court and the Supreme Court have discussed similar evidence (including the Cass Review itself) in cases like *Skrmetti* and *Eknes-Tucker*.

Having ignored Defendants' evidence, the district court gave "controlling weight" to Plaintiffs' expert reports, which merely parrot the recommendations of WPATH and similar groups. R.50 at 41. By uncritically accepting Plaintiffs' evidence on medical necessity, the district court allowed the views of WPATH and various professional associations to dictate the constitutional standard. That is the precise analytical move that this Court and the Supreme Court rejected in *Skrmetti* and *Eknes-Tucker*. The district court also faulted GDC for having previously provided the interventions under policies that SB185 superseded, creating a constitutional one-way ratchet. In both respects, the decision below is largely interchangeable with the district court opinions that were reversed in *Skrmetti* and *Eknes-Tucker*. It should be reversed for the same reasons too.

Finally, the district court neglected this Court's recent interpretation of the deliberate indifference standard to require subjective recklessness and immunize reasonable responses to medical risk. R.23-24; *Wade*, 106 F.4th at 1253. Neither the General Assembly nor Defendants can be deemed to have acted with subjective recklessness in light of the ongoing medical debate, the dozens of state and federal laws that have been enacted regulating the interventions at issue (including one with a substantially similar

14

public funding prohibition for inmates), and the evidence showing that Defendants are providing comprehensive medical care to Plaintiffs. Rather, the General Assembly acted reasonably in enacting SB185 to prevent the use of public funds for controversial and unproven medical interventions. And Defendants acted reasonably in crafting a plan to implement SB185 that mitigated any risks that might result to Plaintiffs from the change in policy.

Compounding the court's errors on the merits, its class-certification and injunctive orders flouted the limits of the PLRA and Article III. The court's class-wide injunctive relief turned a case about five named plaintiffs into a vehicle for exercising sweeping federal control over medical treatment in the Georgia prison system on behalf of a constantly shifting pool of unidentified and absent class members. The class-wide injunction violates the PLRA's command that relief be limited to "a particular plaintiff," 18 U.S.C. §3626(a)(1)(A), and Plaintiffs entirely failed to show that the named plaintiffs had Article III standing to represent an amorphous class of those who might "request" hormones in the future.

This Court should reverse the decision below, vacate the preliminary injunction, and remand with instructions to enter partial final judgment for Defendants.

## ARGUMENT

I. **The Eighth Amendment does not mandate public funding of unproven and controversial sex-change interventions in prison.**

A. *Skrmetti* **and** *Eknes-Tucker* **underscore that courts should not second-guess legislative judgments in this area.**

1.    The district court's decision fails to give proper weight to binding precedent of this Court and the Supreme Court. In *Eknes-Tucker*, this Court rejected claims alleging a constitutional right to sex-change interventions under the Equal Protection Clause and the Due Process Clause. 80 F.4th 1205. The plaintiffs had challenged an Alabama law that made it a crime to "'engage in or cause' the prescription or administration of puberty blocking medication or cross-sex hormone treatment to a minor 'for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex.'" *Id.* at 1210.

The district court in *Eknes-Tucker* (like the district court here) enjoined the law by flyspecking every aspect of Alabama's policy judgments. *See Boe v. Marshall*, 603 F. Supp. 3d 1131, 1144-48, 1151 (M.D. Ala. 2022) (later re-captioned *Eknes-Tucker v. Marshall*). The district court faulted Alabama for "produc[ing] no credible evidence to show that transitioning medications are 'experimental.'" *Id.* at 1145. And it deferred to the plaintiffs' assertion "that at least twenty-two major medical associations in the United States endorse transitioning medications as well-established, evidence-based treatments for gender dysphoria in minors." *Id.*

16

Reversing the preliminary injunction, this Court held that the district court applied an overly stringent standard of review. *Eknes-Tucker*, 80 F.4th at 1230. The panel explained that, because Alabama's law did not classify based on "sex, gender nonconformity, [or] transgender status," or infringe any fundamental right, it was subject to rational basis review—a deferential standard that the law was "exceedingly likely to satisfy." *Id.* The full Court declined to revisit the panel decision en banc, with Judge Lagoa concurring in the denial of rehearing to reiterate that "'when a legislature undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.'" *Eknes-Tucker*, 114 F.4th at 1248 (Lagoa, J., concurring).

Like *Eknes-Tucker*, *Skrmetti* began with a preliminary injunction preventing Tennessee officials from enforcing a state law restricting hormonal sex-change interventions. 679 F. Supp. 3d 668 (M.D. Tenn. 2023). Under the law (called SB1) providers could "administer … hormones to minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence." *Skrmetti*, 605 U.S. at 511. Thus, just like the Alabama law in *Eknes-Tucker*, SB1 banned the precise hormonal interventions at issue here for a significant segment of the general public. *Id.* at 495.

Also like *Eknes-Tucker*, *Skrmetti* involved a lower court second-guessing the factual basis for a state law restricting access to controversial and unproven interventions. *See* 679 F. Supp. 3d at 700-12. The district court deferred to WPATH's and the Endocrine Society's purported "standards of care." *Id.* at 700-01. And it credited the view of

17

various professional groups that the interventions SB1 banned were "appropriate and medically necessary treatments … when clinically indicated" as evidence of unconstitutionality. *Id.* at 709.

Again like in *Eknes-Tucker*, the appellate court vacated the preliminary injunction after rejecting heightened scrutiny and emphasizing that "[r]ational basis review … *requires deference to legislatures, not to medical experts or trial court findings.*" *L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023) (emphasis added).

The Supreme Court affirmed. Chief Justice Roberts explained in his opinion for the Court that because providers are permitted to "administer … hormones to minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence," SB1 is an age and "medical use" classification "subject to only rational basis review." *Id.* at 511; *see also Vacco v. Quill*, 521 U.S. 793, 799-808 (1997).

Applying that deferential standard, the Supreme Court held that SB1 was "clearly" constitutional. *Id.* at 498. The Court grounded its conclusion in the principle that state legislatures have especially "'wide discretion to pass legislation'" regulating sex-change interventions, including cross-sex hormones, because the topic is a subject of "'medical and scientific uncertainty.'" *Id.* at 524. With that uncertainty in mind, the Court deferred to Tennessee's policy choices with respect to the "ongoing debate" regarding the risks and benefits of "administering … hormones to treat gender dysphoria, gender identity disorder, and gender incongruence." *Id.* at 523-24.

18

**2.**    The district court nonetheless gave little weight to *Skrmetti* and *Eknes-Tucker* because they purportedly "involved issues of constitutional interpretation that did not rely on factual determinations about the medical standard of care." R.50 at 38-39; R.94 at 21. And it suggested that because "this case does not involve treating minors," criticisms of groups like WPATH that bolstered the holdings in *Eknes-Tucker* and *Skrmetti* are "inapt." R.50 at 12 n.2, 38; *see also* R.94 at 21. The court was wrong on both counts.

Although *Skrmetti* and *Eknes-Tucker* did involve claims under different constitutional provisions, the *reasoning* of those cases is critically relevant here. Most notably, both cases emphasize the importance of *deference to state legislatures* when they exercise traditional policymaking authority in this complex, ever-evolving, and controversial area. Courts must "decline [any] invitation to second-guess the lines that [a state law] draws," *id.* at 524, as regulations on this controversial topic "carr[y] with [them] the weight of fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field," *id.* at 525. This last point remains true even in the face of "arguments … that courts should defer to [the] so-called expert consensus" of groups like WPATH that claim sex-change interventions are medically necessary for their recipients. *Id.* at 530 (Thomas, J., concurring).

Nor can *Skrmetti* and *Eknes-Tucker* be brushed aside because they involved minors. The Supreme Court held in *Skrmetti* that "[c]lassifications that turn on age *or* medical use are subject to only rational basis review," and that even outright bans on sex-

19

change interventions "classif[y] on the basis of medical use." 605 U.S. at 511 (emphasis added). The fact that the Tennessee law involved minors in no way affects the Court's reasoning—fully applicable here—that state classifications based on "medical use" are reviewed under a highly deferential standard. Nor does age affect the need for deference to state legislative judgments in this complex, evolving, and controversial area of public policy. Simply put, *Skrmetti* and *Eknes-Tucker* would have applied an equally deferential standard of review had Tennessee and Alabama banned these interventions for adults, too.

At bottom, the district court's order attempts to avoid the logic of *Skrmetti* and *Eknes-Tucker* as "either distinguishable or dicta or both." *Lange v. Houston Cnty.*, 152 F.4th 1245, 1253 (11th Cir. 2025) (en banc). But, just three months ago, this Court rejected a similar effort to undermine *Skrmetti* by limiting its logic to the Equal Protection context. *See id.* Though *Lange* was a Title VII case and "the plaintiffs' claim in *Skrmetti* arose under the Equal Protection Clause," the en banc Court held that "[t]he Supreme Court's reasoning in *Skrmetti* applie[d] equally" and controlled the case. *Id.* at 1252-53. Similarly, although *Skrmetti* was an Equal Protection case and this one is not, the Supreme Court's reasons for "declin[ing] … to second-guess the lines that SB1 dr[ew]," 605 U.S. at 524, "appl[y] equally" to the (at least) equally deferential deliberate indifference standard, *Lange*, 152 F.4th at 1252. By ignoring *Skrmetti* and *Eknes-Tucker* despite their obvious relevance, the district court committed the same analytical error

20

this Court identified in *Lange*. Like the plaintiffs' unsuccessful arguments in *Lange*, Plaintiffs' arguments that *Skrmetti* and *Eknes-Tucker* have nothing to say about this case fail.

### B. The Eighth Amendment deliberate indifference standard gives state officials even greater deference than rational basis review, and SB185 easily passes muster.

**1.** Plaintiffs, doubtless aware that Equal Protection and Due Process claims would be a non-starter after *Skrmetti* and *Eknes-Tucker*, repackaged the same basic claims as applications of the Eighth Amendment deliberate indifference standard. But although the rational basis test is a "'relatively relaxed standard'" under which courts defer to legislative judgments if there is a "'reasonably conceivable state of facts that could provide a rational basis for'" the line a statute draws, *Skrmetti*, 605 U.S. at 522, the deliberate indifference standard is, if anything, even *more deferential*. That means SB185 "clearly" does not violate the Eighth Amendment in the same way it "clearly" does not violate the Equal Protection and Due Process Clauses. *Id.*

Start from the baseline: "'Medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hoffer*, 973 F.3d at 1271 (cleaned up. That means an inmate's treatment need not be "perfect, the best obtainable, or even very good." *Id.* This Court has been clear that the Eighth Amendment does not constitutionalize the law of medical malpractice, *e.g.*, *Ireland v. Prummell*, 53 F.4th 1274, 1295 (11th Cir. 2022), much less the "standards of care promulgated by [WPATH]," *Bayse v.*

*Ward*, 147 F.4th 1304, 1313 (11th Cir. 2025); *see also Gibson v. Collier*, 920 F.3d 212, 220-23 (5th Cir. 2019) (departure from WPATH guidelines not deliberate indifference).

Confining deliberate indifference to truly conscience-shocking treatment creates a commonsense rule: a "simple difference in medical opinion" between state officials and an inmate about the "latter's diagnosis or course of treatment fails to support a claim of cruel and unusual punishment." *Hoffer*, 973 F.3d at 1273 (cleaned up). Put differently, if the adequacy of an inmate's care is "the subject of genuine, good-faith disagreement between healthcare professionals," there is no claim for deliberate indifference. *Id.*

This stringent standard is necessary to keep the deliberate indifference doctrine from contradicting the original meaning of the Cruel and Unusual Punishment Clause of the Eighth Amendment. At the founding, the term "cruel" was often defined "to mean '[p]leased with hurting others; inhuman; hard-hearted; void of pity; wanting compassion; savage; barbarous; unrelenting,' 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773), or '[d]isposed to give pain to others, in body or mind; willing or pleased to torment, vex or afflict; inhuman; destitute of pity, compassion or kindness,' 1 N. Webster, An American Dictionary of the English Language (1828)." *Bucklew v. Precythe*, 587 U.S. 119, 130 (2019).

As *Eknes-Tucker* and *Skrmetti* confirm, there is nothing "savage," "barbarous," or "inhuman" about a state legislature restricting access to unproven and controversial hormonal interventions. (The rational-basis test is certainly forgiving, but no one thinks

it allows states to engage in savage acts of barbarism.) Rather, such regulations "carr[y] with [them] the weight of fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." *Skrmetti*, 605 U.S. at 525. A version of the deliberate indifference doctrine that made a constitutional claim out of every state official's departure from WPATH's preferred course of treatment would be far too broad and unrecognizable as an original matter.

Voices on both sides of these "debates raise sincere concerns," and "the implications for all are profound." *Id.* But the Constitution "does not resolve these disagreements" or "afford [federal courts] license to decide them as [they] see best." *Id.* That is no less true in the Eighth Amendment context than under the Fourteenth Amendment's Equal Protection Clause or Due Process Clause. *See Bucklew*, 587 U.S. at 130 (explaining that "the judiciary bears no license to end a debate reserved for the people and their representatives" under the Eighth Amendment).

Nor is there anything "unusual" about laws and policies strictly regulating (or even banning) sex-change interventions or prohibiting public funding of them. *Gibson*, 920 F.3d at 226-27. Far from it, such laws are common and becoming more so with each passing year as the science continues to evolve. *See supra* nn.2-3. In fact, it is difficult to imagine something less "unusual" than a policy choice "regularly or customarily employed," to at least some extent, by more than twenty states as applied to far larger non-prison populations. *Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (Op. of Scalia, J.); *cf. Bucklew*, 587 U.S. at 132 (explaining that it was "instructive" to contrast hanging,

23

a "predominant" method of execution the Eighth Amendment was universally under-stood to permit, with the more "unusual" methods it was understood to prohibit).

Declining to expend public funds to facilitate an inmate's preferred sex-change interventions is also a far cry from the "'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). That is especially true when the plaintiff's preferred treatment is controversial and unproven, and the alternative treatments are alleged to be unacceptable only because they *are not* the preferred treatment. *See Hoffer*, 973 F.3d at 1273.

To be sure, the Supreme Court has held that deliberate indifference to an inmate's serious medical need can encompass "pain and suffering which no one suggests would serve any penological purpose." *Estelle*, 429 U.S. at 103-04. But as this Court has explained, for an inmate to meet that standard (much less show that no reasonable factfinder could conclude otherwise), he must demonstrate that the challenged care was "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hoffer*, 973 F.3d at 1271.

That is at least as deferential a test as rational basis review, under which *Eknes-Tucker* and *Skrmetti* upheld outright bans on the same disputed interventions in certain circumstances. If anything, this Court's deliberate indifference precedent is even more deferential to state officials than rational basis review because it requires *both* that an inmate's treatment be objectively conscience-shocking and that state officials act with "'subjective recklessness as used in the criminal law,'" which means they must have

24

"actually [known] that [their] conduct—[their] own acts or omissions—put the plaintiff at substantial risk of serious harm." *Wade*, 106 F.4th at 1253

2.      Applying these settled principles of Eighth Amendment doctrine, Defendants' implementation of SB185 was anything but deliberate indifference. Far from conscience-shocking, SB185 is a rational response to a contested policy question characterized by "fierce … debates." *Skrmetti*, 605 U.S. at 525. Prohibiting the use of public funds for a controversial set of medical interventions—the purported benefits of which are unproven and rest on what even proponents concede to be low-quality evidence—is a quintessentially permissible legislative choice. The Eighth Amendment does not allow an inmate to second-guess that choice based on "a simple difference in medical opinion" or a demand for a different course of treatment. *Hoffer*, 973 F.3d at 1273.

Georgia's policy decision not to use taxpayer funds for hormonal sex-change interventions in its prison system is amply justified by the utter lack of reliable medical evidence supporting such interventions. Defendants offered extensive scientific evidence that cross-sex hormones are unproven and controversial, with even proponents acknowledging that the evidence base is weak and low-quality. Two high-profile studies (which Defendants have cited since their first brief in this litigation, R.25 at 13-14) are especially relevant:

***Baker Review.*** The Baker Review was a systematic review of the medical evidence regarding cross-sex hormonal interventions. It was hardly the product of hostility or animus toward such interventions: it was commissioned and funded by WPATH and

25

published in the Journal of the Endocrine Society. R.72-2 at 2-3. Because previous reviews suffered from methodological flaws (*e.g.*, most "did not require a minimum duration of hormone therapy," one "included only uncontrolled prospective cohorts," and another analyzed only adolescents), the Baker Review aimed to "update and more completely summarize" the evidence base regarding the alleged benefits of cross-sex hormones for transgender-identifying individuals. *Id.* at 2.

The Baker Review concluded the strength of evidence for *every claimed benefit of cross-sex hormones* (quality of life, depression, anxiety, and death by suicide) was either "low" or "[i]nsufficient." *Id.* at 5-6, 13. Indeed, of the studies the Baker Review analyzed all but three were assessed as having at least a moderate risk of bias. *Id.* at 5-6.

More specifically, the Baker Review found the "strength of evidence" that cross-sex hormones improve quality of life—for any patient, of any age—to be "low due to concerns about bias in study designs, imprecision in measurement because of small sample sizes, and confounding by factors such as gender-affirming surgery status." *Id.* at 8. Likewise, the Review found that the strength of evidence that cross-sex hormones decrease depression and anxiety was "low due to concerns about study designs, small sample sizes, and confounding." *Id.* And the single study that addressed death by suicide was assessed as having a "serious" risk of bias "due to the difficulty of identifying appropriate comparison groups and uncontrolled confounding by surgery." *Id.* at 11-12. The Baker Review ultimately could not "draw any conclusions … about whether hormone therapy affects death by suicide among transgender people." *Id.* at 12.

The district court concluded that the medical necessity of cross-sex hormones is so far beyond dispute that it would be conscience-shocking deliberate indifference not to provide them. Yet the Baker Review's conclusion (based on the entire landscape of research in this area) was far more modest: "[m]ore research is needed to further explore the relationship" between hormonal interventions and "[quality of life], death by suicide, and other psychological outcomes" in transgender-identifying persons. *Id.* at 13.

*Cass Review*: The General Assembly's decision not to fund unproven hormonal interventions also finds support in the high-profile Cass Review. R.72-3. Commissioned by the United Kingdom's National Institute of Health, Dr. Cass engaged in a multi-year effort to systematically examine the evidence supporting the purported benefits of, among other sex-change interventions, cross-sex hormones. Dr. Cass produced a voluminous report that has been cited in almost every case of this type since it was published. A core finding of that report is that WPATH "overstate[d] the strength of the evidence in making [its] recommendations." *Id.* at 132.

Dr. Cass's "systematic review of outcomes of masculinising/feminising hormones" observed that "[t]here is a lack of high-quality research assessing the outcomes of hormone interventions in adolescents with gender dysphoria/incongruence, and few studies that undertake long-term follow-up. No conclusions can be drawn about the effect on gender dysphoria, body satisfaction, psychosocial health, cognitive development, or fertility." R.72-3 at 33. Similarly (and consistent with the Baker Review), the

Cass Review found that, although "[i]t has been suggested that hormone treatment reduces the elevated risk of death by suicide," the "evidence found did not support this conclusion." *Id.*

Especially relevant here, the Cass Review analyzed several WPATH and Endocrine Society guidelines, all of which had low scores in the "Rigour of development" category. *See id.* at 128; *compare* R.11-1 (Ettner Decl.) (Plaintiffs' retained expert, who extensively cite the same WPATH and Endocrine Society publications); R.11-2 (Haw. Decl.) (same). Dr. Cass also built on the Baker Review's critiques. *See id.* at 131-32. For example, WPATH ignored or downplayed evidence that questioned the efficacy of "gender-affirming medical treatment," and continued to rely on flawed "studies that were already deemed as low quality" in the Baker Review. *Id.* at 131

Ultimately, the Cass Review "raise[d] serious questions about the reliability of current guidelines" and declined to recommend any WPATH or Endocrine Society publications for use in practice. *Id.* at 130. That is especially important because, as Dr. Cass explained, "[e]arly versions of … the Endocrine Society 2009 and [WPATH SOCv7] guidelines influenced nearly all the other guidelines" since. *Id.* Indeed, WPATH's SOC and the Endocrine Society's guidelines are "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society guideline." *Id.* This interconnectedness matters because WPATH SOCv8 "cite[s] many of the other national and regional guidelines to support some of its recommendations, despite these guidelines

28

having been considerably influenced by WPATH [SOCv7]." *Id.* "The circularity of this approach may explain why there has been an apparent consensus on key areas of practice despite the evidence being poor." *Id.* The practical result is a "lack of evidence-based guidelines." *Id.* at 28.

Dr. Cass's foreword sums up well the state of the medical evidence: "The reality is that we have *no good evidence* on the long-term outcomes of interventions to manage gender-related distress." R.72-3 at 13 (emphasis added).

\* \* \*

At most, Plaintiffs and their retained experts articulated a "genuine, good-faith disagreement" as to whether it is appropriate to provide cross-sex hormones. *Hoffer*, 973 F.3d at 1273. This disagreement is based on a differing view of the "ongoing debate among medical experts regarding the risks and benefits associated with administering … hormones to treat gender dysphoria, gender identity disorder, and gender incongruence" that the Supreme Court acknowledged in *Skrmetti*, 605 U.S. at 523.

For the same reasons the "so-called expert consensus," *id.* at 530 (Thomas, J., concurring), failed to override Tennessee's democratically enacted policy judgment in *Skrmetti*, the district court should not have overridden Georgia's similar judgment about the propriety of funding sex-change interventions in prisons. Rather, the General Assembly "is entitled to look at the competing evidence and draw its own conclusions."

29

*Eknes-Tucker*, 114 F.4th at 1266 (Lagoa, J., concurring). When a law constitutes a reasonable response to uncertainty, federal courts cannot "second-guess the lines that [state policymakers have] draw[n]." *Skrmetti*, 605 U.S. at 524.

### C. The district court's refusal to consider the Cass and Baker Reviews flouted the parties' agreement and was inconsistent with the Supreme Court and this Court's treatment of similar evidence.

The district court overrode the General Assembly's judgments and found SB185 to constitute deliberate indifference only by giving "controlling weight" to Plaintiff's retained third-party experts while blinding itself to the contrary evidence Defendants submitted showing the dubious benefits of cross-sex hormonal interventions. R.50 at 41. The court accepted Plaintiffs' argument that the Baker and Cass Reviews had not been "submitted" in the preliminary injunction record and concluded that "even if [it] were to consider [them] in the abstract, creating a fact dispute with them would require the testimony of an expert." R.94 at 14-17. That was error twice over.

1.      Because the district court's lengthy preliminary injunction order effectively resolved the merits, the parties agreed to proceed promptly to summary judgment. To that end, the parties explicitly stipulated "that the record is complete" (*i.e.*, that the preliminary injunction record would serve as the permanent injunction record) and that they would "stipulate to the admissibility of all evidence submitted to date." R.69 ¶3.

The Baker and Cass Reviews were plainly included under this standard. Defendants directly quoted from and relied on these studies in their preliminary injunction briefing. *See* R.25 at 13 (quoting directly from the Cass Review as cited by Justice

30

Thomas in *Skrmetti*), 14 (citing and quoting directly from the Baker Review). They were also addressed by the parties at the preliminary injunction hearing and in the court's opinion, with no suggestion by anyone that these materials were not properly before the court. *See* R.50 at 12 n.2 (discussing the Cass Review in the district court's preliminary injunction order); R.50 at 40 & n.6 (same for the Baker Review); R.56 at 28:18-30:1, 64:14-65:11 (Defendants' counsel discussing Cass and Baker at the preliminary injunction hearing); R.56 at 56:14-60:12 (same for Plaintiffs' counsel). Given that the Reviews were clearly presented to (and considered by) the district court at the preliminary injunction phase, the parties' stipulation "to the admissibility of all evidence submitted to date" should have been conclusive. R.69 ¶3.

Indeed, the district court's reasoning makes little sense on its own terms. It would be absurd to think that Defendants would have agreed to a closed record and to "stipulate to the admissibility of all evidence submitted to date" under circumstances that would have resulted in the exclusion of two of their most important pieces of evidence. R.69 ¶3. Defendants never would have agreed to such a heads-I-win-tails-you lose approach to the summary judgment proceedings that would have blinded the court to evidence dispelling the notion that cross-sex hormonal interventions lie beyond dispute.

**2.**    The district court was equally wrong to suggest that the Cass and Baker Reviews could be considered only if they were introduced and filtered through another expert. Applying a standard of review at least as deferential as rational basis "requires deference to legislatures, not to medical experts." *Skrmetti*, 83 F.4th at 488. This often

requires engaging directly with the State's primary source evidence, as several jurists did in *Skrmetti* and *Eknes-Tucker*.

The district court's approach is flatly inconsistent with the Supreme Court's approach to identical issues (indeed, to the identical *studies* cited by Defendants). The majority opinion in *Skrmetti* directly cited and discussed the Cass Review "to demonstrate the open questions regarding basic factual issues before medical authorities and other regulatory bodies." 605 U.S. at 524-25. So did Justice Thomas. *Id.* at 539, 544 (Thomas, J., concurring); *cf. id.* at 582 n.5 (Sotomayor, J., dissenting) (noting that Justice Thomas's concurrence "referenc[es] the Cass Review [and] peer-reviewed medical journals"). Between the various opinions, there are a more than a dozen direct citations of various reports and studies addressing the medical evidence regarding sex-change interventions. *See, e.g.*, *id.* at 505 (publications from Finland, the United Kingdom, Sweden, and Norway), 524-25 (the Cass Review); *id.* at 533-34, 539, 542 n.7, 544, (Thomas, J., concurring); *id.* at 581-82 & n.3, (Sotomayor, J., dissenting).

The district court's suggestion that published research must be digested for the court by a retained expert is also contrary to this Court's practice. Indeed, Judge Lagoa specifically criticized the district court in *Eknes-Tucker* for focusing its discussion on expert witnesses and "never mention[ing] any of" the "six journal articles and public-health reports [submitted by the State] that documented concerning data and evidence about the proscribed treatments." *Eknes-Tucker*, 114 F.4th at 1266-67 (Lagoa, J., con-

32

curring). Notably, Judges Lagoa and Rosenbaum (despite coming to very different conclusions on the merits) engaged in an extensive discussion of studies and primary source evidence relevant to the risks and benefits of the banned interventions, *including the Cass Review*, without intermediating the sources through an expert witness. *See, e.g.*, *id.* at 1248 & n.2, 1267-70 (Lagoa, J., concurring); *see also id.* at 1293 n.7, 1307 n.22 (Rosenbaum, J., dissenting) (same).

The single purportedly contrary authority cited in the permanent injunction order is a products liability case discussing whether an expert's testimony might be inadmissible under *Daubert*. R.94 at 17 (quoting *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1179 (S.D. Fla. 2022)). But whatever the rule might be in a products liability case destined for a lay jury, that approach makes little sense when the judge is directly considering the relevant evidence.

The district court's willful blindness to evidence that undermines its conclusions is especially egregious given that Defendants offered the Cass and Baker systematic reviews merely to illustrate "an ongoing debate among medical experts regarding the risks and benefits" of sex-change interventions that has been recognized and discussed at length by this Court and the Supreme Court. *Skrmetti*, 605 U.S. at 523; *see also Eknes-Tucker*, 114 F.4th at 1261 (Lagoa, J., concurring). Both cases included substantial discussion of primary source evidence, including the Cass Review. *See, e.g.*, *id.* at 1248 & n.2, 1267-70 (Lagoa, J., concurring), 1293 n.7 & 1307 n.22 (Rosenbaum, J., dissenting); *Skrmetti*, 605 U.S. at 524-25 (discussing Cass).

The district court's refusal to consider core components of Defendants' evidence was contrary to the parties' agreement, the prior course of proceedings, basic notions of fairness, and the practice of this Court and the Supreme Court.

### D. The district court's conclusions regarding "medical necessity" rest on the same arguments rejected by the Supreme Court and this Court and give undue weight to GDC's prior policies.

**1.** With Defendants' contrary evidence brushed aside, the district court concluded that SB185 violates the Constitution because it prevents inmates from receiving interventions that Plaintiffs' experts (parroting WPATH standards) assert are "medically necessary." *See, e.g.*, R.50 at 26-27. But the plaintiffs (and dissenting Justices) made those same arguments, *unsuccessfully*, in *Skrmetti*. *See* 605 U.S. at 582-83 (Sotomayor, J., dissenting) (arguing that the Court should defer to the views of medical associations that cross-sex hormones are "'appropriate and medically necessary' to treat gender dysphoria when clinically indicated"); Br. of Respondents L.W., et al. at 41-42, *United States v. Skrmetti*, No. 23-477 (U.S. Aug. 27, 2024) (arguing that SB1 is unconstitutional because it bans interventions that are "medically necessary").[4] The Supreme Court majority, by contrast, "decline[d] … to second-guess" SB1. *Skrmetti*, 605 U.S. at 524. SB185 deserves at least the same level of deference.

---

[4] In the Sixth Circuit, Judge White likewise argued in dissent that SB1 was unconstitutional because it banned interventions "well accepted" by "WPATH and the Endocrine Society" and "'major medical and mental health groups.'" *L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 506 (6th Cir. 2023) (White, J., dissenting). Plaintiffs' experts here relied on near-identical reasoning.

The notion that a court should defer to the plaintiffs' retained experts and the views of various professional associations regarding sex-change interventions also resembles the theory that initially prevailed in the district court in *Eknes-Tucker* but that this Court later rejected. *Compare Boe*, 603 F. Supp. 3d at 1144-48, *with* R.50 at 9-11 (favorably citing WPATH publications and the views of professional associations endorsing those publications as evidence of medical necessity); R.94 at 3-4 ("incorporat[ing] the legal conclusions of the Preliminary Injunction Order by reference").

More broadly, courts have refused to allow WPATH to dictate constitutional standards or supply the rule of decision in deliberate indifference cases. The en banc First Circuit refused to write WPATH standards into the Eighth Amendment in *Kosilek v. Spencer*, 774 F.3d 63, 89-90 (1st Cir. 2014) (en banc). The Fifth Circuit did the same in *Gibson*, 920 F.3d at 523-24. The Seventh Circuit, citing *Gibson* and *Kosilek*, broke from WPATH too. *See K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 611 (7th Cir. 2024). The Second Circuit held that failure to follow WPATH standards is not enough to show that an officer acted objectively unreasonably. *Clark v. Valletta*, 157 F.4th 201, 216 (2d Cir. 2025). And this Court held that WPATH's standards "'do not constitute evidence of medical necessity.'" *Bayse*, 147 F.4th at 1313 (cleaned up). WPATH should not dictate the constitutional standard here either.

This widespread skepticism of WPATH has proven to be well founded. "[L]eaked documents suggest that WPATH officials are aware of the risks of cross-sex hormones and other procedures yet are mischaracterizing and ignoring information

about those risks." *Eknes-Tucker*, 114 F.4th at 1249 (Lagoa, J., concurring). For example, one communication "frankly stated, '[o]ur concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" *Id.* at 1261. "[N]ewly released documents" also "suggest that WPATH tailored its [SOC] in part to achieve legal and political objectives." *Skrmetti*, 605 U.S. at 545 (Thomas, J., concurring). And "recent reporting has exposed that WPATH changed its medical guidance to accommodate external political pressure." *Id.* at 546. Together, these "[r]ecent revelations [that WPATH] bases its guidance on insufficient evidence and allows politics to influence its medical conclusions" provide a strong basis "for treating supposed authorities in this area with skepticism." *Id.* at 543.

**2.**    The district court further relied on the fact that previous GDC policies had authorized cross-sex hormones under a standard using the words "medically necessary." R.50 at 13-16; R.94 at 19 n.8. But the fact that GDC once provided cross-sex hormones under its former policies does not make the General Assembly's decision to *supersede* those policies conscience-shocking or intolerable to fundamental fairness.

There is nothing unusual about a state changing its policies or priorities over time, especially as legislators are exposed to new information about the risks and benefits of a particular intervention. *See, e.g., id.* at 504. Indeed, in 2023, the General Assembly enacted a law (SB140) banning cross-sex hormonal interventions or surgeries for minors, over objections from opponents that it was banning "established and medically

necessary" healthcare. *See Koe v. Noggle*, No. 23-cv-2904, Dkt.1 ¶1 (N.D. Ga. June 29, 2023). This was unquestionably a *change* of policy; hormonal interventions that had been offered to minors in Georgia before 2023 could now result in a doctor losing his or her license. But *Skrmetti* and *Eknes-Tucker* make clear that such choices are within the heartland of a state's traditional policymaking authority. SB140 is in force today, and SB185 should be as well.

At bottom, the district court's opinion seems to suggest that any change in policy is evidence of deliberate indifference. But that would short-circuit legislative policymaking in an area "fraught with medical and scientific uncertainties,'" precisely where the Supreme Court and Eleventh Circuit have most clearly stressed the primacy of state legislatures and the limited role of federal courts. *Eknes-Tucker*, 114 F.4th at 1248 (Lagoa, J., concurring); *Skrmetti*, 605 U.S. at 524.

That approach to the Eighth Amendment would also subject the correctional system to a one-way constitutional ratchet. Any time a prison official approves a medical intervention, it would become a fixed Eighth Amendment right that the General Assembly must permanently subsidize at taxpayer expense, even if further study and investigation undermined the propriety of providing it. That one-way ratchet has no relation to the original meaning of the Eighth Amendment's prohibition of cruel and unusual punishment, *see Gibson*, 920 F.3d at 226-28, is not what this Court's deliberate indifference precedent requires, and is anathema to *Skrmetti* and *Eknes-Tucker*'s teachings about the need for deference to state legislatures in this area.

### E. Neither Defendants nor the General Assembly acted with subjective recklessness.

In addition to conscience-shocking treatment, deliberate indifference requires that state officials act with "'subjective recklessness as used in the criminal law,'" which means they must have "actually [known] that [their] conduct—[their] own acts or omissions—put the plaintiff at substantial risk of serious harm." *Wade*, 106 F.4th at 1253.

At the ground level, Defendants' implementation of SB185 was not subjectively reckless. GDC officials and their contractors ensured that inmates who were receiving hormones before SB185 received regular medical follow-ups throughout the tapering process. And GDC's Statewide Mental Health Director explained that all inmates, including Plaintiffs, have access to the "full range of mental health services at a facility … as clinically appropriate," including "counseling, support from a psychologist, support from a psychiatrist, psychotropic medication as appropriate, … specialized housing units and programs," "[c]risis stabilization and increased counseling for suicide prevention." R.25-2 ¶¶7-8. All told, nothing suggests that Defendants ignored inmates' gender dysphoria. Rather, they worked diligently to treat Plaintiffs within the framework the General Assembly reasonably adopted in SB185.

At a higher level of generality, the General Assembly did not act with subjective recklessness, either. The Supreme Court has acknowledged an "ongoing debate" on the relative risks and benefits of using "hormones to treat gender dysphoria, gender identity disorder, and gender incongruence." *Skrmetti*, 605 U.S. at 523. A substantial number of

38

states have laws on the books outright banning these interventions in certain circumstances; some have explicitly defunded them; and a few have permitted insurers to deny coverage for them to private parties. *See supra* nn.2-3. There is even a nearly identical law prohibiting the use of public funds to facilitate these interventions in prisons. Ky. Rev. Stat. Ann. §197.280; *Marcum*, 2025 WL 2630922.

Multiple recent systematic reviews have also questioned the evidentiary base underlying cross-sex hormones. *See supra*, at 25-29. Those studies found that many of the claimed benefits of such interventions (such as reductions in quality of life, anxiety, depression, or suicide risk) were unproven or overstated, and that many of the studies cited by proponents had biased designs, small sample sizes, potential confounding factors, and other flaws. *See id.* On that record, it would be remarkable to hold that sex-change hormonal interventions are so indispensable to treating inmates, and the failure to provide them is so obviously reckless, that SB185 rises to the level of cruel and unusual punishment.

### F. Defendants' implementation of SB185 was a reasonable response to the risks posed by Plaintiffs' gender dysphoria.

Finally, even if a state official "'actually knew of a substantial risk to inmate health or safety,' he cannot be found liable … if he 'responded reasonably to [the] risk." *Wade*, 106 F.4th at 1253. This element, like the objective conscience-shocking prong, is at least as deferential as rational basis review.

After SB185 was passed but before the preliminary injunction was issued, GDC's implementation of SB185 was entirely reasonable. Drs. Wynne and Owen ensured that inmates undergoing tapering had access to all necessary medical and mental health care and would continue to receive treatment for gender dysphoria and any related complications. R.25-2 ¶¶7-16; R.28-1 ¶¶3-11; R.46-1 ¶¶3-5. But Plaintiffs do not want that care. They want more: cross-sex hormones. This Court has been clear that when an inmate's "complaint isn't that [prison officials are] providing *no* care, just that [they aren't] providing the more aggressive—[or] better—care that [the inmate] desire[s]," there is no claim for deliberate indifference. *Hoffer*, 973 F.3d at 1272. That is the case here.

Plaintiffs and their experts asserted, and the district court accepted, that the State Defendants engaged in conscience-shocking Eighth Amendment violations because providing inmates counseling and mental health treatment without cross-sex hormones is per se constitutionally inadequate. R.50 at 19, 35-36; R.94 at 5, 19-20. But that ignores Defendants' direct evidence from high-ranking officials that Plaintiffs are receiving adequate care.

Dr. Wynne's declarations explained the mechanics of tapering, including that patients "received an initial evaluation by mental health staff prior to tapering," were "monitored by mental health and medical professionals" including a monthly "meeting with the statewide medical director," and could request "additional medical care or evaluation if they [had] acute concerns." R.28-1 ¶6. And he discussed Plaintiffs' individual

40

medical histories, including their progress through the tapering process if applicable. R.28-1 ¶¶8-11; R.46-1 ¶¶3-5.

Dr. Owen's declaration stated that all offenders, including Plaintiffs "have access to mental health resources to address any distress that may result from the implementation of SB 185." R.25-2 ¶7. She confirmed that "[t]he full range of mental health services at a facility," including "counseling, support from a psychologist, support from a psychiatrist, psychotropic medication as appropriate, … specialized housing units and programs[,] [c]risis stabilization[,] and increased counseling for suicide prevention" would continue to be "available to offenders with Gender Dysphoria as clinically appropriate." R.25-2 ¶¶7-8; *see also id.* Ex.A (GDC SOP 508.40(IV)(E)(3)). She explained that mental health referrals were occurring as needed, that most tapering patients had received counseling before starting the process, and that patients who had been receiving mental health treatment or developed the need for such treatment would receive it consistent with GDC policy. R.25-2 ¶¶10-11; *see also id.* Ex.B (GDC SOP 508.15(III)(B)).

Dr. Owen also outlined GDC's policies and procedures "to address any concerns of risk of self-harm in the offender population," including a referral process and a comprehensive system of assessing and mitigating the risk of suicide and self-harm. R.25-2 ¶¶11-15; *see also id.* Ex.C (GDC SOP 508.29). And she reiterated that GDC "takes seriously the mental health of all offenders, including Plaintiffs, and will ensure access to appropriate mental health services for all offenders in GDC custody." R.25-2 ¶16. Thus,

41

to the extent Plaintiffs claimed they would suffer from suicidality or suicidal ideation if they no longer received hormones, Defendants took that risk extraordinarily seriously and worked proactively to ensure all inmates remained safe.

Plaintiffs and their experts did not dispute the quality of these services or the efficaciousness of GDCs policies designed to protect all inmates' health and well-being—they simply asserted as *ipse dixit* that they are insufficient because hormones are required. The district court agreed. R.50 at 19, 35-36; R.94 at 5, 19-20. But the Supreme Court rejected this *precise* argument in *Skrmetti* when it deferred to Tennessee's determination that "gender dysphoria 'can be resolved by less invasive approaches'" than cross-sex hormones "'that are likely to result in better outcomes.'" *Skrmetti*, 605 U.S. at 506. In short, Plaintiffs' desire for "more aggressive" interventions using cross-sex hormones does not mean that the care Plaintiffs were undisputedly receiving was constitutionally inadequate. *Hoffer*, 973 F.3d at 1272.

### G. At minimum, this Court should reverse the decision below, vacate the entry of partial summary judgment for Plaintiffs, and remand for further proceedings.

Because Plaintiffs' claimed constitutional right to publicly funded cross-sex hormones fails as a matter of law no matter what additional evidence Plaintiffs could arguably proffer, the Court should reverse and remand with instructions to issue partial final judgment for Defendants. But at a minimum—especially given the district court's misapplication of *Skrmetti* and *Eknes-Tucker* and its refusal to consider evidence directly

relevant to the efficacy of the interventions at issue—this Court should vacate the judg-

ment in favor of Plaintiffs and remand for further proceedings using an appropriately

deferential standard of review and with the Cass and Baker Reviews properly included

in the record. *Cf. Alexander v. S.C. State Conf. of the* NAACP, 602 U.S. 1, 38-39 (2024).

**II.    Certifying a pair of Rule 23(b)(2) injunctive classes and entering class-wide injunctive relief violated the PLRA.**

Regardless of how this Court resolves the named Plaintiffs' claims (and it should

hold that they fail because SB185 does not violate the Eighth Amendment), the district

court independently erred by certifying a pair of Rule 23(b)(2) classes and issuing cor-

responding class-wide permanent injunctions. By granting Plaintiffs' request to enter

class-wide relief, the district court extended an injunction purporting to redress five

individuals' alleged injuries to an amorphous and ever-changing group of unnamed ab-

sent class members. That violates the PLRA, which requires that "[p]rospective relief

in any civil action with respect to prison conditions shall extend no further than neces-

sary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."

18 U.S.C. §3626(a)(1)(A). Thus, at minimum, the Court should reverse the district

court's class certification rulings and vacate the permanent injunctions as to unnamed

absent class members.

"Congress enacted the Prison Litigation Reform Act of 1995, 18 U.S.C. §3626,

to expedite prison litigation and end judicial overreach into the management of pris-

ons." *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1205-06 (11th Cir. 2021), *vacated as moot*, 33

F.4th 1325 (11th Cir. 2022). "Put simply, 'Congress meant to get the federal courts out of the business of running jails.'" *Id.* To achieve that purpose, Congress drafted §3626(a)(1) of the PLRA to "strictly limi[t] the circumstances in which district courts can issue 'prospective relief' in civil actions challenging prison conditions." *Id.* The first and most important limitation is that prospective relief "in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a *particular plaintiff or plaintiffs*." 18 U.S.C. §3626(a)(1)(A) (emphasis added). That command "supercharges" the "traditional equitable principl[e] of injunctive relief" requiring narrow tailoring by focusing the inquiry on violations of the rights of "particular" inmates who are "plaintiffs" in the suit. *Jackson*, F.4th at 1209.

The function of this statutory scheme is clear—district courts must identify violations of the rights of "a particular plaintiff or plaintiffs" and issue injunctions that "extend no further than necessary" to "correct" those "particular" violations. 18 U.S.C. §3626(a)(1)(A). Thus, even though the PLRA "does not mention class actions by name," Congress's "clear command" limiting federal courts' remedial power "comfortably encompasses class actions" under Rule 23(b)(2), "which necessarily involve more than the case of [a particular plaintiff or plaintiffs actually before the court]." *Brito v. Garland*, 22 F.4th 240, 248 (1st Cir. 2021) (holding that similar limiting language in the Immigration and Nationality Act prohibits class-wide injunctive relief).

44

Put differently, the PLRA "does not preclude a court from entering injunctive relief on behalf of a particular" inmate whose rights have been violated. *Garland v. Aleman Gonzalez,* 596 U.S. 543, 550 (2022) (adopting *Brito*'s holding on this point). "[B]ut injunctive relief on behalf of an entire class of [unnamed and absent inmates] is not allowed because it is not limited," *id.* at 550-51, to "correct[ing] the violation of the Federal right of a particular plaintiff or plaintiffs," 18 U.S.C. §3626(a)(1)(A) (emphasis added).

The district court's provisional class certification and preliminary injunction order relied on out-of-circuit precedent holding that the PLRA permits Rule 23(b)(2) class-wide injunctions. See R.50 at 61 (citing *Shook v. El Paso Cnty.*, 386 F.3d 963, 970 (10th Cir. 2004); *Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017)). But those decisions predate *Aleman Gonzalez* and rely on the same negative inference—that statutes limiting federal courts' remedial powers must expressly mention class actions to preclude class-wide injunctive relief—that the Supreme Court expressly rejected. *See Shook*, 386 F.3d at 970; *Yates*, 868 F.3d at 369-70. *Aleman Gonzalez* made short work of this argument, explaining that it was "reluctant to give much weight to th[e] negative inference" when interpreting a provision of the INA that (like the PLRA) sharply cabins the scope of courts' remedial powers within a particular class of cases. 596 U.S. at 555.

In fact, the negative inference *Aleman Gonzalez* rejected was far stronger than the inference underlying *Shook* and *Yates*. Section 3626(a)(1) of the PLRA is merely silent

on class actions; in contrast, a subsection one letter over from the INA provision Aleman Gonzalez interpreted "expressly bar[red] the certification of 'a class under Rule 23 of the Federal Rules of Civil Procedure.'" *Id.* (citing 8 U.S.C. §1252(e)(1)(B)).

Reading the PLRA to prohibit class-wide injunctions harmonizes the statute's effect with its obvious purpose: "end[ing] judicial overreach into the management of prisons." *Jackson*, 4 F.4th at 1205-06. The PLRA "alter[ed] the landscape for injunctions in prison cases" by "supercharg[ing] some of the traditional equitable principles of injunctive relief" and "emphasiz[ing] the importance of narrow tailoring in prison litigation." *Id.* at 1209. Congress effected that alteration by stating unequivocally that prospective relief in PLRA cases is limited to that which is "necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. §3626(a)(1)(A) (emphasis added). A Rule 23(b)(2) class-wide injunction, which necessarily extends to numerous absent class members, is the antithesis of a "particular" remedy.

Although Defendants extensively briefed *Aleman Gonzalez* to explain why the district court's out-of-circuit authority from the preliminary injunction order was incorrect, the Court did not even cite *Aleman Gonzalez* in the permanent injunction order. Indeed, the district court did not engage with the new argument at all.

Because Rule 23(b)(2) class-wide injunctions exceed the scope of federal courts' remedial power under the PLRA, the district court erred by refusing to limit injunctive relief to the named plaintiffs (minus Stewart and Madison, who lack standing).

46

### III. Certifying the "requesting class" and issuing a permanent injunction covering inmates not currently receiving cross-sex hormones violated Article III.

Finally, the district court's decision to certify and issue injunctive relief to a "requesting class" of inmates who were not receiving cross-sex hormones before the law was passed and made no attempt to show they were entitled to them afterward exceeded the Court's Article III authority. It is blackletter law that plaintiffs "must demonstrate standing separately for each form of relief sought." *Williams v. Reckitt Benckiser*, 65 F.4th 1243, 1253 (11th Cir. 2023); *see also Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888 & n.6 (11th Cir. 2023). There is no genuine dispute (and if there were, if would only have precluded summary judgment) that neither Stewart nor Madison was receiving cross-sex hormones as of SB185's effective date.

Stewart's and Madison's deliberate indifference claims are premised on the denial of cross-sex hormones. The district court was wrong that the Eighth Amendment ever requires providing cross-sex hormones to satisfy an inmate's desire to live as the opposite sex, in the face of a state legislature's policy judgment that taxpayers should not fund these interventions. But even if that Eighth Amendment theory were correct, to have standing to seek a permanent injunction against the enforcement of SB185, each named plaintiff would have to prove a substantial likelihood that their alleged Eighth Amendment injuries would be redressed by a favorable decision on the merits. *See Berrocal v. Att'y Gen.*, 136 F.4th 1043, 1051-52 (11th Cir. 2025).

47

Stewart and Madison lack standing because neither has shown that enjoining enforcement of SB 185 would "significantly increase the likelihood" that GDC would ultimately provide them with the specific hormonal interventions they seek. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc). Both made the conclusory assertion that some undefined interventions were "medically necessary" to treat their gender dysphoria. R.1 ¶¶20, 22. But they never provided any of the individualized medical evidence that, on their own view of the law, would have been necessary to support such a claim. Plaintiffs' experts, for example, never examined Stewart and Madison and never specifically discussed either inmate's medical history or conditions. *See* R.11-1; R.11-2. And although Stewart and Madison mentioned receiving cross-sex hormones in the past, *see* R.11-3 ¶¶12-13 (recounting interventions authorized in 2020-2021); R.11-5 (Madison Decl.) ¶10 (similar in early 2024), those authorizations relied on contemporaneous medical evaluations that were long-stale when they began their most recent term of imprisonment. The district court was not permitted to rely on vague accounts of Plaintiffs' previous interventions as proof that GDC would likely provide the same interventions today absent enforcement of SB185.

Nothing about this handful of conclusory allegations established that it was "'likely, as opposed to merely speculative,'" that enjoining the enforcement of SB185 would cause Stewart or Madison to ultimately be approved for the interventions they seek under GDC's pre-SB-185 policies. *Berrocal*, 136 F.4th at 1051-52; *cf. Green-Cooper*, 73 F.4th at 888-89. At best, they suggested that an injunction would "mak[e] it possible"

that their distinct Eighth Amendment allegations might eventually be redressed. *Berrocal*, 136 F.4th at 1053.

But the mere implication that redress is "possible, instead of significantly more likely," cannot support a grant of prospective relief. *Id.* Indeed, this theory of redressability is especially weak because it relies on both "'a series of speculative events'" involving Plaintiffs' individual doctors, and speculation about GDC's discretionary application of its pre-SB-185 policies, which Plaintiffs have not challenged as applied to them, *cf. KH Outdoor v. Clay Cnty.*, 482 F.3d 1299, 1303 (11th Cir. 2007) (an alleged First Amendment injury was not redressable because the defendant could have imposed the same injury under an unchallenged policy even if the plaintiff prevailed on the merits).

"Because injunctions regulate future conduct," Plaintiffs have "standing to seek injunctive relief" only if their injury in fact is "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Williams*, 65 F.4th at 1253. Stewart and Madison (and even more so, the absent class members) cannot show that granting class certification and an injunction would actually result in their receiving the requested interventions. And because Plaintiffs' theory of injury for the "requesting" class rests on speculation, it is doubtful that Plaintiffs' constitutional claims are even ripe for adjudication. *See Wilderness Soc'y v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996).

Because Plaintiffs received a permanent injunction, they had to "show actual success on the merits instead of a likelihood of success," including that they had standing. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). Neither Stewart

49

nor Madison has shown that their alleged Eighth Amendment injuries will be redressed by an injunction prohibiting the enforcement of SB185, so they lack standing to seek prospective relief outside the context of an as-applied challenge that would permit them to adequately prove redressability.

## CONCLUSION

For these reasons, the Court should reverse the decision below, vacate the partial final judgment, class certification and permanent injunctions, and remand with instructions to enter partial final judgment for Defendants.

Dated: January 2, 2026

Christopher M. Carr
 *Attorney General*
John Henry Thompson
 *Solicitor General*
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408
jhthompson@law.ga.gov

Respectfully submitted,

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris
Rachael C.T. Wyrick
Julius Kairey
Zachary P. Grouev*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Supervised by principals of the firm admitted to practice in Virginia*

*Counsel for Defendants-Appellants*

50

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 27 because it contains 12,380. words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point and 16-point Garamond font.

Dated: January 2, 2026                          _/s/ Jeffrey M. Harris_

51

52

## CERTIFICATE OF SERVICE

I filed this brief with the Court via CM/ECF, which will send a notice of docketing activities to all parties who are registered through CM/ECF.

Dated: January 2, 2026                    /s/ Jeffrey M. Harris