No. 25-14263

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ISIS BENJAMIN, *et al.*,

*Plaintiffs-Appellees,*

v.

COMMISSIONER TYRONE OLIVER, in his official capacity, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:25-cv-04470 (Calvert, J.)

## BRIEF OF IDAHO, INDIANA, ALABAMA, ALASKA, ARKANSAS, IOWA, KANSAS, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, NORTH DAKOTA, OHIO, OKLAHOMA, SOUTH CAROLINA, TEXAS, UTAH, WEST VIRGINIA, WYOMING, AND THE ARIZONA LEGISLATURE, AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS

THEODORE E. ROKITA
INDIANA ATTORNEY GENERAL

JAMES A. BARTA
Solicitor General

OFFICE OF INDIANA ATTORNEY GENERAL
IGC South, Fifth Floor
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

RAÚL R. LABRADOR
IDAHO ATTORNEY GENERAL

MICHAEL A. ZARIAN
Deputy Solicitor General

JADEN STEEVES
David H. Leroy Fellow

OFFICE OF IDAHO ATTORNEY GENERAL
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

*Counsel for Amici States*
Additional Signatories Listed Below Signature Block

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1, the undersigned counsel certifies that in addition to the persons identified in the Certificate of Interested Persons and Corporate Disclosure Statement that Defendants-Appellants filed with the Court on January 6, 2026, Dkt. 36, the persons listed below are known to have an interest in the outcome of this case:

1. Barta, James, A.,

2. Bird, Brenna,

3. Brown, Derek,

4. Cox, Stephen J.,

5. Drummond, Gentner,

6. Fitch, Lynn,

7. Griffin, Tim,

8. Hanaway, Catherine, L.,

9. Hilgers, Michael, T.,

10. Kautz, Keith, G.,

11. Knudsen, Austin,

12. Kobach, Kris, W.,

13. Labrador, Raúl, R.,

14. Marshall, Steve,

15. McCuskey, John, B.,

16. Murrill, Liz,

17. Montenegro, Steve,

18. Paxton, Ken,

19. Peterson, Warren,

20. Rokita, Theodore, E.,

21. State of Alabama,

22. State of Alaska,

23. State of Arkansas,

24. State of Idaho,

25. State of Indiana,

26. State of Iowa,

27. State of Kansas,

28. State of Louisiana,

29. State of Mississippi,

30. State of Missouri,

31. State of Montana,

32. State of Nebraska,

33. State of North Dakota,

34. State of Ohio,

35. State of Oklahoma,

36. State of South Carolina,

37. State of Texas,

38. State of Utah,

39. State of West Virginia,

40. State of Wyoming,

41. Steeves, Jaden,

42. The Arizona Legislature,

43. Wilson, Alan,

44. Wrigley, Drew, H.,

45. Yost, Dave,

46. Zarian, Michael, A.,

Dated: January 9, 2026

/s/ *Michael A. Zarian*
Michael A. Zarian

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................................................i

TABLE OF CONTENTS........................................................................................iv

TABLE OF AUTHORITIES ..................................................................................v

INTRODUCTION AND INTEREST OF *AMICI* ......................................................1

ARGUMENT .......................................................................................................2

I.  State Legislatures have broad authority to regulate the medical field. ..................3

  A.  States have ample police power to regulate medical treatments, especially in areas of uncertainty. ..........................................................3

  B.  The Eighth Amendment doesn't diminish States' power to regulate medicine in prisons.................................................................................7

II. The district court should have upheld Georgia's reasonable decision not to treat gender dysphoria with cross-sex hormones in prisons...............................11

  A.  The district court improperly refused to consider evidence of legislative facts. .........................................................................................12

  B.  The Georgia Legislature's choice of medical care is more than adequate.................................................................................................14

CONCLUSION ....................................................................................................24

TABLE OF AUTHORITIES

## CASES

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,*
  495 F.3d 695 (D.C. Cir. 2007) ....................................................................5, 10, 15

*Allied Structural Steel Co. v. Spannaus,*
  438 U.S. 234 (1978) ....................................................................................3

*Barsky v. Bd. of Regents of Univ.,*
  347 U.S. 442 (1954) ................................................................................3, 5

*Bernier v. Obama,*
  201 F. Supp. 3d 87 (D.D.C. 2016) ....................................................................11

*Box v. Planned Parenthood of Indiana & Kentucky, Inc.,*
  587 U.S. 490 (2019) ....................................................................................5

*Brown v. Bd. of Educ.,*
  347 U.S. 483 (1954) ..................................................................................13

*Bucklew v. Precythe,*
  587 U.S. 119 (2019) ....................................................................................7

*City of Grants Pass v. Johnson,*
  603 U.S. 520 (2024) ..........................................................................7, 13, 23

*Dent v. West Virginia,*
  129 U.S. 114 (1889) ....................................................................................4

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ....................................................................................6

*Eknes-Tucker v. Governor of Ala.,*
  114 F.4th 1241 (11th Cir. 2024) ......................................................................21

*Estelle v. Gamble,*
  429 U.S. 97 (1976) ......................................................................................7

*Forbes v. Edgar,*
  112 F.3d 262 (7th Cir. 1997) ..........................................................................8

*Gibson v. Collier,*
  920 F.3d 212 (5th Cir. 2019) ..........................................................................9

*Gibbons v. Ogden,*
  22 U.S. 1 (1824) ........................................................................................3

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ................................................................................5, 8

*Harris v. Thigpen,*
  941 F.2d 1495 (11th Cir. 1991) ..................................................8

*Hawker v. People of N.Y.,*
  170 U.S. 189 (1898) ...............................................................4

*Helling v. McKinney,*
  509 U.S. 25 (1993) .................................................................7

*Hoffer v. Sec'y, Fla. Dep't of Corr.,*
  973 F.3d 1263 (11th Cir. 2020) ................................................10

*Jacobson v. Commonwealth of Massachusetts,*
  197 U.S. 11 (1905) ...................................................5, 6, 15, 17

*Johnson v. Dominguez,*
  5 F.4th 818 (7th Cir. 2021) .....................................................8

*Jones v. United States,*
  463 U.S. 354 (1983) ..............................................................16

*K.C. v. Individual Members of the Med. Licensing Bd. of Ind.,*
  121 F.4th 604 (7th Cir. 2024) ..................................................20

*Kansas v. Hendricks,*
  521 U.S. 346 (1997) ................................................................6

*Kennedy v. Louisiana,*
  554 U.S. 407 (2008) ..............................................................13

*Keohane v. Fla. Dep't of Corr. Sec'y.,*
  952 F.3d 1257 (11th Cir. 2020) ............................................8, 10

*Lambert v. Yellowley,*
  272 U.S. 581 (1926) ................................................................4

*Lange v. Houston Cnty., Georgia,*
  152 F.4th 1245 (11th Cir. 2025) ..............................................10

*Lockhart v. McCree,*
  476 U.S. 162 (1986) ..............................................................14

*Marshall v. United States,*
  414 U.S. 417 (1974) ................................................................6

*Mosley v. Zachery,*
  966 F.3d 1265 (11th Cir. 2020) ...............................................17

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) .................................................................12

*Obergefell v. Hodges,*
    576 U.S. 644 (2016) ........................................................................... 13

*Powell v. Texas,*
    392 U.S. 514 (1968) ........................................................................... 24

*Robinson v. Liberty Mut. Ins. Co.,*
    958 F.3d 1137 (11th Cir. 2020) ................................................ 12, 13

*Rohan v. Chater,*
    98 F.3d 966 (7th Cir. 1996) ............................................................. 12

*Snipes v. DeTella,*
    95 F.3d 586 (7th Cir. 1996) ............................................................... 8

*United States v. Skrmetti,*
    605 U.S. 495 (2025) ...................................................................*passim*

*Valentino v. Vill. of S. Chicago Heights,*
    575 F.3d 664 (7th Cir. 2009) .......................................................... 15

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ......................................................................4, 5

*Washington v. Harper,*
    494 U.S. 210 (1990) ........................................................................... 5

*Watson v. State of Maryland,*
    218 U.S. 173 (1910) ........................................................................... 4

*Whalen v. Roe,*
    429 U.S. 589 (1977) ........................................................................... 4

*Wilson v. Seiter,*
    501 U.S. 294 (1991) ........................................................................... 8

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. VIII ............................................................................ 7

**STATUTES**

Idaho Code § 18-8901 .............................................................................. 2

Tenn. Code § 33-8-315 ............................................................................. 5

**RULES**

Fed. R. Evid. 201(a) ................................................................................ 12

## OTHER AUTHORITIES

Alice A. White et al., *Potential Immunological Effects of Gender-Affirming Hormone Therapy in Transgender People—an Unexplored Area of Research*, 13 Therapeutic Advances in Endocrinology & Metabolism 1 (2022) ..........................19

Allison Orr Larsen, *Confronting Supreme Court Fact Finding*, 98 Va. L. Rev. 1255, 1259 (2012) ............................................................13

Allison Orr Larsen, *The Trouble with Amicus Facts*, 100 Va. L. Rev. 1757, 1778 (2014) ............................................................13

Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says*, N.Y. Times (Oct. 23, 2024) .......................................................................23

Claudia Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138 (2020) .................17

Daniel Jackson, *Suicide-Related Outcomes Following Gender-Affirming Treatment: A Review*, 15 Cureus 9 (2023) ............................................................................18

Daniel Yetman, *Lobotomy Overview*, Healthline, (Apr. 28, 2022) ......................................................................16

Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch. (2022) .......................................................20

Darios Getahun et al., *Cross-Sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, 169 Annals of Internal Medicine 205 (2018) .................................19

Gabrielle M. Etzel, *Controversial suppressed paper on trans youth procedures is finally published*, Wash. Examiner (June 6, 2025) ....................................................23

Giovanni Corso et al., *Risk and Incidence of Breast Cancer Risk in Transgender Individuals: A Systematic Review and Meta-Analysis*, 32 European J. Cancer Prevention 207 (2023) .........................19

H. Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (2024) ..............................................................8

Jose O. Sanetellan-Hernandez et al., *Multifocal Glioblastoma and Hormone Replacement Therapy in a Transgender Female*, 14 Surgical Neurology Int'l 106 (2023) ............................................19

Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*,
5 J. Endocrine Soc. 1 (2021) .................................................................................18

Kenny Rodriguez-Wallberg et al., *Reproductive Health in Transgender and Gender Diverse Individuals: A Narrative Review to Guide Clinical Care and International Guidelines*,
24 Int'l J. Transgender Health 7 (2023) ...........................................................19

Khobe Chandran et al., *A Transgender Patient with Prostate Cancer: Lessons Learnt*,
83 European Urology 379 (2023) .......................................................................18

Leor Sapir, *'We're All Just Winging It': What the Gender Doctors Say in Private*,
The Free Press (Dec. 3, 2025) .............................................................................21

Lois G. Forer, *Law and the Unreasonable Person*,
36 Emory L.J. 181 (1987) ...................................................................................17

Naomi E. Gutkind et al., *Idiopathic Intracranial Hypertension in Female-to-Male Transgender Patients on Exogenous Testosterone Therapy*,
39 Ophthalmic Plastic & Reconstructive Surgery 449 (2023) .........................19

Patricia J. Zettler, *Pharmaceutical Federalism*,
92 Ind. L.J. 846 (2017) .........................................................................................5

Prisha Mosley, *I was 15 and trusted the 'experts' on gender care. Turns out, they were winging it*,
Fox News (Dec. 17, 2025) ...................................................................................20

Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*,
90 Annals of Plastic Surgery 96 (2023) .............................................................18

Talal Alzahrani et al., *Cardiovascular Disease Risk Factors and Myocardial Infarction in the Transgender Population*,
12 Circulation: Cardiovascular Quality & Outcomes (2019) ...........................19

Vianney Andzembe et al., *Branch Retinal Vein Occlusion Secondary to Hormone Replacement Therapy in a Transgender Woman*,
46 J. Fr. Ophtalmologie 148 (2023) ...................................................................19

**INTRODUCTION AND INTEREST OF *AMICI***

Across the country, medical professionals and policymakers are engaged in intense dialogue over how to address surging cases of gender dysphoria. Some groups, like plaintiffs and their experts, advocate for treating discomfort with one's body by altering a person's physical appearance through invasive surgeries and risky cross-sex hormones. Others urge a more measured approach that includes non-invasive psychotherapy. Georgia has sided with the latter view, enacting legislation to prohibit the administration of cross-sex hormone therapy in its state-run prisons.

Whatever the wisdom of these competing approaches, it is not the role of federal courts to take one side of the debate or the other. Rather, the Constitution leaves those choices to politically accountable policymakers, who are best positioned to weigh the safety, efficacy, and ethics of different approaches. When States exercise their police power to regulate whether and when a medical treatment may be administered, courts must defer to those decisions—not second-guess them or subordinate them to the contrary opinions of medical interest groups like the World Professional Association of Transgender Health (WPATH).

The district court in this case misapprehended its role, inserting itself as a referee of this ongoing debate within the medical community. Worse still, the court changed the rules of the game to Georgia's disadvantage, deeming legislative judgments inherently inferior to the judgments of doctors and expert witnesses and misapplying procedural rules to brush aside the weighty medical literature that Georgia put forward.

As sovereigns who have long regulated prisons and medicine to protect health and safety—some of whom have enacted similar regulations to the one at issue in this case, *e.g.*, Idaho Code § 18-8901 (prohibiting public funds from being used for gender-transition treatments, including in prisons)—Idaho, Indiana, Alabama, Alaska, Arkansas, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, Texas, Utah, West Virginia, Wyoming, and the Arizona Legislature, ("*Amici* States") have an interest in protecting their authority. They urge the Court to reverse the district court's order enjoining Georgia's law and requiring Georgia officials to provide cross-hormone therapy to prisoners.

## ARGUMENT

The Georgia Legislature's reasoned determination that cross-sex hormone therapy is not a medically appropriate treatment for gender dysphoria should have been conclusive in this case. States have ample authority under their police power to regulate medical treatments, and courts reviewing these regulatory decisions afford the utmost deference, particularly where (as here) there are "fierce scientific and policy debates about the safety, efficacy, and propriety of [the] medical treatments in an evolving field." *United States v. Skrmetti*, 605 U.S. 495, 525 (2025).

Still, the district court refused to respect Georgia's choice, attempting to minimize the State's decision by labeling it a "policy judgment" (supposedly different from a "medical judgment") and misapplying procedural rules to excise any evidence supporting Georgia's law from consideration. This Court should correct those mistakes

and reinforce States' primacy over the medical treatments they choose to provide in their own prisons.

## I. State Legislatures have broad authority to regulate the medical field.

From the beginning of the Republic to now, States have enacted health laws of every kind regulating the who, what, and how of the medical profession, and these regulations have ordinarily been subject only to the most limited of judicial scrutiny. The Eighth Amendment has been interpreted to impose a duty on States to ensure that prisoners receive adequate medical care, but that requirement does not strip States of their power to regulate medicine. It is still States, not judges, who decide what medical treatments are appropriate and under what conditions.

### A. States have ample police power to regulate medical treatments, especially in areas of uncertainty.

The police power of States has always encompassed the power to enact "health laws of every description." *Gibbons v. Ogden*, 22 U.S. 1, 203 (1824). Indeed, the police power is, at its essence, "an exercise of the sovereign right of the Government to protect the lives, *health*, morals, comfort and general welfare of the people." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) (emphasis added); *Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 449 (1954) (a State's "broad power to establish and enforce standards of conduct within its borders relative to the health of everyone" is "a vital part of a state's police power").

3

States' power to regulate in the interest of its citizens' health naturally includes the power to regulate the practice of medicine—"there is no right to practice medicine which is not subordinate to the police power of the states." *Lambert v. Yellowley*, 272 U.S. 581, 596 (1926). States can bar unlicensed persons from practicing medicine, *Dent v. West Virginia*, 129 U.S. 114, 122–23 (1889), require practitioners to possess the requisite "[c]haracter" and "knowledge of diseases" to apply remedies "safely," *Hawker v. People of N.Y.*, 170 U.S. 189, 193–94 (1898), and impose measures designed to "protect[] the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997); *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910) (it is "too well settled to require discussion . . . that the police power of the state extends to the regulations of certain trades and callings," and "perhaps no profession [is] more properly open to such regulation than that which embraces the practitioners of medicine").

Not only can States use their police power to regulate the ethics and qualifications of medical practitioners, but also the treatments those practitioners administer. For example, it is "well settled that the State has broad police powers in regulating the administration of drugs by the health professions." *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977). And States have regularly exercised those powers since colonial times, enacting laws to govern matters like the quantity, type, and condition of drugs that doctors dispense in light of "the risks associated with both drug safety and efficacy." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,* 495 F.3d 695, 703–04 (D.C. Cir.

2007); *see also* Patricia J. Zettler, *Pharmaceutical Federalism*, 92 Ind. L.J. 846, 851–57, 859–61 (2017) (describing history of State regulation through modern times).

Indeed, States' "broad power" to regulate medicine and public health allows them to establish a whole host of "standards of conduct." *Barsky*, 347 U.S. at 449. States can outlaw certain medical procedures. *E.g.*, *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 587 U.S. 490, 494 (2019) (Thomas, J., concurring) (discussing Indiana's anti-eugenics law); *Glucksberg*, 521 U.S. at 735 (Washington's assisted-suicide ban); Tenn. Code § 33-8-315 (banning lobotomies for children); *cf. Gonzales v. Carhart*, 550 U.S. 124, 140–43 (2007) (federal prohibition on certain surgical procedures for abortions). Or in certain circumstances, the Supreme Court has allowed States to *compel* certain treatments. *E.g.*, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 26 (1905) (vaccinations in the interest of public health); *Washington v. Harper*, 494 U.S. 210, 222–23 (1990) (antipsychotic drugs for prisoners).

And as States decide which treatments medical professionals should be allowed to administer and under what conditions, courts reviewing those decisions must exercise restraint. "Our Nation's history and traditions have consistently demonstrated that the democratic branches are better suited [than courts] to decide the proper balance between uncertain risks and benefits of medical technology, and are entitled to deference in doing so." *Abigail All.*, 495 F.3d at 713. There may be an "opposite theory" of medicine to the one that the State adopted that is "maintained by high medical authority"—likely a theory "the legislature of [the State] was []aware" of—but the State is "not compelled to commit

5

a matter involving the public health and safety to the final decision of a court or jury." *Jacobson*, 197 U.S. at 30.

In fact, "it is precisely where such [medical] disagreement exists that legislatures have been afforded the widest latitude." *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997). "[L]egislative options must be especially broad" in such circumstances, "and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices." *Marshall v. United States*, 414 U.S. 417, 427 (1974); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 274 (2022) (the "normal rule" is that federal courts must "defer to the judgments of legislatures in areas fraught with medical and scientific uncertainties") (cleaned up).

All of these principles remain equally true when it comes to the regulation of so-called "gender-affirming care," as the Supreme Court confirmed less than a year ago in *United States v. Skrmetti*, 605 U.S. 495 (2025). There, after concluding that Tennessee's prohibition on administering puberty blockers, cross-sex hormones, and sex transition surgeries to minors did not implicate heightened scrutiny under the Equal Protection Clause, the Court upheld the State's statute under rational basis review. *Id.* at 522–25. It (1) reiterated that States have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty," and (2) agreed that there were "open questions regarding basic factual issues before medical authorities and other regulatory bodies" regarding the efficacy of "gender-affirming care." *Id.* at 525 (cleaned up).

6

### B. The Eighth Amendment doesn't diminish States' power to regulate medicine in prisons.

States' broad authority to regulate medicine does not vanish in prisons because of the Eight Amendment.

The Eighth Amendment was originally intended to bar the infliction of "cruel and unusual punishments" to "ensure that the new Nation would never resort" to "certain barbaric punishments" like "disemboweling, quartering, public dissection, and burning alive." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (cleaned up); U.S. Const. amend. VIII. The Amendment's purpose was to bar "long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Bucklew v. Precythe*, 587 U.S. 119, 131 (2019) (cleaned up).

The Supreme Court in *Estelle v. Gamble* extended the Eighth Amendment to prohibit "deliberate indifference to serious medical needs of prisoners." 429 U.S. 97, 102–105 (1976); *but see Helling v. McKinney*, 509 U.S. 25, 42 (1993) (Thomas, J., dissenting) ("I seriously doubt that *Estelle* was correctly decided."). But in the same breath it made equally clear that courts must apply the "deliberate indifference" standard with an extremely deferential eye, emphasizing that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105–06 (not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment").

Thus, the Eighth Amendment's "deliberate indifference" standard does not require that medical care in prisons be "perfect, the best obtainable, or even very good." *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991) (cleaned up). Instead, to ensure proper deference to State authority and to prevent the Eighth Amendment from becoming a "medical code that mandates specific medical treatment," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), medical care will amount to a constitutional violation only if it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505 (cleaned up); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (the Eighth Amendment does not empower prisoners to "demand specific care" from the State).

That means "a simple difference in medical opinion . . . cannot support a claim of cruel and unusual punishment." *Keohane v. Fla. Dep't of Corr. Sec'y.*, 952 F.3d 1257, 1274 (11th Cir. 2020) (cleaned up). To show that a State has violated the Eighth Amendment, a prisoner must prove that "*no* minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (cleaned up) (emphasis added).[1] For the same reasons that States' police power must be broadest in areas "where there is medical and scientific uncertainty," *Carhart*, 550 U.S. at 163, there can be "no intentional or wanton deprivation of care"

---

[1] Proving an Eighth Amendment violation also requires showing that the inadequate care was administered with a "sufficiently culpable" state of mind—only then can the inadequate care be deemed a "punishment." *Wilson v. Seiter*, 501 U.S. 294, 297–300 (1991).

amounting to deliberate indifference "if a genuine debate exists within the medical community about the necessity or efficacy of that care." *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019).

Nor does the Eighth Amendment abridge States' power to regulate the who, what, whether, and where of medical treatments in categorical terms. The district court concluded otherwise, holding that the State may not impose a "blanket ban" on a treatment and must instead make "individual determinations of medical necessity." App. Vol. 4 at 44. However, nothing in the text or history of the Amendment or any of its surrounding precedents suggest at all that a State must assess the risks and efficacy of a treatment anew every time a prisoner makes a request.

Indeed, the district court's individualized-determination requirement "defies common sense." *Gibson*, 920 F.3d at 216. "If the FDA prohibits a particular drug, surely the Eighth Amendment does not require an individualized assessment for any inmate who requests that drug." *Id.* Moreover, the district court's approach would wrest medical regulation in prisons from the hands of state legislatures (who regulate in categorical terms) and entrust that task exclusively with prison doctors (who evaluate individual patients), requiring them to provide even treatments that are categorically illegal under state law if they personally believe it is medically indicated. That cannot be correct. *See Abigail All.,* 495 F.3d at 703–04 (explaining state legislatures' categorical regulations of medicine since the Founding).

The proper approach is simply to consider the reasonableness of States' treatment decisions in the context in which they arise. If a State decides by statute that physician-assisted suicide, abortion, lobotomies, or cross-sex hormone therapy are never medically appropriate and should not be provided in prisons,[2] the State will simply need to show the reasonableness of that decision in the circumstances of every prisoner that challenges it. As long as refusing the treatment constitutes "at least tolerable" care as to each prisoner, a court will be "hard-pressed to find that the [State] has acted in so reckless and conscience-shocking a manner as to have violated the Constitution." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1273 (11th Cir. 2020) (cleaned up).[3]

---

[2] The district court suggested that a blanket ban on a treatment in prisons is subject to different scrutiny than a blanket ban on a treatment for everyone in the State. App Vol. 4 at 44 n.10. Again, nothing about the Eighth Amendment supports that conclusion. A State may reasonably (and constitutionally) decide that a treatment is too risky or unproven to provide with state funds or in prisons, while allowing private parties to seek those treatments on their own. *See Lange v. Houston Cnty., Georgia*, 152 F.4th 1245, 1249 (11th Cir. 2025) (en banc) (upholding county's decision not to use public funds to cover "sex change surgery" for employees).

[3] The district court also believed that circuit precedent specifically prohibits blanket bans on cross-sex hormone therapy to treat gender dysphoria. App. Vol. 1 at 166–67. Not so. This Court's brief observations in *Keohane v. Florida Department of Corrections* were (1) clearly dicta, since the Court lacked jurisdiction, and (2) addressed to a "freeze-frame" policy of continuing to provide the same treatment for gender dysphoria that a prisoner received at the time of incarceration, not a blanket ban on cross-sex hormone therapy for all prisoners. 952 F.3d at 1263, 1266–67.

## II. The district court should have upheld Georgia's reasonable decision not to treat gender dysphoria with cross-sex hormones in prisons.

These principles should have made this an easy case. There are "fierce scientific and policy debates about the safety, efficacy, and propriety" of cross-sex hormone therapy, with extensive literature suggesting that hormones present significant risks while offering unproven benefits. *Skrmetti*, 605 U.S. at 525. Based on this literature, Georgia decided to offer the "full range of mental health services"—including "counseling, support from a psychologist, support from a psychiatrist, psychotropic medication as appropriate, . . . [and] specialized housing units and programs," R.25-2 ¶ 7–8—to prisoners with gender dysphoria instead of hormones. That legislative choice was entirely reasonable, and does not become unconstitutional simply because it offers "a different method of treatment than that requested by the inmate." *Bernier v. Obama*, 201 F. Supp. 3d 87, 93 (D.D.C. 2016) (cleaned up).

The district court paid lip service to the principles set forth above—then charted a different course. Much of its deviation from the settled path can be boiled down to two key errors. First, it refused to consider the evidence supporting the Georgia Legislature's decision because it was not introduced by an expert. Second, the court devalued the Georgia Legislature's assessment of the relevant risks and rewards of cross-sex hormone therapy on the premise that the Legislature's decision was "not a medical judgment, [but] a policy judgment." App. Vol. 1 at 164.

### A. The district court improperly refused to consider evidence of legislative facts.

The district court's first mistake was to refuse to look at any medical evidence regarding the safety and efficacy of hormone therapy that the State did not introduce through an expert witness, quipping that "[t]he undersigned is not a doctor" and would not "succumb to the temptation to play doctor." App. Vol. 4 at 40 (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (requiring deference to agency factfinding, not artificial restraint of constitutional inquiries)). Like many constitutional questions, assessing medical evidence "can be difficult." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 25 (2022) (cleaned up) (discussing the challenges of historical analysis). But district courts cannot avoid their duty to accurately resolve necessary constitutional questions by forcing States to retain costly expert witnesses to explain the relevant evidence on pain of having state law held unconstitutional.

In trying to justify its exclusion of such significant evidence, the district court clearly misunderstood the difference between adjudicative facts and legislative facts. "Adjudicative facts are those developed in a particular case, while legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally." *Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137, 1142 (11th Cir. 2020) (cleaned up). When it comes to legislative facts, the "formal" "introduction of evidence" is not necessary, and the ordinary limits on judicial notice don't apply. Fed. R. Evid. 201(a) 1972 advisory committee's note; Allison Orr Larsen, *Confronting Supreme Court Fact*

*Finding*, 98 Va. L. Rev. 1255, 1259 (2012) ("[C]ourts are free to approach legislative fact questions without the use of experts or witness testimony, and can even go outside the bounds of the record. There is currently no federal law restricting outside evidence of this sort.").

In fact, the Supreme Court regularly relies on legislative facts from outside the record, even facts presented for the first time by amicus briefs. *E.g. Brown v. Bd. of Educ.*, 347 U.S. 483, 494–95 & n.11 (1954) (social science and psychological studies regarding segregation from amicus brief); *Kennedy v. Louisiana*, 554 U.S. 407, 438 (2008) (statistics showing prevalence of child rape convictions from a website); *Obergefell v. Hodges*, 576 U.S. 644, 661 (2016) (history of homosexuality in America from amicus briefs); *Grants Pass*, 603 U.S. at 530 (homelessness statistics from amicus briefs); *see also* Larsen, 98 Va. L. Rev. at 1276–77 (collecting more examples). By one scholar's estimate, roughly 20% of the Supreme Court's 606 citations to amicus briefs between 2008 and 2013 were "to support assertions of legislative fact." Allison Orr Larsen, *The Trouble with Amicus Facts*, 100 Va. L. Rev. 1757, 1778 (2014).

The risks and efficacy of cross-sex hormone therapy and psychotherapy for treating gender dysphoria are issues of legislative fact because they "do not change from case to case but apply universally"—resolving those issues does not depend on the circumstances of any of the plaintiffs in this case. *Robinson*, 958 F.3d at 1142 (cleaned up). It's precisely because those issues involve legislative facts that the Georgia Legislature was able to evaluate them when it enacted S.B. 185.

13

That the central question in this case concerns legislative facts carries at least three consequences. *First*, the district court was wrong to demand that Georgia submit the scientific evidence on which its Legislature relied as evidence at all, much less expert evidence. *Skrmetti*, 605 U.S. at 524–25 (discussing the Cass Review, which was released after the petition for certiorari in the case was filed).[4] *Second*, this Court can consider the scientific evidence the district court excluded, as well as any evidence presented in this amicus brief. And *third*, the Court need not defer to any conclusions by the district court regarding the objective reasonableness of Georgia's decision not to provide cross-sex hormones to prisoners. *Lockhart v. McCree*, 476 U.S. 162, 168 n.3 (1986).

## B. The Georgia Legislature's choice of medical care is more than adequate.

Even apart from its evidentiary blunders, the district court's decision reflects a fundamentally misguided understanding of the relevant standards. According to the district court, the only "healthcare decisions" that carry any weight in a claim of deliberate indifference are those "made dispassionately, by physicians, based on individual determinations of medical need." App. Vol. 4 at 44. If the Legislature prescribes a rule in "categorical" terms, that's "not a medical judgment, [but] a policy judgment." App. Vol. 1 at 164. This reasoning is flawed several times over.

---

[4] To be clear, Georgia *did* submit the studies it cited in a declaration after the district court erroneously concluded it could not take judicial notice of them. App. Vol. 4 at 36–39.

14

**1.** For starters, and as explained previously, the Eighth Amendment does not demand that all medical decisions in prisons be individualized assessments made by doctors rather than general assessments made by legislatures. The Supreme Court time and again has reaffirmed the ability of state legislatures (which enact general rules) to regulate medicine in the interest of public health. *E.g.*, *Jacobson*, 197 U.S. at 25 ("the police power of a state must be held to embrace, at least, such reasonable regulations established *directly by legislative enactment* as will protect the public health and the public safety") (emphasis added); *Skrmetti*, 605 U.S. at 524 ("We afford States wide discretion to *pass legislation* in areas where there is medical and scientific uncertainty.") (emphasis added) (cleaned up). There has been no whiff in these precedents that this power fails to extend to medical decisions that take place in state-run prisons, or that prison doctors must be allowed to operate outside of state law.

Moreover, there is no meaningful difference in this context between a "policy judgment" and a "medical judgment." State legislatures process an enormous amount of information when they enact legislation (as *Amici* States can attest), and a "policy judgment" is simply the result of using that information to "balance competing interests" and make a "judgment call as to what solution will best serve those interests." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 679 (7th Cir. 2009) (cleaned up). In the medical-legislation space, that means reviewing medical literature to "determine the risks associated with both drug safety and efficacy" and arriving at a particular policy (i.e., law) for the State. *Abigail All.*, 495 F.3d at 703. Weighing a drug's safety and efficacy based on

available research is the same task doctors undertake in rendering a "medical judgment"—it's just that the State's decision has a broader reach and is labeled "policy" as a result.

And while state legislators may not have MDs, they are the people that the citizens of the State have entrusted to make important decisions affecting health and safety on a state-wide basis. Respecting this sovereign prerogative is precisely why the Supreme Court has rejected the idea that States' "power to legislate in this area depends on the research conducted by the psychiatric community." *Jones v. United States*, 463 U.S. 354, 365 n.13 (1983); *Skrmetti*, 605 U.S. at 530 (Thomas, J., concurring) ("so-called experts have no license to countermand the wisdom, fairness, or logic of legislative choices") (cleaned up).

Indeed, the view of the "medical community" may be just as likely as a state legislature's to be mistaken. Lobotomies are a perfect example of the risks of requiring States to unquestioningly accept a treatment that is in vogue with the medical community—the doctor who pioneered the lobotomy received a Nobel Prize for Medicine in 1949, but there hasn't been a lobotomy performed in the United States since 1967 after many recipients died or were left permanently handicapped.[5] The human toll of lobotomies would have been far greater if judges had made the procedure a

---

[5]    Daniel Yetman, *Lobotomy Overview*, Healthline, (Apr. 28, 2022), https://tinyurl.com/vdk6kmu4.

constitutional requirement based on its acceptance among prominent medical voices. Lois G. Forer, *Law and the Unreasonable Person*, 36 Emory L.J. 181, 188 (1987) (noting that "[j]udges frequently bend to the winds of scientific fads," and giving lobotomies and eugenics as examples); *Jacobson*, 197 U.S. at 30 (recognizing that "high medical authority" did not believe the spread of smallpox could be prevented with a vaccine).

**2.** It appears what the district court really meant to imply through its "policy judgment" label was that the Georgia Legislature's decision was motivated solely by considerations other than the risks and efficacy of cross-sex hormones. App. Vol. 4 at 44 (indicating that a treatment decision must be made "dispassionately"). That assumption has no support, and would threaten to undermine States' ability to regulate any medical treatment if applied consistently. But the court's assumption is also irrelevant in light of the significant objective evidence that *does* support Georgia's decision. *Mosley v. Zachery*, 966 F.3d 1265, 1270–71 (11th Cir. 2020) (explaining the "objective component" of the deliberate-indifference standard).

The evidence that hormone therapy is effective to treat gender dysphoria is weak. A 2020 systematic review of available studies "found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition"—it concluded that "[t]he evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research." Claudia Haupt et al., *Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women*, 11 Cochrane Database of Systematic Reviews, Art. No. CD013138, at 2, 11 (2020) ("well-designed,

17

sufficiently robust randomised controlled trials (RCTs) and controlled-cohort studies do not exist"). Another systematic review of studies concluded that it was "impossible to draw conclusions about the effects of hormone therapy on death by suicide" and the "strength of evidence" for other positive effects of hormone therapy reported by the literature was "low." Kellan E. Baker, et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc. 1, 12–13 (2021). A third review included studies "that showed an *increase* in suicidality for those who received gender-affirming treatment," including cross-sex hormones, and concluded that all existing studies on the effect of hormone therapy on suicidality suffered from methodological errors. Daniel Jackson, *Suicide-Related Outcomes Following Gender-Affirming Treatment: A Review*, 15 Cureus 9–13 (2023) (emphasis added).

This lack of proven benefits is accompanied by significant risks associated with hormone therapy. Evidence shows that males who are treated with estrogen have twenty-two times the likelihood to develop breast cancer,[6] an increased risk of prostate[7]

---

[6] *See* Rakesh R. Gurrala et al., *The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals*, 90 Annals of Plastic Surgery 96 (2023).

[7] *See* Khobe Chandran et al., *A Transgender Patient with Prostate Cancer: Lessons Learnt*, 83 European Urology 379 (2023).

and other cancers,[8] an increased risk of retinal vein occlusion,[9] a higher risk of strokes,[10] and a potential risk of autoimmune disorders.[11] Females treated with testosterone may experience infertility,[12] pseudotumor cerebri,[13] an earlier onset of breast cancer,[14] and an increased risk of heart attacks.[15]

Those risks are only compounded by "high desistance rates" among those who identify as transgender (particularly youth), which can lead to "the tragic 'regret' of detransitioners." *Skrmetti*, 605 U.S. at 517 (quoting Brief of Respondents at 26–27). In

---

[8] *See* Jose O. Sanetellan-Hernandez et al., *Multifocal Glioblastoma and Hormone Replacement Therapy in a Transgender Female*, 14 Surgical Neurology Int'l 106 (2023).

[9] *See* Vianney Andzembe et al., *Branch Retinal Vein Occlusion Secondary to Hormone Replacement Therapy in a Transgender Woman*, 46 J. Fr. Ophtalmologie 148 (2023).

[10] *See* Talal Alzahrani et al., *Cardiovascular Disease Risk Factors and Myocardial Infarction in the Transgender Population*, 12 Circulation: Cardiovascular Quality & Outcomes (2019).

[11] *See* Alice A. White et al., *Potential Immunological Effects of Gender-Affirming Hormone Therapy in Transgender People—an Unexplored Area of Research*, 13 Therapeutic Advances in Endocrinology & Metabolism 1 (2022).

[12] *See* Kenny Rodriguez-Wallberg et al., *Reproductive Health in Transgender and Gender Diverse Individuals: A Narrative Review to Guide Clinical Care and International Guidelines*, 24 Int'l J. Transgender Health 7 (2023).

[13] *See* Naomi E. Gutkind et al., *Idiopathic Intracranial Hypertension in Female-to-Male Transgender Patients on Exogenous Testosterone Therapy*, 39 Ophthalmic Plastic & Reconstructive Surgery 449 (2023).

[14] *See* Giovanni Corso et al., *Risk and Incidence of Breast Cancer Risk in Transgender Individuals: A Systematic Review and Meta-Analysis*, 32 European J. Cancer Prevention 207 (2023).

[15] *See* Darios Getahun et al., *Cross-Sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, 169 Annals of Internal Medicine 205 (2018).

the words of one detransitioner, "Just one appointment led me down a pathway of permanent destruction and mutilation" that "haunt[s] me every single day."[16]

So hormone-based interventions for gender dysphoria are fraught with serious risks and uncertain to deliver any benefits. Meanwhile, there are non-surgical, non-hormone related interventions that have been shown to address gender dysphoria effectively—specifically, "[s]ocial support and psychotherapy are widely recognized approaches." *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610–11 (7th Cir. 2024) (citing Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psych. Rsch., at 4 (2022)). Given the choice between these two approaches, it was more than reasonable for Georgia to opt out of risky, unproven cross-hormone therapy and choose to provide only psychotherapy.

**3.** The district court's concerns about medical decisions being driven by ideology over science would have been better directed at WPATH—the organization whose recommendations (1) form the basis of most other medical associations' recommendations, and (2) the court touted as being "based on the best available science and expert professional consensus." App. Vol. 1 at 139 (cleaned up). WPATH has been a leading proponent of using cross-sex hormone therapy to treat gender dysphoria, "[b]ut recent revelations indicate that WPATH's lodestar is ideology, not science."

---

[16] Prisha Mosley, *I was 15 and trusted the 'experts' on gender care. Turns out, they were winging it*, Fox News (Dec. 17, 2025), https://tinyurl.com/5y73fw93.

*Eknes-Tucker v. Governor of Ala.*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring in denial of rehearing en banc); *see* Amicus Brief of the State of Alabama, *United States v. Skrmetti*, No. 23-477 (Oct. 15, 2024) ("Alabama Amicus") (cataloguing internal documents showing that WPATH routinely ignored the evidence, silenced scholars who questioned its guidelines, and censured members who went public with their concerns).

The secret is now out on WPATH—the organization has consistently "overstate[d] the strength of the evidence" behind its recommendations in pursuit of ideological advocacy.[17] While their recommendations were being solemnly presented to courts as evidence-based, WPATH doctors admitted behind closed doors that they were "all just winging it."[18] A "contributor to WPATH's most recent Standards of Care frankly stated, '[o]ur concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" *Eknes-Tucker*, 114 F.4th at 1261 (Lagoa, J., concurring in denial of rehearing en banc).

That WPATH's recommendations are driven by ideology and not science is the deliberate result of how those recommendations were developed. One WPATH

---

[17] H. Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* 132 (2024), https://tinyurl.com/346ufbw6.

[18] Leor Sapir, *'We're All Just Winging It': What the Gender Doctors Say in Private*, The Free Press (Dec. 3, 2025), https://tinyurl.com/27wwcsca.

president who oversaw the development of the current Standards of Care (SOC-8) made "more than a million dollars" in the previous year from performing gender-transition surgeries. Alabama Amicus at 27. To that president, it was "important" to WPATH that each contributing author to the SOC-8 "be an advocate for [gender-transition] treatments before the guidelines were created." *Id.* at 11. The chair of the SOC-8 guideline committee seemed to agree, noting that "most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest." *Id.* at 27.

Biden Administration officials and ideologically aligned attorneys also had significant influence in drafting WPATH's current standards of care, which some authors used "to strengthen [their] position in court." *Id.* at 11. In particular, former Assistant Secretary of Health Rachel Levine was an extremely impactful voice in developing SOC-8. Levine urged fast publication, with one WPATH member reporting Levine's view that "[t]he failure of WPATH to be ready with SOC-8 [was] proving to be a barrier to optimal policy progress." *Id.* at 15. Long after the public comment period ended, SOC-8 was sent to Levine, who told WPATH to remove the already relaxed age limitations. *Id.* at 16–18. WPATH initially resisted, but ultimately removed the age minimums, with the WPATH president privately struggling with the "balancing act between what [I] feel to be true and what we need to say." *Id.* at 18–22.

And while WPATH hired an outside evidence-review team from John Hopkins University, the doctor who led that team reported that WPATH was "trying to restrict our ability to publish" the results of that review. *Id.* at 33. Presumably, that's because

the review found "little to no evidence" for some of WPATH's recommendations, but WPATH policy required all of its data to be used "for the benefit of advancing transgender health in a positive manner." *Id.* at 32. These sorts of stories are familiar even outside of WPATH—a yearslong study funded by the National Institutes of Health that began in 2015 found that puberty blockers caused no change in depression symptoms among gender dysphoric youth, but the authors did not publish their findings for years because they did "not want [their] work to be weaponized."[19]

\*        \*        \*

There are "perennial gaps" and "uncertainties" when it comes to the science of "the human mind"—"[e]ven as some puzzles get resolved, others emerge." *Kahler v. Kansas*, 589 U.S. 271, 280 (2020). Those puzzles are even harder to solve when there are advocacy groups deliberately misrepresenting the state of the medical evidence. But "nothing . . . could be less fruitful than for this Court to try to resolve for the Nation profound questions like" those surrounding the psychology of gender identity "under a provision of the Constitution that does not speak to them," and thereby "freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold." *Grants Pass*, 603 U.S. at 551 (first and second quotes) (cleaned up); *Powell v. Texas*,

---

[19] Gabrielle M. Etzel, *Controversial suppressed paper on trans youth procedures is finally published*, Wash. Examiner (June 6, 2025), https://tinyurl.com/28234zpm; Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says*, N.Y. Times (Oct. 23, 2024), https://tinyurl.com/3ffc8khc.

392 U.S. 514, 537 (1968) (plurality opinion) (third quote). Georgia's statutory decision to treat gender dysphoria with psychotherapy instead of cross-sex hormones has more than enough evidentiary support to constitute adequate treatment, and that is all this Court needs to decide.

## CONCLUSION

The Court should reverse the district court's judgment.


Dated: January 9, 2026

THEODORE E. ROKITA
INDIANA ATTORNEY GENERAL

JAMES A. BARTA
Solicitor General

Respectfully submitted,

RAÚL R. LABRADOR
IDAHO ATTORNEY GENERAL

/s/ *Michael A. Zarian*

MICHAEL A. ZARIAN
Deputy Solicitor General

JADEN STEEVES
David H. Leroy Fellow


*Counsel for Amici States*

24

## ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

STEVE MONTENEGRO
Speaker of the Arizona
House of Representatives

WARREN PETERSON
President of the
Arizona Senate

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

KEITH G. KAUTZ
Attorney General
State of Wyoming

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,967 words. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

Dated: January 9, 2026

/s/ *Michael A. Zarian*
Michael A. Zarian

26

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

Dated: January 9, 2026

/s/ *Michael A. Zarian*
Michael A. Zarian