No. 25-14263

---

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

ISIS BENJAMIN, et al.,
*Plaintiffs-Appellees*,
v.
COMMISSIONER TYRONE OLIVER, in his official capacity, et al.,
*Defendants-Appellants*.

---

Appeal from the U.S. District Court for the
Northern District of Georgia, No. 1:25-cv-04470-VMC

---

**PLAINTIFFS-APPELLEES' BRIEF**

---

Amanda Kay Seals
Matthew R. Sellers
BONDURANT, MIXSON & ELMORE, LLP
1201 W Peachtree St NW
Suite 3900
Atlanta, GA 30309
Phone: (404) 881-4100
Fax: (404) 881-4111
seals@bmelaw.com
sellers@bmelaw.com

*Counsel for Plaintiffs-Appellees*

Emily C. R. Early
A. Chinyere Ezie
Celine Zhu
Kayla Vinson
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Phone: (212) 614-6464
eearly@ccrjustice.org
cezie@ccrjustice.org
czhu@ccrjustice.org
kvinson@ccrjustice.org

D. Korbin Felder
kfelder@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. BOX 12046
Jackson, MS 39236
Phone: (601) 228-6101

## STATEMENT REGARDING ORAL ARGUMENT

The Court has already set this case for oral argument, and Plaintiffs-Appellees respectfully request that it remain on an oral argument calendar.

This appeal is about enforcing Georgia's established constitutional obligation to treat the serious medical needs of those whom it incarcerates: specifically, Georgia's duty to provide proven, medically necessary care to those in custody of the Georgia Department of Corrections ("GDC") suffering from gender dysphoria, a serious medical need. Georgia treated gender dysphoria in prisons with hormone therapy until July 2025. Since then, it has banned all such care in prisons, without regard to medical need, pursuant to 2025 Ga. Laws Act 69 ("SB185"), codified at O.C.G.A. § 42-5-2. The same care remains available to adults outside prison. This violates the Eighth Amendment.

Defendants Tyrone Oliver, the GDC Commissioner, Assistant Commissioner of GDC's Health Services Division Randy Sauls, GDC's Statewide Medical Director Dr. Marlah Mardis ("the State Defendants"), and Defendant Centurion of Georgia, LLC ("Centurion"), GDC's contracted healthcare provider (collectively "Defendants"), do not dispute with any admissible, reliable evidence the material facts supporting the district court's grant of summary judgment. Defendants do not dispute, for example, that gender dysphoria is a serious medical need requiring individualized treatment.

ii

Rather than offer any admissible evidence to genuinely dispute the medical necessity of hormone therapy or the recklessness of withdrawing it, the State Defendants contend that recent equal protection caselaw makes blanket bans on hormone therapy in prison *per se* constitutional. Centurion, for its part, does not even defend the ban; it simply claims that only the State Defendants can be held liable. Both arguments fail. Decades of Eighth Amendment precedent guarantees the right to medically necessary healthcare in prisons.

Oral argument will assist the Court's resolution of the critical question this case poses: whether the Eighth Amendment prohibits states from banning an entire category of medically necessary care *only* for those they imprison.

TABLE OF CONTENTS

Statement Regarding Oral Argument.......................................................................... ii

Table of Authorities........................................................................................... vii

Statement of Jurisdiction....................................................................................1

Introduction .......................................................................................................1

Statement of the Issues.......................................................................................2

Statement of the Case.........................................................................................4

    I.    Factual Background .................................................................................4

        A.  For a decade before SB185's enactment, GDC recognized gender dysphoria is a serious medical condition requiring—for at least some patients—hormone therapy. ................................................................4

        B.  SB185 prohibits the use of hormone therapy to treat gender dysphoria......7

        C.  Defendants began enforcing SB185, using a model already enjoined as unconstitutional elsewhere. ..............................................................7

    II.   Course of Proceedings Below......................................................................10

        A.  Plaintiffs supplied significant evidence in support of their preliminary injunction motion. ................................................................................10

        B.  Defendants did not contest material facts in response to Plaintiffs' motion for preliminary injunction. ................................................................12

        C.  After a hearing, the district court entered a preliminary injunction...........14

        D.  The parties agreed to brief summary judgment on the limited record existing at the preliminary injunction stage. ....................................................16

        E.  The district court granted partial summary judgment on Plaintiffs' claims related to the withholding of hormone therapy and ordered associated relief..18

    III.    Statement of Standard of Review..........................................................20

Summary of the Argument................................................................................21

Argument..........................................................................................................25

I.   Defendants violated the Eighth Amendment by imposing a blanket ban on medically necessary healthcare for incarcerated adults. ......................................27

  A.  It is undisputed that Plaintiffs have demonstrated an objectively serious medical need..........................................................................................................28

  B.  Undisputed evidence confirms Defendants' subjective knowledge of the substantial risk posed by withdrawing or withholding medically necessary hormone therapy..................................................................................................29

  C.  Withdrawing necessary medical care for non-medical reasons is reckless and therefore deliberately indifferent...............................................................34

  D.  Defendants' provision of mental health services is not a reasonable response to the withdrawal of medically necessary care. ................................38

II.   Defendants did not supply evidence to create a genuine dispute of material fact. .................................................................................................................42

  A.  The parties' stipulation did not include materials cited in passing in briefs. 43

  B.  The law requires expert testimony to explain medical literature to the factfinder for good reason. ................................................................................44

  C.  Neither the Baker nor the Cass Reviews support the conclusion that hormone therapy is controversial treatment for adults with gender dysphoria.47

III.   SB185 is not constitutional under *Skrmetti* and *Eknes-Tucker*, nor is it a permissible exercise of police power.................................................................50

  A.  Neither *Skrmetti* nor *Eknes-Tucker* overrule Eighth Amendment precedent or constitutionalize bans on hormone therapy for incarcerated adults. ............50

  B.  State laws cannot abrogate the requirements of the Eighth Amendment. .52

IV.   The District Court did not abuse its discretion in certifying the classes....54

  A.  The PLRA does not prohibit class certification. ........................................55

  B.  Plaintiffs Benjamin and Madison have Article III standing........................58

V.   The District Court properly entered a permanent injunction. ......................60

VI.   The District Court correctly found Centurion liable for implementing SB185. ...............................................................................................................60

v

A.  Centurion does not dispute evidence of its policymaking authority or direct participation in causing Plaintiffs' and Class Members' injuries. ..........61

B.  The PLRA does not bar injunctions against private contractors.................63

Conclusion ........................................................................................................64

Certificate of Compliance ...............................................................................66

Certificate of Service .......................................................................................67

# TABLE OF AUTHORITIES

## Cases

*Ancata v. Prison Health Servs., Inc.*,
769 F.2d 700 (11th Cir. 1985)......................................................... 37–39, 41, 53

*Anderson v. Crouch*,
__ F.4th __, 2026 WL 667919 (4th Cir. Mar. 10, 2026).............................. 51

*Anderson v. Garner*,
22 F. Supp. 2d 1379 (N.D. Ga. 1997)...................................................... 55–56

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................. 25

*Barcelona v. Sec'y, Fla. Dep't of Corr.*,
657 F. App'x 896 (11th Cir. 2016)................................................................. 31

*Bickerstaff Clay Prods. Co. v. Harris Cnty.*, Ga.,
89 F.3d 1481 (11th Cir. 1996)..................................................................... 53

*Branch v. Smith*,
538 U.S. 254 (2003)............................................................................... 55–56

*Brown v. Plata*,
563 U.S. 493 (2011)............................................................................... 27, 55

*Buchanan v. Warley*,
245 U.S. 60 (1917)..................................................................................... 53

*Calderon v. Sixt Rent a Car, LLC*,
114 F.4th 1190 (11th Cir. 2024)................................................................. 49

*Carter v. City of Montgomery*,
108 F.4th 1334 (11th Cir. 2024)................................................................. 21

*Chandler v. Janssen Pharms., Inc.*,
322 F. Supp. 3d 314 (E.D.N.Y. 2018). ...................................................... 45

*Chapman v. Dunn*,
  129 F. 4th 1307 (11th Cir. 2025)..................................................... 20

*Colwell v. Bannister*,
  763 F.3d 1060 (9th Cir. 2014)...................................................... 37

*Cont'l Tech. Serv., Inc. v. Rockwell Int'l Corp.*,
  927 F.2d 1198 (11th Cir. 1991)............................................... 54, 60

*Cooper v. Dillon*¸
  403 F.3d 1208 (11th Cir. 2005)..................................................... 62

*Cordoba v. DIRECTV, LLC*,
  942 F.3d 1259 (11th Cir. 2019)..................................................... 60

*Denis v. Liberty Mut. Ins. Co.*,
  791 F.2d 846, 849 (11th Cir. 1986)............................................... 26

*Diamond v. Owens*,
  131 F. Supp. 3d 1346 (M.D. Ga. 2015) .............................. 4, 37, 42

*Doe v. McHenry*,
  763 F. Supp. 3d 81 (D.D.C. 2025)........................................... 37, 41

*Eknes-Tucker v. Governor of Alabama*,
  80 F.4th 1205 (11th Cir. 2023)................................... 24, 50–52

*Estelle v. Gamble*,
  429 U.S. 97 (1976)................................. 24, 27, 31, 35, 40, 52, 54

*Farmer v. Brennan*,
  511 U.S. 825 (1994)........................................................ 29–30, 35

*Fields v. Smith*,
  653 F.3d 550 (7th Cir. 2011)............................................. 36, 41–42

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008).................................................... 59

*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023).................................................................. 58–59

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022).................................................................................. 56

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
267 F.3d 1228 (11th Cir. 2001)................................................................ 20

*Grayson v. Warden Comm'r, Alabama*,
869 F.3d 1204 (11th Cir. 2017) ............................................................... 46

*Hardin v. Hayes*,
52 F.3d 934 (11th Cir. 1995).................................................................... 31

*Helling v. McKinney*,
509 U.S. 25 (1993)................................................................................... 35

*Hicklin v. Precynthe*,
No. 4:16-CV-01357-NCC, 2018 WL 806764
(E.D. Mo. Feb. 9, 2018)........................................................................... 36

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020)...................................................... 28, 37, 41

*Howell v. Evans*,
922 F.2d 712 (11th Cir. 1991)............................................................ 60–62

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
644 F. Supp. 3d 1075 (S.D. Fla. 2022) .................................................... 45

*Johnson v. Niehaus*,
491 F. App'x 945 (11th Cir. 2012) ........................................................... 49

*Johnson v. Wright,*
412 F.3d 398 (2d Cir. 2005)..................................................................... 37

*Jones v. Bock*,
549 U.S. 199 (2007).................................................................................. 57

ix

*Kelly v. Robinson*,
    479 U.S. 36 (1986)............................................................... 54

*Keohane v. Fla. Dep't of Corr. Sec'y*,
    952 F.3d 1256 (11th Cir. 2020)............................... 20, 28–29, 35–40, 42, 63

*Kingdom v. Trump*,
    No. 1:25-CV-591-RCL, 2025 WL 1568238
    (D.D.C. June 3, 2025)........................................................ 37, 41

*KMS Rest. Corp. v. Wendy's Int'l, Inc.*,
    361 F.3d 1321 (11th Cir. 2004)............................................... 26

*Kosilek v. Spencer*,
    774 F.3d 63 (1st Cir. 2014) .................................................. 37

*Kothmann v. Rosario*,
    558 F. App'x 907 (11th Cir. 2014)............................................ 41

*Kuhne v. Fla. Dep't of Corr.*,
    745 F.3d 1091 (11th Cir. 2014)............................................... 29

*Lange v. Houston Cnty.*,
    152 F.4th 1245 (11th Cir. 2025)............................................. 51

*Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*,
    772 F.3d 1352 (11th Cir. 2014)........................................... 21, 45

*Mandel v. Doe*,
    888 F.2d 783 (11th Cir. 1989).............................................. 35, 39

*Mann v. Taser Int'l, Inc.*,
    588 F.3d 1291 (11th Cir. 2009)............................................... 26

*Monell v. Department Social Services*,
    436 U.S. 658 (1978)....................................................... 60–62, 63

*Mosley v. Zachery*,
    966 F.3d 1265 (11th Cir. 2020)........................................... 29, 34, 39

x

*Moye v. Fountain Corr. Facility*,
　　No. 24-13692, 2025 WL 2745808 (11th Cir. Sept. 26, 2025) ..................... 41

*Njie v. Experian Info. Sols., Inc.*,
　　549 F. Supp. 3d 1361 (N.D. Ga. 2021) ...................................................... 56

*Panhandle E. Pipe Line Co. v. State Hwy. Comm'n*,
　　294 U.S. 613 (1935)................................................................................. 53

*Pensley v. Eslinger*,
　　605 F.3d 843 (11th Cir. 2010)................................................................. 49

*Perttu v. Richards*,
　　605 U.S. 460 (2025)................................................................................. 57

*Polelle v. Fla. Sec'y of State*,
　　131 F.4th 1201 (11th Cir. 2025).......................................................... 58–59

*Rhodes v. Chapman*,
　　452 U.S. 337 (1981)................................................................................. 54

*Robinson v. Labrador*,
　　747 F. Supp. 3d 1331 (D. Idaho 2024) .............................................. 62, 63

*Robinson v. Labrador*,
　　No. 1:24-CV-00306-DCN, 2025 WL 1547067 (D. Idaho May 30, 2025) .... 8

*Robinson v. Labrador*,
　　No. 1:24-CV-00306-DCN, 2026 WL 564074 (D. Idaho Feb. 27, 2026)....... 8

*Roe v. Elyea*,
　　631 F.3d 843 (7th Cir. 2011)................................................................... 37

*Rogers v. Evans*,
　　792 F.2d 1052 (11th Cir. 1986)............................................................... 38

*Shook v. El Paso Cnty.*,
　　386 F.3d 963 (10th Cir. 2004)........................................................... 55, 57

*Soneeya v. Spencer*,
  851 F. Supp. 2d 228 (D. Mass. 2012) .................................................. 36–37

*Stalley v. Cumbie*,
  124 F.4th 1273 (11th Cir. 2024) .............................................................. 27

*United States v. Farley*,
  607 F.3d 1294 (11th Cir. 2010) ............................................................... 53

*United States v. Jones*,
  29 F.3d 1549 (11th Cir. 1994) .................................................................. 46

*United States v. Pate*,
  84 F.4th 1196 (11th Cir. 2023) ................................................................ 57

*United States v. Skrmetti*,
  605 U.S. 495 (2025) ........................................... 13, 17, 24, 46, 50–51

*United States v. Valois*,
  915 F.3d 717 (11th Cir. 2019) ............................................................ 45–46

*W. Ala. Women's Ctr. v. Williamson*,
  900 F.3d 1310 (11th Cir. 2018) .............................................................. 47

*Wade v. McDade*,
  106 F.4th ....................................................... 21, 27, 29, 38, 53

*Washington v. Dugger,*
  860 F.2d 1018 (11th Cir. 1988) ........................................................... 31–32

*Wilderness Soc'y v. Alcock,*
  83 F3d 386 (11th Cir. 1996) ................................................................... 59

*Wyatt v. Cole*,
  504 U.S. 158 (1992) ................................................................................ 61

*Yates v. Collier*,
  868 F.3d 354 (5th Cir. 2017) ............................................................. 55–57

xii

*Young v. City of Augusta*,
    59 F.3d 1160 (11th Cir. 1995) ........................................................... 30

## **Constitutional Authority**

U.S. Const. art III .................................................................... 3, 58–59

U.S. Const. amend. VIII .................................. ii, iii, 2–3, 8, 15–16,  18,  20–21, 25
    27, 29–31, 36–37, 41–42, 50–54

U.S. Const. amend. XIV ................................................................ iii, 50

## **Statutory Authority**

8 U.S.C. § 1252(f)(1) ..................................................................... 56

18 U.S.C. § 3626 .............................................. 3, 16, 24, 54–59, 63–64

28 U.S.C. § 1331 ........................................................................... 1

42 U.S.C. § 1983 ................................................................. 1, 62, 65

O.C.G.A. § 42-5-2 ...................................................................... ii, 7

## **Rules**

Fed. R. App. P. 10 ........................................................................ 44

Fed. R. Civ. P. 56(a) ..................................................................... 25

Fed. R. Civ. P. 56.1 ...................................................................... 17

Fed. R. Civ. P. 56(d) ..................................................................... 16

Fed. R. Evid. 703 ......................................................................... 48

Fed. R. Evid. 803 ................................................................ 17, 45, 48

N.D. Ga. L.R. 7.1(B) ..................................................................... 10

N.D. Ga. L.R. 56.1(B) .................................................................... 26

## **Other Authority**

Black's Law Dictionary (12th ed. 2024) ............................................... 44

## STATEMENT OF JURISDICTION

This district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' 42 U.S.C. § 1983 claims arise under federal law. This Court has appellate jurisdiction for the reasons set out in Plaintiffs' Response to the Court's Jurisdiction Question, Dkt-41.[1]

## INTRODUCTION

Defendants have not supplied evidence disputing the material facts that prove Plaintiffs' deliberate indifference claim. Defendants do not dispute that gender dysphoria is a serious medical need requiring individualized treatment. Defendants do not dispute that GDC clinicians prescribed hormone therapy for adult gender dysphoria patients for more than a decade. Nor do they dispute that GDC clinicians prescribed this treatment pursuant to policies acknowledging that—for some gender dysphoria patients—hormone therapy is medically necessary treatment, without which patients faced serious health risks. Defendants do not dispute that clinicians, including Defendant Mardis, had already determined hormone therapy to be medically necessary treatment for over one hundred Plaintiffs and Class Members,

---

[1] Pursuant to Eleventh Circuit Rule 28-5, Appellees use the following format for citations to the district court record: R-[district court docket number] (abbreviated name of the document, if needed for context) at [page number(s) or paragraph number(s), as appropriate]. Citations to this Court's or other courts' dockets use the following format: Dkt-[docket number(s)]. All page numbers refer to the page number generated by the respective court's electronic filing system.

nor do they dispute that prior to SB185, they were in the process of evaluating others. Defendants do not dispute that despite knowing these risks, they adopted a blanket ban that terminated access to hormone treatment and evaluations, not because providers' medical judgment changed but *only* because of SB185's blanket ban on such care. This is paradigmatic deliberate indifference.

Defendants cannot reframe this case to make it about states' authority to regulate purportedly controversial medicine. It is not—not according to the General Assembly that enacted SB185; not according to Defendants or their clinicians, who have repeatedly acknowledged that hormone therapy is medically necessary for at least some Plaintiffs and Class Members; and not even according to the sources Defendants sought to admit in defiance of the Federal Rules of Evidence and the parties' stipulation that the record was closed.

The district court properly enjoined this categorical ban on medically necessary care, enforcing the Eighth Amendment's requirement that "healthcare decisions for prisoners [] be made … for reasons beyond the fact that the prisoners are prisoners." R-94 at 22. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether Defendants failed to create a genuine dispute of material fact that Defendants' enforcement of a statutory ban on hormone therapy to treat gender dysphoria amounted to deliberate indifference to medical need, in

2

violation of Plaintiffs' Eighth Amendment rights, where Defendants offered no evidence to dispute that (1) gender dysphoria is a serious medical need, (2) hormone therapy is medically necessary to treat at least some patients' gender dysphoria, and (3) Defendants consciously disregarded the known risks of terminating or withholding hormone therapy by implementing a blanket treatment ban;

2. Whether the district court correctly rejected Defendants' novel argument that the Prison Litigation Reform Act ("PLRA") prohibits class actions, in accord with every other court to have confronted the issue;

3. Whether Plaintiffs Benjamin and Madison, whom Defendants have denied evaluations for hormone therapy based on SB185's blanket statutory ban on such care regardless of need, have Article III standing to seek injunctive relief against Defendants for enforcing that ban against them and the class they represent; and

4. Whether Centurion can be held liable for its effectuation of and direct participation in SB185's unconstitutional blanket ban on healthcare.

3

## STATEMENT OF THE CASE

I. **Factual Background**

A. **For a decade before SB185's enactment, GDC recognized gender dysphoria is a serious medical condition requiring— for at least some patients—hormone therapy.**

Gender dysphoria is a diagnosable medical condition appearing in the DSM-V, arising from the incongruence between an individual's gender identity and birth-assigned sex. R-11-1 ¶¶ 24–25, 31(a)–(b); R-11-2 ¶¶ 11–12; R-11-8 at 3; R-11-10 at 3. Gender dysphoria is a serious medical need requiring individualized treatment. R-11-1 ¶¶ 45–59; R-11-2 ¶¶ 16–17, 21–32; R-11-8 at 2–4.

In 2015, GDC adopted a Standard Operating Procedure ("SOP") called "the Management and Treatment of Offenders Diagnosed with Gender Dysphoria." R-11-12 at 2. GDC adopted the SOP because its prior policy of denying gender dysphoria treatment caused "psychological and physical harm." *Diamond v. Owens*, 131 F. Supp. 3d 1346, 1374 (M.D. Ga. 2015);[2] *see also* R-56 at 27 (stating that "the *Diamond* case" prompted GDC to "pass[] this new reg that said we will consider hormones in certain circumstances"). The preamble to the 2015 policy stated that GDC would provide "constitutionally appropriate" medical treatment to gender

---

[2] Unless otherwise noted, quotations, citations, and alterations original to both legal and record citations are omitted, while alterations and emphasis are added throughout.

dysphoria patients, inclusive of individualized evaluations for hormone therapy. R-11-12 at 2–3.

Over the next decade, GDC authorized hormone therapy and individualized treatment evaluations to gender dysphoria patients in custody pursuant to the SOP, R-11-12, and with additional SOPs that the State Defendants and Centurion adopted and enforced. *See* R-11-9; R-11-10; R-11-11. Those SOPs were in place until July 2025 when Defendants implemented SB185. R-82-1 ¶¶ 10, 14; R-28-1 ¶ 4. The SOPs acknowledged that gender dysphoria "represents [a] serious medical need[] which may not be ignored." R-11-10 at 4. The SOPs also expressly recognized—in multiple places—that gender dysphoria is "characterized by clinically significant distress" and "impairment[s] in …important areas of functioning," among other symptoms, caused by the "marked incongruence between an individual's experienced/expressed and assigned gender." R-11-9 at 2; R-11-11 at 2-3.

Reflecting the seriousness of the medical needs arising from gender dysphoria, the SOPs acknowledged that "appropriate management" of gender dysphoria requires a patient-specific "individual management plan." R-11-10 at 4. To facilitate creation of such plans, the SOPs required individual evaluations. R-11-10 at 5; R-11-9 at 3.

The SOPs committed GDC to "provide transgender offenders with individualized assessments and care," including specifically "[w]hen warranted,

5

hormone treatment throughout their incarceration." R-11-11 at 18. The SOPs stated that GDC would "ensure that all gender-related hormone treatment that may be provided while the offender is in custody occurs after an individualized assessment of the offender by a medical practitioner," that practitioners would "adjust hormone levels and dosages as medically warranted," and that "[o]nly medical practitioners will make decisions regarding gender-related hormone treatment needs." *Id.* Pursuant to the SOPs, GDC's Statewide Medical Director—Defendant Mardis— would "make the final determination on whether gender-related hormone treatment for a transgender offender should be initiated or continued based on documented medical need." *Id.* at 19.

Before July 2025, there were 340 adults with gender dysphoria in GDC custody. R-28-1 ¶ 3. Over one hundred were receiving hormone therapy as of June 30, 2025, including Plaintiffs Doe, Horton, and Wilson. R-28-1 ¶ 3; R-11-4 ¶¶ 7–12; R-11-6 ¶¶ 8–13; R-11-7 ¶¶ 7–17. Each was prescribed hormone therapy because GDC healthcare providers found it to be medically necessary treatment for their gender dysphoria. *See, e.g.*, R-11-4 ¶ 7; R-11-7 ¶¶ 7–8; R-11-9 at 5; R-11-10 at 6–8; R-11-11 at 18–19. Others, like Plaintiffs Madison and Benjamin, were awaiting evaluation. R-11-3 ¶¶ 12–27; R-11-5 ¶¶ 7–18.

**B.    SB185 prohibits the use of hormone therapy to treat gender dysphoria.**

SB185, enacted on May 8, 2025, bans "[h]ormone replacement therapies," among other gender dysphoria treatment, for people in GDC custody. O.C.G.A. § 42-5-2(e)(1)(A)–(C). Specifically, SB185 prohibits the "use of state funds or resources" for hormone therapy as gender dysphoria treatment within GDC, *id.* § 42-5-2(e)(1), and prohibits patients from self-paying for the care. R-82-1 ¶ 20.

SB185 does not contain any medical necessity exception, except where the prohibited treatments are "medically necessary" to treat a condition *other than* gender dysphoria. O.C.G.A. § 42-5-2(e)(2)(A). Thus, the law requires "transitioning" patients who were—at enactment—receiving hormone therapy determined by GDC clinicians to be medically necessary "off such therapy." O.C.G.A. § 42-5-2(e)(2)(D); *see also* R-11-14 at 3.

**C.    Defendants began enforcing SB185, using a model already enjoined as unconstitutional elsewhere.**

In July 2025, R-28-1 ¶¶ 4–5, Defendants began enforcing SB185. R-11-20. Defendant Centurion led the effort "to ensure compliance with the new law in GA[SB185]." R-11-18 at 2. It created a plan, stamped with its logo, to implement SB185 across GDC that the State Defendants adopted. R-11-18 at 2, R-11-20 at 2, 4. Centurion's Statewide Medical Director attested that "Centurion began tapering all patients off" hormone therapy to comply with SB185, including Plaintiffs Horton,

Wilson, and Doe. R-28-1 ¶¶ 4–5. Defendants also stopped evaluating gender dysphoria patients to determine if they needed hormone therapy to treat their severe symptoms, including Plaintiffs Benjamin and Madison. R-11-3 ¶¶ 12–20; R-11-5 ¶¶ 12, 16–17. For Plaintiff Benjamin, that meant losing access to treatment she had relied on for almost 20 years. R-11-3 ¶ 8.

Centurion modeled its SB185 enforcement plan on a plan its Idaho affiliate used when that state passed a similar state law. R-11-18 at 1; R-11-21 at 6. By the time Defendants began implementing Centurion's plan in Georgia, an Idaho federal court had preliminarily enjoined Idaho's enforcement of its analogous law four times, on the same Eighth Amendment ground Plaintiffs assert here. *Robinson v. Labrador*, No. 1:24-CV-00306-DCN, 2025 WL 1547067, at *1 (D. Idaho May 30, 2025). That court has since enjoined the Idaho law a *seventh* time. *Robinson v. Labrador*, No. 1:24-CV-00306-DCN, 2026 WL 564074 (D. Idaho Feb. 27, 2026).

Still, Defendants began terminating hormone therapy for more than one hundred patients—including Plaintiffs Horton, Wilson, and Doe. R-28-1 ¶¶ 4–5, 9, 11; R-46-1 ¶ 5. They did so even though, as detailed above, GDC had authorized hormone therapy for gender dysphoria only when determined medically necessary based on individualized assessments. R-11-11 at 18–19. They also did so notwithstanding risks obvious even to Defendant Oliver, GDC's Commissioner, who

exchanged the following text messages about SB185 with GDC's in-house lawyer

while the bill was before the legislature. Oliver's messages appear in white.



R-11-16 at 2.

## II.    Course of Proceedings Below

### A.    Plaintiffs supplied significant evidence in support of their preliminary injunction motion.

Plaintiffs filed suit on August 8, 2025, R-1, less than one month after Defendants began enforcing SB185.[3] Plaintiffs contemporaneously moved for a preliminary injunction on the hormone therapy ban, R-3, and for provisional class certification, R-2. Plaintiffs supported their motion with extensive evidence, R-11-1–23, including testimony from two experts in the treatment of gender dysphoria, psychologist Dr. Randi Ettner, R-11-1, and Emory School of Medicine endocrinologist Dr. Jeehea Sonya Haw, R-11-2.[4] Doctors Ettner and Haw based their expert opinions on a variety of sources, including their extensive professional training and their combined 45 years of clinical experience treating gender dysphoria patients. R-11-1 ¶¶ 1, 6–19; R-11-12 ¶¶ 1, 9.

This expert evidence showed that without medically necessary treatment, including—for some—hormone therapy, adult gender dysphoria patients can experience clinically significant distress. *E.g.*, R-11-1 ¶¶ 34, 124–162, 164, 167; R-11-2 ¶¶ 32, 42–43, 49–51, 56–57, 61–62. Specifically, gender dysphoria patients

---

[3] Defendants agreed to waive service on August 8, the day Plaintiffs filed suit, and an acknowledgment of service was filed August 11. R-16-1. Like this Court, the district court approved expedited briefing. R-10. Defendants had 10 days, rather than the 14 provided in the Local Rules, N.D. Ga. L.R. 7.1(B), to respond. R-10.

[4] Defendants challenged neither expert on *Daubert* or other grounds.

10

often require treatment to avoid or reduce impairments to important areas of functioning, anxiety, depression, and suicidality and other forms of self-harm. R-11-1 ¶¶ 34, 124–62, 167; R-11-2 ¶¶ 32, 42–43, 49–51, 56–57, 61–62. The seriousness of these symptoms makes hormone care especially critical in prisons, where other forms of treatment are less available. R-11-1 ¶¶ 62, 155; R-11-2 ¶¶ 30, 56. Gender dysphoria symptoms tend to worsen the longer hormone treatment is withheld. R-11-1 ¶¶ 145–48; R-11-2 ¶¶ 42–43.

The expert evidence also established that terminating medically necessary hormone therapy once it has been prescribed puts patients at risk of physiological and psychological harm. R-11-1 ¶¶ 31(b), 53, 151–154; R-11-2 ¶¶ 42, 46–49, 61–62. This includes metabolic dysregulation; vasomotor instability; hormonal disequilibrium; mood destabilization and dysregulation; and musculoskeletal, neuroendocrine, cardiovascular, cardiometabolic, and neuropsychiatric effects. R-11-1 ¶¶ 147–155, 157–162, 167; R-11-2 ¶¶ 42-43, 46–51, 56-57, 61–62; R-11-20 at 14; R-11-21 at 7–8.

Dr. Ettner and Dr. Haw also testified that neither psychotherapy nor psychotropic drugs are a substitute for hormone therapy because they do not treat the underlying condition of gender dysphoria or the clinically significant distress it causes. R-11-1 ¶¶ 95–97, 120–22, 140, 145–50, 169; R-11-2 ¶¶ 33, 43–45, 63. This is, of course, consistent with Defendants' pre-SB185 policies, which—like the

11

expert testimony—also recognized the necessity of individual evaluations and hormone therapy for gender dysphoria patients. R-11-11 at 18–19. The SOPs required that patients "be referred to the Medical Department to be evaluated and referred to an endocrinologist or other appropriate provider," and this requirement existed notwithstanding the concomitant availability of mental health services. R-11-9 at 5.

### B.    Defendants did not contest material facts in response to Plaintiffs' motion for preliminary injunction.

On August 18, Defendants filed briefs opposing Plaintiffs' motion for preliminary injunction. R-25. The State Defendants presented only two evidentiary exhibits in support of their opposition, neither of which included any testimony from a named Defendant. Instead, Defendants presented declarations from Dr. Gerald Wynne, Centurion's Statewide Medical Director, R-28-1, R-46-1,[5] and Dr. Kathryn Haynes Owen, R-25-2, Centurion's Statewide Mental Health Director. Centurion did not submit any evidence.

Those declarations were remarkable largely for what they did *not* say. They did not dispute that gender dysphoria is a serious medical condition. They did not dispute the medical necessity of hormone therapy to treat some patients' gender dysphoria. They did not dispute the conclusions of Plaintiffs' experts that serious

---

[5] Defendants filed a supplemental affidavit from Dr. Wynne, which added information about the John Doe plaintiff. *Compare* R-28-1 *with* R-46-1.

12

harm was likely to result from withdrawing and withholding hormone therapy from those who need it. Moreover, Dr. Wynne *admitted* that Centurion and the State Defendants began terminating hormone treatment in July 2025, even though it was prescribed only when GDC clinicians—including Defendant Mardis—deemed the treatment medically necessary. R-28-1 ¶¶ 4, 9, 11. In other words, Defendants' evidence *confirmed*, rather than disputed, Plaintiffs' core contention that Defendants had implemented a blanket ban on hormone therapy and denied treatment and evaluations for the same regardless of medical need.

The State Defendants' brief also made passing reference to two academic reviews, although Defendants did not file either with the Court or otherwise submit them into evidence as part of the preliminary injunction record. As to one—the Cass Review—Defendants did not even provide a citation to the Cass Review or list it in the brief's Table of Authorities. R-25 at 5, 18. Instead, the State Defendants referred in passing to Justice Thomas's citation to the document in his *Skrmetti* concurrence. *See* R-25 at 18 ("Justice Thomas also discussed the Cass Review, published in April 2024, which concluded, 'we have no good evidence on the long-term outcomes of interventions to manage gender-related distress.' *Id.* at 1845." (quoting *United States v. Skrmetti*, 145 S. Ct. 1816, 1845 (2025)).

As to the Baker Review, referenced in a single paragraph of their brief, the State Defendants wrote that it showed "the medical debate is unsettled." R-25 at 19.

13

And although the State Defendants' counsel offered a lay interpretation of the Reviews at the preliminary injunction hearing, neither Centurion nor the State Defendants offered any *evidence* suggesting that they had adopted a changed view on Plaintiffs' and Class Members' need for such care.

### C.    After a hearing, the district court entered a preliminary injunction.

The district court held a hearing on August 29, at which it heard argument from both sides. There, Plaintiffs relied on the exhibits filed in support of their motions. The State Defendants relied on the declarations attached to their filings. Centurion offered no evidence. Defendants did not offer any testimony about *any* scientific literature—not from a third-party expert or from the GDC clinicians who *did* supply declarations. R-28-1, R-25-2, R-46-1. The named Defendants did not appear at the hearing or offer testimony. No party tendered any evidence beyond that already attached to their briefing.

At the hearing, the court observed the apparent lack of factual dispute regarding the medical necessity of hormone treatment. When the court asked whether there was "any information in the record showing that the doctors felt that … these plaintiffs … should be taken off the HRT based on no longer having a medical need for it," counsel for the State Defendants answered, "[T]hat's not in the record. It was based on the legislature's determination that this category of interventions is not something the State supports." R-56 at 35.

14

On September 4, 2025, the district court granted Plaintiffs' motion. R-50. The district court emphasized that "[t]he Eighth Amendment does not federalize medical malpractice claims," nor does it require medical care in prison to be "perfect, the best obtainable, or even very good." *Id.* at 29. But, the court reasoned, SB185's withdrawal of care "was not a medical judgment." *Id.* at 34. Defendants had failed to produce evidence "that hormone therapy is never a medically appropriate treatment for gender dysphoria" in response to the ample necessity evidence already in the record, *id.* at 40, or that "there was any possible benefit to the tapering course of treatment that could offset the risk of the harm posed by the withdrawal side effects," *id.* at 34.

The preliminary injunction order did not mention the Cass Review, R-50, which, again, the State Defendants did not actually cite in their preliminary injunction briefing. As to the Baker Review, the district court observed that it had not been properly presented into evidence, R-50 at 40, and that it ultimately "affirms that hormone therapy is 'an essential component of care.'" *Id.* at 40 n.6 (quoting the Baker Review). For this reason, the court could not "take judicial notice of the allegedly unsettled nature of a medical debate." R-50 at 40.

The court also granted Plaintiffs' class certification motion, provisionally certifying two classes: one for those "who were receiving hormone therapy proscribed by S.B. 185 on May 8, 2025," when the law took effect (the "Receiving

15

Class"), and another for those who were not members of the Receiving Class but "who identify as transgender and request hormone treatment now proscribed by S.B. 185" (the "Requesting Class"). *Id.* at 50.

### D.    The parties agreed to brief summary judgment on the limited record existing at the preliminary injunction stage.

Given the apparent lack of factual disputes, the district court's preliminary injunction order directed the parties to brief whether partial summary judgment was appropriate on Plaintiffs' Eighth Amendment hormone therapy ban claim. R-50 at 63–64 n.16.

On November 3, 2025, as the expiration date imposed by the PLRA for the preliminary injunction approached, *see* 18 U.S.C. § 3626(a)(2), the parties stipulated to, and the district court ordered, an expedited summary judgment briefing schedule. R-69. As part of the stipulation, the parties agreed that summary judgment would be decided exclusively on the evidence the parties submitted in connection with their preliminary injunction briefing, and "that the record is complete for purposes of the [forthcoming] motions." *Id.* at 2. The parties agreed neither side would "submit additional evidence, and no party [would] contend that the lack of discovery is a reason to deny summary judgment under Federal Rule of Civil Procedure 56(d)." *Id.* They further "stipulat[ed] to the admissibility of all evidence submitted to date." *Id.*

This comported with the parties' discussion at an October 30 status conference with the Court, quoted in the summary judgment order, where the State Defendants

16

stated they would be "comfortable resting on what we've *submitted*, as long as …

our *declarations* are deemed admissible evidence and not hearsay." R-94 at 16 n.7

(quoting Oct. 30, 2025 Status Conf. 5:10–6:10). The State Defendants said nothing

about the medical literature cited in their preliminary injunction opposition. R-25.

On November 10, 2025, Plaintiffs moved for partial summary judgment and

a permanent injunction, while the State Defendants cross-moved for partial summary

judgment. R-71; R-72. Plaintiffs and the State Defendants filed Rule 56.1 statements.

*See* R-71-1; R-72-1. On November 11, Centurion filed a joinder motion seeking to

adopt the State Defendants' summary judgment arguments as its own, R-75, but did

not file a Rule 56.1 statement.

Despite the Parties' stipulation that the evidentiary record was already

complete for purposes of summary judgment, R-69 at 2, the State Defendants

attempted to admit the Baker Review and Cass Review as evidence for the very first

time, without any testimony laying a foundation for their admissibility under Federal

Rule of Evidence 803(18). *See* R-72-2 (Baker Review); R-72-3 (Cass Review).

Again, while State Defendants had merely cited—not filed—the Baker Review in

their preliminary injunction briefing, their singular mention of the Cass Review

came in reference to Justice Thomas's concurrence in *Skrmetti*. R-25 at 18. In other

words, the State Defendants never sought to admit the Baker or Cass Reviews into

evidence and never provided so much as a citation to the Cass Review until *after* the parties' stipulation closed the record. R-69.

Plaintiffs and Defendants opposed each other's motions and filed reply briefs in support of their own motions. R-78, R-87 (Centurion); R-79, R-89 (Plaintiffs); R-80, R-93 (State Defendants). Plaintiffs and the State Defendants also filed responses to the other's Rule 56.1 statements. R-81 (Plaintiffs), R-80-1 (State Defendants). Plaintiffs also filed a reply Rule 56.1 statement. R-91. Across their filings, Plaintiffs repeatedly objected to the State Defendants' attempt to expand the summary judgment record contrary to the Parties' November 3 stipulation and the Federal Rules of Evidence. R-79 at 23–24; R-81 ¶¶ 44, 57; R-89 at 12–14; R-91 ¶¶ 4–9.

Plaintiffs also moved for class certification, R-70, which only the State Defendants opposed. R-77. By November 24, the motions were fully briefed.

**E.    The district court granted partial summary judgment on Plaintiffs' claims related to the withholding of hormone therapy and ordered associated relief.**

On December 3, 2025, the district court granted partial summary judgment in Plaintiffs' favor, finding that Defendants had not shown a genuine dispute of material fact regarding Plaintiffs' Eighth Amendment claims related to hormone therapy. R-94.

In a 29-page order that "largely incorporate[d] the legal conclusions of the Preliminary Injunction Order by reference," R-94 at 3, the district court reasoned

"that there is no genuine dispute of fact that gender dysphoria is a serious medical need" and that Plaintiffs had supplied "evidence that a blanket ban on hormone therapy constitutes grossly inadequate care for gender dysphoria and risks imminent injury." *Id.* at 13. Thus, the district court found that "the sole question remaining [was] whether Defendants have presented any evidence which negates or contradicts Plaintiffs' evidence." *Id.* at 14. The district court concluded that Defendants had not carried their evidentiary burden to defeat Plaintiffs' motion or to demonstrate their entitlement to an affirmative grant of summary judgment. *Id.* at 14, 28–29.

First, the court found that neither the Baker nor the Cass Reviews "create[d] a fact dispute." *Id.* The court reasoned that the parties' stipulation closing the record precluded its consideration of those materials and that the materials would not otherwise be admissible without expert testimony to lay a foundation and connect the reviews to "the facts of the case." *Id.* at 17. Next, the district court observed that the only evidence Defendants *did* offer—the Wynne and Owens declarations—did not rebut Plaintiffs' showing "that hormone therapy can be medically necessary for some gender dysphoria patients." *Id.* at 18. Lastly, the district court rejected Defendants' legal arguments about purported controversy and legislative authority. *Id.* at 20–23. As in its preliminary injunction order, the court emphasized that prison clinicians may "taper a patient off a treatment even if there is some risk of side effects posed," but those decisions must rest on "medical judgment." *Id.* at 23. The district

19

court also granted Plaintiffs' motions for permanent injunctive relief and for class certification, finding Plaintiffs had satisfied the injunctive relief and Rule 23 requirements. *Id.* at 24–26.

The State Defendants and Centurion filed separate notices of appeal. Dkt-1-1; Dkt-22-1. Centurion objected to this Court's consolidation of Defendants' appeals, Dkt-27, but the Court confirmed in a January 30, 2026 order that the appeals would be heard together. Dkt-46. Before this Court, the State Defendants challenge the district court's determination that they violated the Eighth Amendment by imposing a categorical ban on hormone treatment without regard to patient need, Dkt-26, while Centurion challenges only the determination that it is a proper defendant. Dkt-52.

## III.    Statement of Standard of Review

Decisions granting summary judgment are reviewed de novo. *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001); *Chapman v. Dunn*, 129 F. 4th 1307, 1317 (11th Cir. 2025). This Court reviews "the district court's entry of a permanent injunction for an abuse of discretion," while "the district court's underlying legal conclusion—that there was an Eighth Amendment violation warranting equitable relief—is reviewed *de novo*." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1265 n.2 (11th Cir. 2020).

This Court reviews "a district court's class-certification decision for abuse of discretion," which a trial court abuses "if it applies an incorrect legal standard,

20

follows improper procedures in ruling on class certification, makes clearly erroneous fact findings, or applies the law in an unreasonable or incorrect manner." *Carter v. City of Montgomery,* 108 F.4th 1334, 1341 (11th Cir. 2024). Under this standard, the Court reviews factual findings for clear error and legal determinations de novo. *Id*.

Questions related to evidentiary matters are reviewed for abuse of discretion. *Lebron v. Sec'y of Fla. Dep't of Child. & Fams*., 772 F.3d 1352, 1370 (11th Cir. 2014).

## SUMMARY OF THE ARGUMENT

SB185 (1) imposes a blanket ban on hormone therapy as gender dysphoria treatment for those in GDC custody, irrespective of medical need, and (2) terminates all hormone therapy already determined to be medically necessary, although it remains available to adult gender dysphoria patients across Georgia who are not incarcerated. Defendants' enforcement of this ban violates the Eighth Amendment deliberate indifference standard.

Plaintiffs supplied evidence sufficient to establish each element of their Eighth Amendment claim. Deliberate indifference requires a plaintiff show she has an "objectively serious medical need." *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc), of which "the defendant official was subjectively aware," *id.* at 1258. The plaintiff must then show the defendant's "own conduct—again his own

21

actions or inactions—put the plaintiff at substantial risk of serious harm." *Id.* Plaintiffs have satisfied both prongs, entitling them to summary judgment.

To begin, there is no dispute that gender dysphoria is a serious medical need, characterized by clinically significant distress and requiring individualized care. R-82-1 ¶¶ 1–2, 4. Nor is there any dispute that without appropriate care, patients experience clinically significant distress and impairments to functioning that are the hallmarks of gender dysphoria. *Id.* ¶¶ 1–2.

Plaintiffs also supplied evidence that Defendants had actual knowledge of gender dysphoria's seriousness and the medical necessity of hormone therapy for at least some patients. Defendants conceded, for example, that they are subjectively aware of GDC's pre-SB185 standard operating procedures. R-82-1 ¶ 14. Those SOPs state explicitly that gender dysphoria is a "serious medical need[]," R-11-10 at 4, "characterized by clinically significant distress," R-11-9 at 2; R-11-11 at 2, and requiring individualized care, R-11-10 at 4, and that "hormone treatment" is medically-necessary for some patients based on "documented medical need" R-11-11 at 18–19; *see also* R-82-1 ¶¶ 10–15. Defendants also admitted they knew hormone therapy was only prescribed to Plaintiffs and Class Members when GDC clinicians—including Defendant Mardis—determined it was medically necessary treatment for their "serious medical needs." R-82-1 ¶¶ 11, 14–15. Defendants categorically withdrew access to this care while cognizant of the risks it posed to

22

Plaintiffs and Class Members, not because their medical judgment on the necessity of hormone therapy changed but—instead—"to comply with Senate Bill 185." R-28-1 ¶ 4; R-56 at 35. This amounts to deliberate indifference.

Defendants, meanwhile, failed to carry their burden. They did not supply evidence sufficient to create a genuine dispute of material fact on any issue. They proffered no *evidence* that mental health services are a substitute for hormone therapy for any, let alone *all*, gender dysphoria patients, such that categorically withholding hormone therapy and offering only counseling and psychotropic medication would be reasonable, contrary to GDC's pre-SB185 policies. R-11-9 at 5; R-11-11 at 18–19. Defendants did not offer any competing evidence to challenging Plaintiffs' evidence that counseling and psychotropic medication are—for at least some patients—insufficient to treat gender dysphoria. *Compare* R-82-1 ¶¶ 6, 7, 35 *with* R-11-1 ¶¶ 95–97, 120–22, 145–50, 169; R-11-2 ¶¶ 33, 43–45, 63.

Further, while the district court was correct to exclude the only "evidence" Defendants point to—the Baker Review and the Cass Review—as inadmissible, the exclusion was also harmless. Even if the Cass and Baker Reviews were admissible, neither creates a fact question on whether hormone therapy's benefits outweigh any risks for adult patients. And neither support the position that hormone therapy is never medically necessary for adult gender dysphoria patients, or that it should be prohibited pending further study. R-72-2 at 14; R-72-3 at 183. Rather, they establish

23

that hormone therapy is an "essential component" of gender dysphoria care for adults that "has transformed the lives of many transgender people." R-72-2 at 14; R-72-3 at 183. That is not evidence of controversy or uncertainty within the medical community regarding this treatment.

*United States v. Skrmetti*, 605 U.S. 495 (2025), or *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), do not resolve the constitutional question Plaintiffs' claims pose. Both decisions expressly distinguished treatment for minors from that for adults and emphasized the limited scope of the laws before them. Nor did either address—let alone displace—*Estelle v. Gamble*, 429 U.S. 97 (1976), settled Supreme Court precedent requiring prison officials to provide incarcerated people with adequate medical care. Even the broadest police power does not authorize violating the Constitution.

Nor were the district court's rulings effectuating relief error. Nothing in the PLRA precludes class relief. And Plaintiffs Benjamin, Madison, and other members of the Requesting Class have standing because they seek redress for Defendants' policy banning them from being evaluated for or prescribed hormone therapy based on their individual medical need. They do not, in other words, seek an order that they be prescribed hormone therapy. And because the district court's conclusion on Plaintiffs' partial summary judgment was correct, so too was its permanent injunction. Defendants have never challenged any requirement for permanent

24

injunctive relief except for success on the merits, and they have waived any such challenge now.

Finally, the district court properly enjoined Centurion from enforcing SB185. The undisputed evidence confirms that Centurion was both directly involved in the implementation of SB185 and that it adopted SB185 as its own policy. It is liable for violating the Eighth Amendment for both those reasons.

## ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). Instead, factual disputes must be both "*genuine*" and "*material.*" *Id.* (emphasis in original).

As to each element of Plaintiffs' deliberate indifference claim, Plaintiffs submitted evidence establishing Defendants' liability. Defendants, meanwhile, failed to marshal evidence that could create a genuine issue of material fact on *any* of those elements. In their Response to Plaintiffs' Statement of Undisputed Material Facts, the State Defendants repeatedly "do not dispute" that Plaintiffs' evidence proves a particular fact for which that evidence is proffered. For example, in response to the

very first paragraph of Plaintiffs' Statement of Undisputed Material Fact, wherein Plaintiffs cite expert testimony establishing that "[g]ender dysphoria is a serious medical condition that appears in the DSM-5," the State Defendants respond that they "do not dispute that Plaintiffs' retained experts offered these opinions." R-82-1 ¶ 1. That is a concession the State Defendants make as to evidence supporting each element of Plaintiffs' claim.[6]

The district court's Local Rule 56.1 "demands that the non-movant's response contain individually numbered, concise, non-argumentative responses … to each one of the movant's enumerated material facts." *Taser*, 588 F.3d at 1302. Defendants' failure to "directly refute a material fact set forth in [Plaintiffs'] Statement of Material Facts with specific citations to evidence, or … to state a valid objection" means "such fact is deemed admitted." *Id.* Defendants cannot claim a fact dispute when they failed to do so in the district court: "factual assertions that defeat a summary judgment cannot be presented for the first time to an appellate court." *Denis v. Liberty Mut. Ins. Co.*, 791 F.2d 846, 849 (11th Cir. 1986). Nor can Defendants "argue an issue in [their] reply brief that was not preserved in [their] initial brief." *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321 (11th Cir. 2004).

---

[6] Centurion did not respond to Plaintiffs' Statement of Undisputed Material Facts at all, and thus the facts "[are] deemed admitted" under the district court's local rules. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009).

The district court was correct to grant summary judgment in Plaintiffs' favor, and to enter permanent injunctive relief on behalf of Plaintiffs and the two classes it certified. R-94. This Court should affirm.

## I.    Defendants violated the Eighth Amendment by imposing a blanket ban on medically necessary healthcare for incarcerated adults.

The Eighth Amendment's prohibition against cruel and unusual punishments obligates providing "medical care for those" a state "is punishing by incarceration." *Estelle*, 429 U.S. at 103. This obligation exists because incarcerated people "cannot by reason of the deprivation of [their] liberty, care for" themselves; therefore "if the authorities fail to do so, those needs will not be met." *Id.* at 103–04. Depriving prisoners of "adequate medical care[] is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Accordingly, "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. *Estelle,* 429 U.S. at 104.

The deliberate indifference standard includes "both an objective and a subjective inquiry." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024). In medical treatment cases, the objective prong of the deliberate indifference test requires a plaintiff to show that she has an "objectively serious medical need." *Wade*, 106 F.4th at 1255. The subjective prong requires that a plaintiff "show that the defendant official was subjectively aware that his own conduct—again his own

27

actions or inactions—put the plaintiff at substantial risk of serious harm." *Id.* at 1258. However, a defendant "cannot be found liable … if he respond[s] reasonably to the risk." *Id.* at 1262. Plaintiffs have satisfied both prongs and have shown that Defendants did not respond reasonably to the known risk, entitling them to summary judgment.

### A.    It is undisputed that Plaintiffs have demonstrated an objectively serious medical need.

By definition, a medical need "that has been diagnosed by a physician as mandating treatment" and "that, if left unattended, poses a substantial risk of serious harm" is objectively serious. *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020). There is "no debate" on this record that "gender dysphoria constitutes a serious medical need." *Keohane*, 952 F.3d at 1266. Defendants have never suggested otherwise, much less produced evidence to support such a suggestion. Again, "[t]he State Defendants do not dispute that" expert testimony shows that "[g]ender dysphoria is a serious medical condition that appears in the DSM-5." R-82-1 ¶ 1.

Beyond expert testimony, the SOPs that Defendants promulgated and enforced before SB185's implementation also establish this point. R-11-9; R-11-10; R-11-11; R-11-12. This body of evidence proves that gender dysphoria is a diagnosable condition, "characterized by clinically significant distress," R-11-9 at 2, R-11-11 at 2, and that gender dysphoria patients have "serious medical needs which

28

may not be ignored," R-11-10 at 4. Those needs require "individualized assessments and care." R-11-11 at 18.

In other words, gender dysphoria is a serious medical need that, until SB185, GDC clinicians "diagnosed … as mandating treatment." *Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1096 (11th Cir. 2014). The only two pieces of evidence Defendants proffered—the declarations of Drs. Wynne and Owens—do not suggest otherwise.[7] There is, therefore, no genuine dispute of material fact that Plaintiffs have satisfied the objective prong of the deliberate indifference test. *Keohane*, 952 F.3d at 1266.

**B.    Undisputed evidence confirms Defendants' subjective knowledge of the substantial risk posed by withdrawing or withholding medically necessary hormone therapy.**

Plaintiffs' evidence also satisfies the Eighth Amendment's second, subjective deliberate indifference prong, which asks whether Defendants were "subjectively aware that [their] own conduct—their own actions or inactions—put [Plaintiffs] at substantial risk of serious harm." *Wade*, 106 F.4th at 1258 (en banc). Subjective knowledge is determined based "on the facts the prison official knew *at the time*" of the challenged conduct. *Mosley v. Zachery*, 966 F.3d 1265, 1271 (11th Cir. 2020). Requisite knowledge can be established by "inference from circumstantial evidence" as well as "the very fact that the risk was *obvious*." *Farmer, v. Brennan*, 511 U.S 825,

---

[7] Neither do the Baker and Cass Reports, although neither publication was properly admitted into evidence, as explained more fully below in Part II.

842 (1994). Here, the record evidence establishes that Defendants had subjective knowledge that withdrawing and withholding medically necessary hormone therapy posed a substantial risk of serious harm to Plaintiffs and Class Members.[8]

*First*, Defendants knew that for at least some gender dysphoria patients, hormone therapy is medically necessary care. To begin, Defendants "do not dispute that [the] SOPs were operative prior to the enactment of SB185 or that they were aware of them." R-82-1 ¶ 14. Nor could they, given that they enforced the SOPs until SB185's passage. And they concede that the pre-SB185 SOPs establish that "gender dysphoria is 'characterized by clinically significant distress,'" R-82-1 ¶ 11 (quoting R-11-9 at 2), that those "with gender dysphoria have 'serious medical needs which may not be ignored,'" R-82-1 ¶ 11 (quoting R-11-10 at 4), and that "hormone therapy can be medically necessary gender dysphoria treatment" for at least some gender dysphoria patients, R-82-1 ¶ 11 (citing R-11-9, R-11-10 at 4, R-11-11 at 18–19). Indeed, Defendants do not dispute that expert testimony establishes that gender

---

[8] Centurion certainly had all the knowledge described in this section, but it is liable regardless: the deliberate indifference standard for entity defendants is objective under this Court's precedent in *Young v. City of Augusta*, 59 F.3d 1160 (11th Cir. 1995), which held that a city can face liability if it has "actual *or constructive* notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Id.* at 1172; *see also Wade*, 106 F.4th at 1264 ("Our cases view the Eighth Amendment deliberate indifference standard for municipalities as objective.") (Jordan, J., concurring).

dysphoria can "result[] in clinically significant distress." R-82-1 ¶ 2. Again, Defendants offer no competing evidence on this point.

Further, Plaintiffs were under no obligation to establish that hormone therapy cures *all* that ails *all* gender dysphoria patients. As this Court acknowledged in *Washington v. Dugger*, the medical need of a prisoner need not be life-threatening to be constitutionally protected. 860 F.2d 1018, 1021 (11th Cir. 1988). "In fact, the Court in *Estelle* held that a deliberate indifference to serious medical needs of prisoners was a violation of the Eighth Amendment because it amounted to the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Estelle*, 429 U.S. at 104). Medical necessity isn't defined (only) by avoiding mortality. After all, hearing loss is not fatal, yet the Eighth Amendment can still require the provision of hearing aids. *See Barcelona v. Sec'y, Fla. Dep't of Corr.*, 657 F. App'x 896, 898–99 (11th Cir. 2016). Inflicting "unnecessary suffering is inconsistent with contemporary standards of decency." *Estelle*, 429 U.S. at 103. And withdrawing care despite knowing will cause "mental anguish" is deliberate indifference. *Hardin v. Hayes*, 52 F.3d 934, 939 (11th Cir. 1995). And again, Defendants knew that for at least some patients in GDC custody, hormone therapy was necessary to avoid their suffering from gender dysphoria symptoms.

*Second*, the SOPs further establish Defendants' knowledge that members of the Receiving Class *specifically* had a medical need for hormone therapy. Under the

SOPs, GDC "provide[d] transgender offenders with individualized assessments and care, to include … [w]hen warranted, hormone treatment throughout their incarceration." R-11-11 at 18. "Only medical practitioners" made "decisions regarding gender-related hormone treatment needs," and "GDC's Statewide Medical Director" made "the final determination on whether gender-related hormone treatment … should be initiated or continued based on documented medical need." *Id.* at 18–19. Because GDC's own doctors decided that every member of the Receiving Class had a "documented medical need" for that care, "[t]his is not a case, as contended by the defendants, of a disagreement with the prison authorities as to the appropriate care to be provided." *Washington,* 860 F.2 at 1021. Defendants knew, as to each member of the Receiving Class, that a qualified medical provider had determined that they needed hormone therapy to alleviate their gender dysphoria symptoms.

*Third*, Defendants knew that forgoing hormone therapy evaluations for gender dysphoria patients not currently receiving hormone therapy put those patients at risk. Here again, the SOPs required GDC to refer anyone who "identif[ied] as Transgender and request[ed] hormone treatment … to an endocrinologist or other appropriate provider." R-11-9 at 5. And GDC committed to give those "who report to have symptoms consistent with or have been diagnosed with Gender Dysphoria … a current individualized assessment and evaluation." R-11-10 at 7. GDC provided

32

hormone treatment "[w]hen warranted" based on those "individualized assessment[s]." R-11-11 at 18. These policies existed to ensure that GDC addressed the "clinically significant distress" that gender dysphoria causes. R-11-9 at 2.

Record evidence—including communications *before* Defendants enacted SB185's blanket ban—also confirms Defendants' awareness that "forcibly detransition[ing]" gender dysphoria patients posed health risks. R-11-16. And though Defendants already knew all this from the SOPs, R-82-1 ¶¶ 10-15, 17–18, Plaintiffs' counsel notified Defendants in July 2025 of the multiple medical harms likely to occur if Defendants executed their plan to implement SB185. R-11-21 at 4–8. But Defendants nonetheless withdrew hormone therapy and evaluations, even though the risk was both obvious and known to them.

By contrast, Defendants submitted *no* evidence to dispute their knowledge of these risks. *See* Dkt-82-1 ¶¶ 13–15. The *only* thing Defendants ever suggested to the district court could possibly create a fact dispute on their subjective knowledge are the Baker and Cass Reviews, *see* R-80 at 24, but there is no evidence that any Defendant ever read those documents, let alone relied on them to conclude that hormone therapy is controversial. Defendants never submitted any other evidence to try to rebut the subjective prong, however accessible the evidence was to them. For example, no Defendant submitted a declaration disclaiming knowledge of the risk of untreated gender dysphoria, as they could easily have done if they truly lacked

33

such knowledge. The declarations from Dr. Wynne and Dr. Owens do not say anything about Defendants' knowledge, and neither would be competent to testify about Defendants' knowledge in any event. On this record, no reasonable factfinder could conclude that Defendants were ignorant of the risks of withholding gender dysphoria treatment.

To be clear, Plaintiffs do not cite GDC's prior SOPs to suggest that *any* change to them would be unconstitutional. They are relevant, though, because they confirm Defendants' knowledge "at the time [they]" withdrew care, *see Mosley*, 966 F.3d at 1271, that hormone therapy and evaluations can be medically necessary treatment for adult gender dysphoria patients, for which counseling is no substitute, and that they were actually *determined* to be so for Plaintiffs and Class Members.

### C.    Withdrawing necessary medical care for non-medical reasons is reckless and therefore deliberately indifferent.

Defendants' knowledge of these facts is dispositive of the recklessness prong of Plaintiffs' deliberate indifference claim. After all, Defendants admit that they did not impose their ban on hormone therapy because they determined that hormone therapy was no longer medically necessary or efficacious for patients. R-56 at 35; R-28-1 ¶ 4. Rather, Defendants simply overruled the medical judgments of their own prison healthcare providers and categorically denied Plaintiffs and Class Members necessary care because "this category of interventions is not something the State supports." R-56 at 35. It was not only reckless to withdraw care for non-medical

reasons in the face of a known medical risk;[9] it is textbook deliberate indifference. After all, "[t]his court has consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).

Courts have regularly struck down blanket bans like SB185 because banning necessary medical care for non-medical reasons is a reckless disregard of a known risk. It is, in other words, deliberate indifference. Under Supreme Court precedent, "intentionally denying or delaying access to medical care," choosing an "easier and less efficacious treatment" without the use of medical judgment, and "intentionally interfering with treatment once prescribed" amounts to deliberate indifference. *Estelle*, 429 U.S. at 104–05, 105 n.10. So, too, does "responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate," as this Court's precedent in *Keohane* confirms. 952 F.3d at 1266–67.

Yet that is precisely what Defendants did: denied Plaintiffs and Class Members individualized medical treatment for their serious medical needs and

---

[9] Defendants "cannot escape liability for deliberate indifference" simply because the risk of harm posed by their ban were not "personal" to individual patients but applied to "all prisoners in his situation." *Farmer*, 511 U.S. at 843–44. Nor does it matter whether Plaintiffs have already experienced harm, as the Eighth Amendment protects against the risk of future harm, including risk so widespread they "might not affect all of those exposed." *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993).

terminated access to hormone therapy that prison healthcare officials—including Mardis—had approved *because* it was medically necessary. This is "the very definition of 'deliberate indifference'—anti-medicine, if you will." *Keohane*, 952 F.3d at 1266–67.

*Keohane* bears important parallels to this case. There, as here, an incarcerated plaintiff with gender dysphoria brought suit after the state denied her access to hormone therapy pursuant to a categorical policy that did not account for individual patient need. *Id.* at 1263. And there, as here, the state denied treatment that would have otherwise been available to the plaintiff if she were not incarcerated. *Id.* Although the plaintiff's claims were ultimately mooted after corrections officials adopted a new policy that "properly attend[ed] to inmates' individualized medical needs," the Eleventh Circuit stated that the Eighth Amendment "*almost certainly*" rendered the categorical policy unconstitutional, noting other courts' decisions holding as much. *Id.* at 1266–67.

Time and again, courts addressing "blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they constitute deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment." *Id.* at 1267 (collecting cases, namely *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011); *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *11–12 (E.D. Mo. Feb. 9, 2018); *Soneeya v. Spencer*, 851 F. Supp. 2d

228, 247–50 (D. Mass. 2012)). There are others. *Diamond*, 131 F. Supp. 3d at 1353, 1356–58. And since *Keohane*, there have been more still. *Doe v. McHenry*, 763 F. Supp. 3d 81, 88–89 (D.D.C. 2025) (enjoining ban similar to SB185 within the BOP); *Robinson*, 2025 WL 3282293, at *1 (enjoining ban similar to SB185 within Idaho's prison system); *Kingdom v. Trump,* No. 1:25-cv-691-RCL, 2025 WL 1568238, at *1 (D.D.C. June 3, 2025). "[R]efus[ing] to take the steps to see that [Plaintiffs are] properly evaluated" poses the same problems. *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (1985).

Unsurprisingly, blanket bans on care necessary to treat conditions other than gender dysphoria have also been found unconstitutional. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014) (cataract surgery); *Roe v. Elyea*, 631 F.3d 843, 859, 862–63 (7th Cir. 2011) (hepatitis treatment); *Johnson v. Wright,* 412 F.3d 398, 406 (2d Cir. 2005) (same). And for good reason: it is impossible to effectuate the Eighth Amendment's guarantee of adequate medical care without considering a patient's individual needs. *Kosilek v. Spencer*, 774 F.3d 63, 90–91 (1st Cir. 2014) (en banc) (explaining that blanket bans "conflict with the requirement that medical care be *individualized* based on a particular prisoner's serious medical needs.").

*Hoffer*, which the State Defendants invoke, confirms this point. While the Court lifted an injunction requiring an expensive class of Hepatitis C treatment be

37

prescribed to *all* patients with the condition, *without* an individual showing of need, the Court did not approve a blanket ban. 973 F.3d at 1272. Instead, the Court endorsed an approach much like GDC's pre-SB185 gender dysphoria policies—one where clinicians, using *medical* judgment, evaluated patients *individually* and prescribed medical treatment for those who had a medical need. *Id.*

Defendants, meanwhile, categorically banned hormone therapy and individualized evaluations, without regard to individual medical need and did so knowing the harm imposing a blanket hormone therapy ban was likely to cause. Again, the *same* SOPs Defendants concede they were aware of, R-82-1 ¶ 14, establish that gender dysphoria "represents serious medical needs which may not be ignored." R-11-10 at 4. Defendants' "refusal to provide essential care" to Plaintiffs and Class Members is plainly deliberate indifference. *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986); *accord Keohane*, 952 F.3d at 1266–67.

### D. Defendants' provision of mental health services is not a reasonable response to the withdrawal of medically necessary care.

Defendants did not "respond reasonably to the risk" posed by Plaintiffs' gender dysphoria when they provided mental health treatment in place of medically necessary hormone therapy. *Wade*, 106 F.4th at 1262. There is no reasonable way to implement a ban that categorically withdraws care already "acknowledged to be necessary." *Ancata*, 769 F.2d at 704. Nor is there any reasonable way to give a

"shoulder-shrugging refusal even to consider" a patient's individual medical needs. *Keohane*, 952 F.3d at 1266–67. Yet the undisputed evidence confirms that is exactly what Defendants did. This inquiry is "objective[]." *Mosley*, 966 F.3d at 1270.

*First*, Defendants' generic mental health services were not a suitable alternative to hormone treatment. Defendants provided mental health services even though they knew, based on the pre-SB185 SOPs, that individualized care for hormone therapy can require "[n]ecessary and appropriate mental health services; *and* [w]hen warranted, hormone treatment." R-11-11 at 18. Further, Centurion, Defendant Mardis, and other GDC clinicians prescribed hormone therapy to more than one hundred gender dysphoria patients before SB185, despite the availability of mental health services, again because they concluded as to each individual patient that hormone therapy was medically necessary. R-28-1 ¶¶ 3–5. This confirms that for at least some gender dysphoria patients, mental health services alone were insufficient and hormone therapy was required. Knowing all this, Defendants did not act reasonably when they switched to providing care "so cursory as to amount to no treatment at all." *Mandel*, 888 F.2d at 789.

*Second*, undisputed evidence establishes that "counseling" and "psychotropic medication" are not a substitute for medically necessary hormone therapy. Plaintiffs' experts testified without challenge that counseling and psychotropic medication do not treat gender dysphoria or its associated symptoms. R-11-1 ¶¶ 95–97, 120–122,

140, 168–170; R-11-2 ¶¶ 33, 43–44, 63. They also explained that because other forms of gender dysphoria treatment—like surgery and social transition care—are categorically unavailable under SB185, continued access to hormone treatment is even more critical. *See* R-11-1 ¶¶ 65–94; R-11-2 ¶¶ 14, 19, 21–30. Defendants never supplied contrary evidence.

*Third*, the clinician declarations of Dr. Wynne and Dr. Owens—the only evidence Defendants properly put before the district court—show the mental health services available to Plaintiffs are intended to help them "cope" with the distress that is the *foreseeable* result of Defendants' hormone therapy ban, R-72-1 at 4-6, not to treat medical needs associated with their gender dysphoria. Because "[t]he infliction of such unnecessary suffering is inconsistent with contemporary standards of decency," *Estelle*, 429 U.S. at 103, this is not evidence of reasonableness.

*Fourth*, Defendants' response is out-of-step with that of other prison officials faced with similar laws—including Centurion's Florida affiliate. Defendants knew that Centurion's Florida affiliate continued to provide hormone therapy to gender dysphoria patients in Florida custody, notwithstanding a Florida statute like SB185. R-11-21 at 6 (discussing Florida policy); R-82-1 ¶¶ 34–35 (State Defendants' acknowledging receipt); *see also Keohane v. Dixon*, 4:24-cv-434-AW-MAF, Order Granting in Part Motion to Certify a Class, Dkt-125 at 6 (N.D. Fla. Oct. 22, 2025) (describing continuation of care). The Federal Bureau of Prisons also refused to

40

terminate hormone therapy for incarcerated adults when faced with a similar policy. *Doe v. McHenry*, 763 F. Supp. 3d 84 (D.D.C. 2025); *Kingdom v. Trump*, No. 1:25-cv-691, 2025 WL 1568238, at \*12 (D.D.C. June 3, 2025).

Defendants' response to SB185 is tantamount to offering talk therapy to diabetes patients instead of insulin, or insisting that cancer patients "must be treated only with therapy and pain killers." *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011). This does not pass constitutional muster. Even if the Eighth Amendment doesn't require medical treatment to be "perfect, the best obtainable, or even very good," "medical necessity" remains the constitutional minimum. *Hoffer*, 973 F.3d at 1271. Prison officials violate the Eighth Amendment by offering "easier and less efficacious treatment[s]" that do not treat the patient's underlying condition. *Ancata*, 769 F.2d at 704.

Again, this Court's precedent is consistent. This is why in *Moye v. Fountain Correctional Facility*, this Court affirmed a jury's conclusion that "continu[ing] to prescribe ineffective" treatment amounted to deliberate indifference. No. 24-13692, 2025 WL 2745808, at \*8 (11th Cir. Sept. 26, 2025). It is also why, in *Kothmann v. Rosario*, this Court affirmed that a transgender plaintiff suffering from gender dysphoria, who was offered "anti-anxiety and anti-depression medications, mental health counseling, and psychotherapy treatments," but denied hormone therapy, stated a claim to relief. 558 F. App'x 907, 910 (11th Cir. 2014).

41

None of these cases is an outlier. In *Fields v. Smith*, the Seventh Circuit affirmed a district court's ruling, enjoining enforcement of a Wisconsin law that prohibited hormone therapy but permitted "psychotherapy as well as antipsychotics and antidepressants" to treat gender dysphoria. 653 F.3d at 556. Similarly, in *Diamond*, 131 F. Supp. 3d at 1353, 1373, a plaintiff stated an Eighth Amendment claim where she alleged that defendants "at most, prescribed or authorized treatment—psychotropic drugs and counseling—they knew was medically inadequate" to treat her gender dysphoria. 131 F. Supp. 3d at 1353, 1373.

Medical treatment violates the Eighth Amendment when it is "so incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Keohane*, 952 F.3d at 1266. Put simply, Plaintiffs have shown that Defendants' withdrawal and withholding of hormone therapy satisfies this standard.

## II.    Defendants did not supply evidence to create a genuine dispute of material fact.

Defendants argue an "ongoing debate" about hormone therapy for adults with gender dysphoria precludes liability. Dkt-26 at 40. Yet despite every opportunity, Defendants presented no evidence supporting that conclusion to the district court. The only evidence Defendants point to—the Baker and Cass Reviews—were properly excluded as inadmissible and do not create a genuine fact dispute on any deliberate indifference element. Summary judgment was therefore proper.

The district court properly excluded the Cass and Baker Reviews for two independent reasons. *First*, the State Defendants violated the parties' stipulation that the summary judgment record was closed when they belatedly filed the reviews. *Second,* even if the studies were not belatedly filed, without a foundation for their admissibility as required by the Federal Rules of Evidence, the studies are not competent evidence. And any error was harmless because neither publication creates a fact question on Plaintiff and Class Member's medical need for hormone therapy.

### A.    The parties' stipulation did not include materials cited in passing in briefs.

The State Defendants insist the district court erred in "blinding itself" to the contents of the Baker and Cass Reviews, Dkt-26 at 14, but this argument's first mistake is its assumption that either of those pieces of literature were *ever* a part of the evidentiary record on summary judgment. Neither was.

The district court, per the parties' agreement, limited the summary judgment record to the preliminary injunction filings and prohibited the submission of any additional evidence. R-69 at 2. Because the only evidence that Defendants submitted to oppose the preliminary injunction were Dr. Wynne and Dr. Owens' declarations, R-28-1, R-25-2, and because Defendants did not even cite the Cass Review in their opposition to Plaintiffs' preliminary injunction motion, *see* R-25 at 18, Defendants cannot credibly insist the Cass Review was part of the record they agreed was complete. R-69 at 2.

And while the State Defendants cited the Baker Review in a single paragraph of their preliminary injunction opposition, the decision *not* to file the article means it was not "submitted" as part of the closed record. Fed. R. App. P. 10(a) ("the original papers and exhibits *filed* in the district court," along with transcripts and docket entries, "constitute the record on appeal"); *Record*, Black's Law Dictionary (12th ed. 2024) (same).

Defendants now protest that they "never would have agreed to" a closed record had they known the studies were not part of it. Dkt-26 at 42. Their belated filing of the studies with their summary judgment motion, however, belies any claim they believed the studies were part of the stipulated closed record. R-69.

Releasing Defendants from their stipulation would prejudice Plaintiffs, who *did* heed it. Plaintiffs could have, for example, deposed Defendants on the studies, had they been part of the record. Plaintiffs had no need to do so on the closed record. This Court cannot let litigants cede the absence of disputed facts and then save them when they come to regret that decision mere days after agreeing to close the record.

## B.    The law requires expert testimony to explain medical literature to the factfinder for good reason.

Even if the Cass and Baker Reports were part of the closed record, the district court was not required to consider them. Indeed, the district court properly refused "the temptation to play doctor and make [its] own independent medical findings" as to these studies. R-94 at 17–18.

44

The district court did not abuse its discretion in concluding that, without an expert to testify about them, the studies were neither admissible nor substantive evidence. Federal Rule of Evidence 803(18) makes statements in studies admissible only *if* "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination." But Defendants did not present "an expert to lay the foundation for admission of a statement in an academic publication[.]" R-94 at 17.

The Rule exists for good reason. "Neither the Court nor a lay jury is capable of assessing the credibility of [] studies" without expert testimony. *Chandler v. Janssen Pharms., Inc.*, 322 F. Supp. 3d 314, 326 (E.D.N.Y. 2018). Courts cannot draw conclusions about academic studies in specialized fields without an expert to "explain the link between the stud[ies] and the facts of the case." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1179 (S.D. Fla. 2022). All the district court had, and all this Court has now, is counsel's argument, which is not evidence. *United States v. Valois*, 915 F.3d 717, 726 (11th Cir. 2019).

This principle is so established that this Court has approved exactly what the district court did here. In *Lebron*, this Court affirmed entry of a permanent injunction against a Florida law that required mandatory drug testing of welfare recipients after a district court excluded the state's expert. 772 F.3d at 1371. Before this Court, Florida claimed the studies on which the excluded expert relied justified the law. *Id.*

45

at 1370. But the Court, "left with studies about which it could not readily determine methodological soundness or reliability, nor establish their relevance" to the case, declined to "ascribe significance to the[] studies without an appropriately credentialed expert to vet them." *Id.* This Court cannot find an abuse of discretion when it has done exactly what the district court did.

Defendants argue the district court should have decided what the reviews mean, given the "Supreme Court's approach" in *United States v. Skrmetti*, 605 U.S. 495, and what they call "this Court's practice." Dkt-26 at 43. But the Rules of Evidence bound the district court, and Defendants cite no law requiring courts to interpret medical literature without an expert, in defiance of the Rules. Nor did they offer the district court any basis to interpret the reviews besides their counsel's arguments, which "are not evidence." *Valois*, 915 F.3d at 726. The district court did not have to accept counsel's word on what the studies purport to mean.

Beyond that, the district court was bound to decide this case based on the record before it, not whatever may have been before the *Skrmetti* Court or before this Court in other cases. Courts in this Circuit may not "take judicial notice of a document filed in another court … for the truth of the matters asserted in the other litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); *see also Grayson v. Warden, Comm'r of Ala. Dep't of Corrs.*, 869 F.3d 1204, 1225 (11th Cir. 2017) ("[A] court cannot take judicial notice of factual findings of another court.").

46

Defendants' *amici* attempt an even bolder argument: that the "safety and efficacy of hormone therapy" is a "legislative fact[]" to which even "the ordinary limits on judicial notice don't apply." Dkt-37 at 22. Precedent confirms otherwise. In a case concerning Alabama's restrictions on medical procedures, this Court found no "authority suggesting that the facts on which this case turns"—that is, "the safety of the proposed methods" of abortion at issue—"are legislative instead of adjudicative." *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1316, 1324 (11th Cir. 2018), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Accordingly, the Court refused to treat facts regarding the safety of the procedures at issue in *Williamson* and legislative facts, and the Court should do the same as it relates to the medical treatment at issue here.

### C.    Neither the Baker nor the Cass Reviews support the conclusion that hormone therapy is controversial treatment for adults with gender dysphoria.

Beyond all that, the State Defendants woefully mischaracterize the Baker and Cass Reviews. They insist that the Cass and Baker Reviews demonstrate controversy about hormone therapy's efficacy and safety sufficient to create a fact question. But the reviews say nothing of the sort.

Neither publication suggests that hormone therapy is never medically necessary for adults with gender dysphoria, or even that its risks outweigh its benefits. They do not conclude that hormone therapy for adult gender dysphoria

47

patients lacks therapeutic benefit, or that it should be withdrawn pending further study. R-72-2; R-72-3. Defendants obscure this fact only by cherry-picking passages within the materials and ignoring their ultimate conclusions.

Defendants provide only inaccurate lay interpretations of the scientific terms appearing in the reviews. The conclusions Defendants draw from the Reviews' use of terms of art like "strength of the evidence," "risk of bias," "[r]igour of development," Dkt-26 at 37–39, are precisely *why* the Rules insist that expert testimony supply a foundation for academic literature. Fed. R. Evid. 703, 803(18). The same is true of Defendants' suggestion that calling for "more research" on hormone therapy means it must not be medically necessary. *See* Dkt-26 at 38. Nothing in either review indicates that the need for more research militates against offering treatment *now*.

The opposite is true, a fact Defendants obscure only by ignoring the bottom line of both reviews. Defendants omit that the Baker Review concludes, based on a review of scientific literature, that hormone therapy is "an essential component of care" for adults. R-72-2 at 14. For its part, the Cass Review describes hormone therapy for adults as "a well-established practice that has transformed the lives of

many," and as treatment whose costs "are dramatically outweighed by the long-term benefits." R-72-3 at 183.[10]

The obligation to construe evidence and draw inferences in favor of a non-movant does not permit—much less require—*misconstruing* evidence, which is what Defendants are seeking. The summary judgment standard "does not mean that [courts] are constrained to accept all the nonmovant's factual characterizations." *Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1199 (11th Cir. 2024). Rather, a court must "draw these inferences" in the nonmovant's favor "only to the extent supportable by the record." *Pensley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010). Nothing "obliges" this Court "to cherry pick facts from [Defendants'] story which support [their] version of the events and which can[not] be reconciled with the otherwise undisputed evidence." *Johnson v. Niehaus*, 491 F. App'x 945, 951 (11th Cir. 2012).

In short, no reasonable factfinder could read the Baker Review *or* the Cass Review with the other record evidence and conclude that hormone therapy is *not* medically necessary for the Plaintiffs and Class Members to whom it was prescribed. If the Court credits any of Defendants' arguments—and it should not—it must remand for trial. The most this material could *possibly* do is create a fact question.

---

[10] Defendants also conceal that the Cass Review excluded "[s]tudies about gender incongruence or gender dysphoria in adulthood." *See*, *e.g.*, R-72-3, Cass Review at 48 ("At the centre of the Review is a group of children and young people.").

49

Having conceded in response to Plaintiffs' Statement of Undisputed Material Facts that Plaintiffs came forward with evidence to support each element of their claim, Defendants certainly are not entitled to judgment in their favor as a matter of law.

**III.   SB185 is not constitutional under *Skrmetti* and *Eknes-Tucker*, nor is it a permissible exercise of police power.**

Unable to defeat Plaintiffs' Eighth Amendment claim based on the factual record, Defendants insist that *United States v. Skrmetti*, 605 U.S. 495 (2025), and *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), coupled with states' police power to regulate medicine, make any regulation of gender dysphoria *per se* constitutional. Not so.

**A.   Neither *Skrmetti* nor *Eknes-Tucker* overrule Eighth Amendment precedent or constitutionalize bans on hormone therapy for incarcerated adults.**

Defendants read *Skrmetti* and *Eknes-Tucker* to hold that *all* laws regulating gender dysphoria care are a permissible exercise of the state's regulatory authority. What those cases *actually* concerned is whether laws deferring gender dysphoria treatment for minors *until* they reach adulthood survive rational basis review under the Equal Protection and Due Process Clauses. *Skrmetti*, 605 U.S. at 510; *Eknes-Tucker*, 80 F.4th at 1220. In short, they do not control this Eighth Amendment case.

To begin, both Courts emphasized they were reviewing "limited" laws that did not restrict hormone therapy for adults, *Skrmetti*, 605 U.S. at 507, but focused on the "[s]tate's objective of protecting minors' health and welfare." *Id.* at 523;

50

*accord Eknes-Tucker*, 80 F.4th at 1230. Along the way, both Courts distinguished minors—"who warrant government protection"—from adults who are "better able to make decisions for themselves." *Eknes-Tucker*, 80 F.4th at 1230. What's more, the "ongoing debate" the Courts described related only to minors. *Skrmetti*, 605 U.S. at 522–23; *Eknes-Tucker*, 80 F.4th at 1218. Neither Court even hinted at *adult* gender dysphoria treatment being controversial. Both described it as a long-established practice. *Skrmetti*, 605 U.S. at 503–04; *Eknes-Tucker*, 80 F.4th at 1221 n.12.

Further, *none* of the state laws Defendants cite impose a wholesale ban on hormone therapy for adults *outside* prison. Any suggestion otherwise is disingenuous. Nor can the Defendants identify any court that has embraced their insistence that *Skrmetti* insulates laws like SB185 from judicial review for violating the Eighth Amendment. In short, the purported controversy concerning adult healthcare that Defendants insist led to SB185 is a litigation construct—not one evidenced by other states' laws, Defendants' declarants, their clinicians, the literature Defendants cite, or even the Georgia General Assembly.

Post-*Skrmetti* decisions in the government insurance context are equally unavailing. *Lange v. Houston County*, 152 F.4th 1245 (11th Cir. 2025) (en banc), and *Anderson v. Crouch*, __ F.4th __, 2026 WL 667919 (4th Cir. Mar. 10, 2026), rely on *Skrmetti* to uphold government decisions not to cover gender-affirming surgery under an employer-provided insurance program and Medicaid, respectively. In other

51

words, neither case concerned, much less affirmed, government bans on hormone therapy. And under both cases, gender-affirming surgeries remained available, albeit at the patient's expense. That is a far cry from a blanket ban that denies care to incarcerated people who have no other way to obtain medical care.

Thus, the district court did not err when it declined, consistent with this Court's reasoning in *Eknes-Tucker*, to apply decisions "concern[ing] a different law (with materially different language) and a different factual context." 80 F.4th at 1229. These cases do not and could not silently overrule decades of settled Eighth Amendment precedent.

## B.    State laws cannot abrogate the requirements of the Eighth Amendment.

SB185 is not justifiable as an exercise of the State's authority to regulate medicine. That's because SB185 does not regulate hormone therapy for adults generally. Instead, it withholds—based on non-medical judgment—medically necessary care *only* for those "whom [the state] is punishing by incarceration." *Estelle*, 429 U.S. at 103. The General Assembly's decision to single out incarcerated adults—rather than prohibit the same care for all adults—undermines any claim that SB185 arose from genuine concern about medical efficacy or risk.

And while Defendants insist "the General Assembly … can[not] be deemed to have acted with subjective recklessness in light of the ongoing medical debate," Dkt-26 at 25, this suggestion fails twice over.

52

*First*, it is a transparent effort "to shift the subjective recklessness prong of the deliberate indifference analysis" away from Defendants themselves. R-94 at 23. It ignores that the relevant knowledge, for deliberate indifference purposes, is that of "the defendant official." *Wade*, 106 F.4th at 1258. The relevant decisionmaker for Eighth Amendment purposes is, in other words, "the government official responsible for implementing the conditions, not the state legislature," a principle of law the district court correctly applied. R-94 at 23 (citing 18 U.S.C. § 3626(a)(1)(B)).[11]

To be clear, "legislative history [i]s not a necessary part of Eighth Amendment analysis." *United States v. Farley*, 607 F.3d 1294, 1320 (11th Cir. 2010). Plaintiffs need not "come forward with, or rebut, evidence of the legislature's subjective knowledge." R-94 at 24. But were it relevant, the decision to prohibit care only for those incarcerated, again, belies the suggestion that concern for patient welfare animated the legislature.

*Second*, "[t]he exercise of the police power is not without limits." *Bickerstaff Clay Prods. Co. v. Harris Cnty. By and Through Bd. of Comm'rs*, 89 F.3d 1481, 1488 (11th Cir. 1996). Police power cannot "justify disregard of constitutional inhibitions." *Panhandle E. Pipe Line Co. v. State Hwy. Comm'n*, 294 U.S. 613, 619 (1935); *accord Buchanan v. Warley*, 245 U.S. 60, 74 (1917) (This is a "principle …

---

[11] As discussed more fully in Part VI, below, Centurion is the equivalent of a government official since private entities that provide medical care in corrections institutions act under color of state law. *Ancata*, 769 F.2d at 703 (collecting cases).

53

so frequently affirmed in this court that we need not stop to cite the cases"). And while it is within a state's police power to incarcerate people, *Kelly v. Robinson*, 479 U.S. 36, 47 (1986), the Eighth Amendment still restricts "the conditions in which a State may confine those convicted of crimes." *Rhodes v. Chapman*, 452 U.S. 337, 344–45 (1981). The Eighth Amendment establishes minimums below which states cannot push their prisons.

The General Assembly may not override the state's obligation to provide adequate medical care to "those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. And "[i]f government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation." *Brown*, 563 U.S. at 511. The "[m]echanical deference" to state legislatures that the State Defendants seek "would reduce" the Eighth Amendment "to a nullity in precisely the context where it is most necessary." *Johnson v. California*, 543 U.S. 499, 511 (2005). This Court cannot accept Defendants' invitation to insulate their actions from Eighth Amendment scrutiny.

## IV.    The District Court did not abuse its discretion in certifying the classes.

Defendants do not challenge the district court's application of Rule 23 and thus waived any argument class certification was improper under that Rule. *Cont'l Tech. Serv., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991). Instead, in an argument no court has accepted, the State Defendants claim the PLRA

prohibits class actions where it applies. And they further argue that two Plaintiffs, Benjamin and Madison, lack standing to sue and, by extension, to represent a class. These arguments fail.

### A.    The PLRA does not prohibit class certification.

Defendants contend the PLRA prohibits district courts from certifying classes of prisoners. Dkt-26 at 54 (citing 18 U.S.C. § 3626(a)(1)(A)). No court has adopted that reading in the three decades since the PLRA's passage, and this Court should not be the first.

The district court correctly ruled that "the PLRA does not inherently conflict with class certification." R-50 at 61. That conclusion accords with a long line of cases. *E.g.*, *Yates v. Collier*, 868 F.3d 354, 368–71 (5th Cir. 2017); *Shook v. El Paso Cnty.*, 386 F.3d 963, 969–71 (10th Cir. 2004); *Anderson v. Garner*, 22 F. Supp. 2d 1379, 1383 (N.D. Ga. 1997). Indeed, in *Brown v. Plata*, the Supreme Court affirmed an injunction in favor of two prisoner classes in a case *precisely about* the PLRA's limits on federal court power. 563 U.S. at 493. Although *Brown* did not address whether the PLRA prohibits class actions, neither the Supreme Court nor the parties questioned the availability of class actions in PLRA cases.

Nothing in the PLRA suggests Congress intended to displace class actions. The PLRA says nothing about Rule 23. The Supreme Court has held that "repeals by implication are not favored" and should not be found "absent a clearly expressed

congressional intention." *Branch v. Smith*, 538 U.S. 254, 273 (2003). As to the PLRA, this prohibits the conclusion "that Congress intended that provision to alter the well-established requirements of class certification *sub silentio*." *Yates*, 868 F.3d at 370. Rather, the PLRA "addresses only the *type* of relief courts may use to redress constitutional violations, and says nothing about the nature of the proceedings underlying the remedy." *Garner*, 22 F. Supp. 2d at 1383. Although Defendants make much of the PLRA's reference to the "Federal right of a particular plaintiff or plaintiffs," 18 U.S.C. § 3626(a)(1)(A), they ignore that "every member of a certified class is considered a party" for certain purposes, including res judicata. *Njie v. Experian Info. Sols., Inc.*, 549 F. Supp. 3d 1361, 1366 (N.D. Ga. 2021).

Defendants' arguments rely on irrelevant case law interpreting a provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(f)(1). That statute strips lower federal courts of "jurisdiction or authority to enjoin" certain INA provisions "other than with respect to the application of such provisions to an *individual* alien." 8 U.S.C. § 1252(f)(1). Focusing on the singular article "an" and the word "individual," the Supreme Court held that this provision bars class-wide injunctions against the INA. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 551 (2022). But the word "individual" does not appear in the relevant PLRA provision. Defendants' reliance on *Aleman Gonzalez* is thus totally misplaced.

56

Defendants also mischaracterize *Aleman Gonzalez*'s holding. The Supreme Court did not, as Defendants claim, "reject[]" the statutory interpretation that *Shook* and *Yates* adopted. Dkt-26 at 45. *Aleman Gonzalez* rejected a "negative inference" that § 1252(f)(1) does not bar class actions because an adjacent INA provision "expressly bars the certification of a class." 596 U.S. at 555. But there is no negative inference to draw from the PLRA. Unlike the INA, the PLRA does not mention class actions. "[W]here Congress knows how to say something but chooses not to, its silence is controlling." *United States v. Pate*, 84 F.4th 1196, 1202 (11th Cir. 2023) (en banc). The PLRA's silence "is therefore no basis for engrafting Section 3626(a)(1)(A)'s requirements onto Rule 23(b)(2)." *Yates*, 868 F.3d at 369.

The Supreme Court has more than once treated the PLRA's silence as "strong evidence that … the usual practice under the Federal Rules [of Civil Procedure]" controls. *Jones v. Bock*, 549 U.S. 199, 212 (2007); *see also Perttu v. Richards*, 605 U.S. 460, 469–70 (2025). Whatever *Aleman Gonzalez* made of the INA's silence, the PLRA's silence on class actions is "strong evidence" that Rule 23 applies.

In the end, Defendants' interpretation is based not on the PLRA's text, but on what they claim is its "obvious purpose." Dkt-26 at 57. Even if Defendants were right about that purpose, this Court may not "depart from the usual practice under the Federal Rules on the basis of perceived policy concerns." *Bock*, 549 U.S. at 212.

The Court should follow the uniform holding that the PLRA does not prohibit class certification.

**B.    Plaintiffs Benjamin and Madison have Article III standing.**

Plaintiffs Benjamin and Madison satisfy Article III's three standing requirements: injury, traceability, and redressability. *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 922 (11th Cir. 2023). Benjamin has taken hormone therapy for nearly two decades, R-11-3 ¶ 8, and Madison was approved for hormone therapy while previously in GDC custody. R-11-5 ¶ 10. SB185 bans hormone therapy and evaluations for both. The injunction redresses that injury by lifting SB185's ban.

Defendants misstate Plaintiffs' claim and overstate the standing requirements. Focusing on redressability, they insist Benjamin and Madison have no standing unless they show "GDC would ultimately provide them with the specific hormonal interventions they seek." Dkt-26 at 59. But Plaintiffs did not ask the district court to *order* GDC to prescribe hormone therapy. They asked for an injunction against SB185's ban so they can receive care based on a clinician's evaluation of medical necessity. R-1 at 54–55. The injunction against SB185 redresses the claims Plaintiffs actually assert.

Beyond that, Defendants set the redressability standard higher than this Court ever has. A judgment that "would significantly increase the likelihood that [Plaintiffs] would obtain such redress" satisfies Article III. *Polelle v. Fla. Sec'y of*

*State*, 131 F.4th 1201, 1224 (11th Cir. 2025). The permanent injunction meets that standard because it took Plaintiffs from *no chance* of a hormone therapy evaluation to a *guaranteed evaluation*. The insistence that Plaintiffs show they will receive hormone therapy conflates standing and the merits. To assess standing, this Court "must assume that on the merits [the Plaintiffs] would be successful." *Garcia-Bengochea*, 57 F.4th at 922. That means the Court must assume Plaintiffs would receive an evaluation and medically necessary hormone therapy—more than enough to satisfy Article III.

Defendants' remaining three arguments fail for much the same reason.

*First*, redress in no way depends on speculation about the injunction's effect on "Plaintiffs' individual doctors" or GDC's "pre-SB-185 policies." Dkt-26 at 60. The injunction has an immediate effect on Plaintiffs' doctors by restoring their ability to prescribe hormone therapy consistent with GDC's pre-SB185 policies.

*Second*, Defendants point to the ripeness doctrine, *id.* at 49, but ripeness applies only "when evaluating injuries that have not yet occurred." *Wilderness Soc'y v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996). Ripeness does not apply "where the enforcement of a statute is certain." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008). But for the district court's injunction, Defendants would be enforcing SB185 against Plaintiffs.

*Third*, Defendants claim "absent class members" cannot show redressability. Dkt-26 at 60. But Defendants conceded, R-77 at 21, that "[f]or a class action to be justiciable, all that the law requires is that a *named* plaintiff have standing." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019). Benjamin's and Madison's standing suffices for class certification.

## V.      The District Court properly entered a permanent injunction.

The State Defendants have not challenged the permanent injunction except to argue that partial summary judgment was error. "An argument not made is waived." *Cont'l Tech.*, 927 F.2d at 1199. Because Defendants have not challenged any other elements of the permanent injunction, they have waived any argument the district court abused its discretion in awarding that relief. Thus, if the Court—as it should— affirms the partial summary judgment, it must also affirm the permanent injunction.

## VI.     The District Court correctly found Centurion liable for implementing SB185.

In its separate appeal, Centurion does not defend the constitutionality of SB185. Instead, it claims that "a private contractor cannot be liable for complying with state law or policy." Dkt-52 at 17. That argument conflicts with Supreme Court precedent and misunderstands both *Howell v. Evans*, 922 F.2d 712 (11th Cir. 1991),[12] and *Monell v. Department Social Services*, 436 U.S. 658 (1978).

---

[12] *Howell* was vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), but the opinion was reinstated at 12 F.3d 190 (11th Cir. 1994).

To start, the Supreme Court has held that "private defendants" *can* face "§ 1983 liability for invoking state … statutes later declared unconstitutional." *Wyatt v. Cole*, 504 U.S. 158, 159 (1992). A private defendant's reliance on a statute does not, by itself, confer immunity. *Id.* Centurion's contrary argument is wrong.

Centurion also misreads this Court's precedent in *Howell* and its application of *Monell*. Centurion suggests that *Howell* requires courts to "decide if a challenged policy is that of the contractor or one imposed by the state." Dkt-52 at 20. But *Howell* recognizes two ways to show Centurion caused the constitutional violation: "either that [Centurion] was directly involved in the violation, *or* that a policy or custom of [Centurion] led to the violation." 922 F.2d at 724. Holding corporate defendants like Centurion liable for direct involvement in constitutional violations, as well as for their policies, is fully consistent with *Monell*. Because Centurion was both directly involved in the constitutional violation and had an unconstitutional policy, this Court should affirm the district court's ruling.

### A.    Centurion does not dispute evidence of its policymaking authority or direct participation in causing Plaintiffs' and Class Members' injuries.

Plaintiffs put forth undisputed evidence of (1) Centurion's direct involvement in the deprivation of medically necessary care *and* (2) its final policymaking authority over the plan to implement SB185's blanket ban. *See* R-11-20 at 4–24; R-11-18; R-28-1 ¶¶ 4–5, 9, 11.

The same evidence confirms Centurion's direct participation and policymaking authority. Internal communications confirm that Centurion led the effort "to ensure compliance with the new law in GA[SB185]," R-11-18 at 2. Indeed, its logo appears on materials to implement SB185 distributed to GDC employees. R-11-20 at 4–24. Centurion supplied no competing evidence.

Nor does Centurion dispute that its Georgia SB185 implementation plan was adopted from its Idaho affiliate, R-11-18 at 2—a plan a federal court enjoined well before Centurion adapted it for GDC. *See Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1343, 1350–51 (D. Idaho 2024).

As to the evidence Defendants *did* provide, Centurion's Statewide Medical Director confirmed that "Centurion began tapering all patients off" hormone therapy to comply with SB185. R-28-1 ¶¶ 4–5. Centurion staff were involved in evaluations of Plaintiffs and Class Members. R-28-1 ¶¶ 9, 11. The actions of Centurion's employees were not random or unauthorized, they were pursuant to Centurion's implementation plan. That direct involvement and policymaking suffices for liability under *Monell* and *Howell*.

This same evidence belies Centurion's claim that it lacked "authority to make policy on this particular issue." Dkt-52 at 21, 23. Centurion adopted SB185's blanket ban as its policy, and it is liable on that ground. *Cooper v. Dillon*¸ 403 F.3d 1208, 1222 (11th Cir. 2005) (municipality liable because it "adopt[ed] the unconstitutional

proscriptions in" a statute). And it was Centurion's "deliberate decision to enforce the statute that ultimately deprived [Plaintiffs] of constitutional rights," which "trigger[s]" its liability under *Monell*. *Id.* at 1223.

Indeed, the record belies Centurion's assertion that its hands were tied by state law. Faced with a near-identical Florida law that banned public funding for hormone therapy in public prisons, Centurion's Florida affiliate continued providing hormone therapy despite the law. *See Dixon*, Case No. 4:24-cv-434, Dkt-125. It no doubt continued providing hormone therapy and evaluations because of its constitutional obligation to provide medically necessary care. *See Keohane*, 952 F.3d at 1266–67. Centurion could have done the same here but chose not to.

In short, Centurion is liable for its direct involvement in implementing SB185 and the policies it adopted regarding it.

### B.    The PLRA does not bar injunctions against private contractors.

Without citing any authority, Centurion claims the PLRA "limits injunctive relief to 'government officials,'" and not to private contractors. Dkt-52 at 23–24.

That misreads the statute. The PLRA limits the availability of equitable relief against "a government official." 18 U.S.C. § 3626. Centurion acts as a government official in this context because it fulfills a function the government would otherwise undertake—hence why Centurion can be liable under 42 U.S.C. § 1983. *See, e.g.*, *Labrador*, 747 F. Supp. 3d at 1343.

But even if Centurion were not a government official, still, the PLRA would not bar equitable relief. The PLRA is not the source of the district court's power to enjoin constitutional violations. Instead, it limits the district court's preexisting power to do so in prison litigation. If the PLRA provision limiting equitable relief does not apply to Centurion, all that means is that the district court had its usual power to enjoin Centurion's constitutional violation, free of the PLRA's limits.

## CONCLUSION

The district court order granting partial judgment to Plaintiffs, certifying two classes, and permanently enjoining enforcement of SB185's hormone therapy ban should be affirmed.

*[Signature and Certification pages follow.]*

64

Respectfully submitted this 20th day of March, 2026.

Emily C. R. Early,
GA Bar No. 810206
eearly@ccrjustice.org
A. Chinyere Ezie
cezie@ccrjustice.org
Celine Zhu
czhu@ccrjustice.org
Kayla Vinson
kvinson@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Phone: (212) 614-6464

D. Korbin Felder
kfelder@ccrjustice.org
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. Box 12046
Jackson, MS 39236
Phone: (601) 228-6101

/s/ Amanda Kay Seals
Amanda Kay Seals
GA Bar No. 502720
seals@bmelaw.com
Matthew R. Sellers
GA Bar No. 691202
sellers@bmelaw.com
BONDURANT, MIXSON & ELMORE, LLP
1201 W Peachtree St NW
Suite 3900
Atlanta, GA 30309
Phone: (404) 881-4100
Fax: (404) 881-4111

*Counsel for Plaintiffs-Appellees*

# <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the 14,500 word-count limit of this Court's Order of March 10, 2026, Dkt-54-2, because, excluding the parts of the document exempted by Rule 32(f), this document contains 14,494 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

This certification is made on March 20, 2026.

/s/ *Amanda Kay Seals*
Amanda Kay Seals
Ga. Bar No. 502720

Certificate of Compliance

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Counsel for all parties will be served with the foregoing document by the Court's CM/ECF System, pursuant to Federal Rule of Appellate Procedure 25(c)(2)(A) and 11th Cir. R. 25-3(a).

*/s/ Amanda Kay Seals*
Amanda Kay Seals
Ga. Bar No. 502720