**No. 25-14263**

# United States Court of Appeals
*for the*
# Eleventh Circuit

▶▶◀◀

Isis Benjamin, et al.,

*Plaintiffs-Appellees,*

v.

Commissioner Tyrone Oliver, et al.,

*Defendants-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA, No. 1:25-cv-04470-VMC

**BRIEF OF *AMICI CURIAE* JASON S. SCHNEIDER, ARIN SWERLICK, ATHENA SHERMAN, KYLE JONES, AND AMANDA GILLESPIE**

Erica Perdomo
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
2601 S. Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
ericaperdomo@quinnemanuel.com

Adelyn Curran
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
1200 Abernathy Road NE, Suite 1500
Atlanta, GA 30328
(770) 336-8721
adelyncurran@quinnemanuel.com

Andrew Canter
MITCHELL SHAPIRO GREENAMYRE &
    FUNT, LLP
881 Piedmont Avenue NE
Atlanta, Georgia 30309
(404) 301-8830
andrew@mitchellshapiro.com

*Counsel for Amici Medical Providers*

March 27, 2026

## CERTIFICATE OF INTERESTED PARTIES
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rule 26.1-1, counsel for *amici curiae* Jason S. Schneider, Arin Swerlick, Athena Sherman, Kyle Jones, and Amanda Gillespie represent that none of the aforementioned individuals is a corporate entity or has issued stock.  Undersigned counsel certify that, to the best of their knowledge, the following persons and entities may have an interest in the outcome of this case:

1. Benjamin, Isis – Appellee

2. Bentley, Michael J. – Counsel for Appellant

3. Bondurant Mixson & Elmore LLP – Counsel for Appellee

4. Bradley Arant Boult Cummings, LLP-MS – Counsel for Appellant

5. Canter, Andrew – Counsel for Amici

6. Center for Constitutional Rights – Counsel for Appellee

7. Centurion of Georgia, LLC – Appellant

8. Consovoy McCarthy PLLC-VA – Counsel for Appellant

9. Curran, Adelyn – Counsel for Amici

10. Doe, John on behalf of themselves and all person similarly situated – Appellee

11. Early, Emily – Counsel for Appellee

12. Ezie, Andrea Chinyere – Counsel for Appellee

13. Felder, Korbin – Counsel for Appellee

14. Frankson, Michael Geoffrey  – Counsel for Appellant

15. Georgia Department of Law – Counsel for Appellant

16. Gillespie, Amanda – Amicus

C-1

17.  Grouey, Zachary P. – Counsel for Appellant

18.  Harris, Jeffrey Matthew – Counsel for Appellant

19.  Honorable Victoria M. Calvert, U.S. District Court Judge

20.  Horton, Fantasia – Appellee

21.  Huff, Powell & Bailey, LLC – Counsel for Appellant

22.  Jones, Kyle – Amicus

23.  Kairey, Julius – Counsel for Appellant

24.  Madison, Naeomi – Appellee

25.  Mardis, Mariah, Statewide Medical Director – Appellant

26.  Oliver, Tyrone, Commissioner – Appellant

27.  Perdomo, Erica – Counsel for Amici

28.  Petrany, Stephen John – Counsel for Appellant

29.  Quinn Emanuel Urquhart & Sullivan, LLP – Counsel for Amici

30.  Sauls, Randy, Assistant Commissioner  – Appellant

31.  Schneider, Jason S. – Amicus

32.  Seals, Amanda Kay – Counsel for Appellee

33.  Sellers, Matthew – Counsel for Appellee

34.  Sherman, Athena – Amicus

35.  Swerlick, Arin – Amicus

36.  Thompson, John Henry – Counsel for Appellant

37.  Vinson, Kayla – Counsel for Appellee

38.  Wilson, Brynn – Appellee

39.  Wyrick, Rachel C.T. – Counsel for Appellant

40.  Zhu, Celine – Counsel for Appellee

Respectfully submitted,

/s/Erica Perdomo
Erica Perdomo
QUINN EMANUEL URQUHART &
        SULLIVAN, LLP
2601 S. Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
ericaperdomo@quinnemanuel.com

Adelyn Curran
QUINN EMANUEL URQUHART &
        SULLIVAN, LLP
1200 Abernathy Road NE, Suite 1500
Atlanta, GA 30328
(770) 336-8721
adelyncurran@quinnemanuel.com

Andrew Canter
MITCHELL SHAPIRO GREENAMYRE &
    FUNT, LLP
881 Piedmont Avenue NE
Atlanta, Georgia 30309
(404) 301-8830
andrew@mitchellshapiro.com

*Counsel for Amici Medical Providers*

Dated: March 27, 2026

**TABLE OF CONTENTS**

**Page**

INTERESTS OF AMICI CURIAE ...................................................................1

SUMMARY OF ARGUMENT.........................................................................2

ARGUMENT.....................................................................................................5

I.    THE STANDARD OF CARE FOR ADULTS WITH GENDER
DYSPHORIA REQUIRES AN INDIVIDUALIZED ASSESSMENT
BY A MEDICAL PROVIDER AND, IF APPROPRIATE,
HORMONE THERAPY ........................................................................5

    A.    Gender Dysphoria Is a Serious Medical Condition............................8

        1.    The basics: sex, gender identity, and gender dysphoria.............8

        2.    Diagnosis and treatment of gender dysphoria............................9

    B.    Gender-Affirming Medical Care Is Safe and Effective.....................13

    C.    The State's Reliance on The Cass and Baker Reviews to
Illustrate an "Ongoing Debate" Does Not Eliminate the Role of
Clinical Judgment .............................................................................16

        1.    The Baker Review does not support categorical
restrictions and underscores the limits of population-level
evidence....................................................................................17

        2.    The Cass Review addresses pediatric care and does not
translate to adult correctional care..........................................19

II.    A BLANKET BAN ON HORMONE THERAPY HARMS *AMICI'S*
PATIENTS, *AMICI'S* PROFESSION, AND GEORGIA...........................21

CONCLUSION ..............................................................................................26

CERTIFICATE OF COMPLIANCE..............................................................27

CERTIFICATE OF SERVICE........................................................................29

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Estelle v. Gamble*, 429 U.S. 97 (1976) ................................................................21

## Statutes

Georgia Senate Bill 185 ................................................................................passim

O.C.G.A. § 43-34-8 .....................................................................................23

## Other Authorities

Alessandra Daphne Fischer & Carlotta Cocchetti, *Biological Basis of Gender Identity*, The Plasticity Of Sex: The Molecular Biology And Clinical Features Of Genomic Sex, Gender Identity And Sexual Behavior 89 (2020) .........................9

Am. Psychiatric Ass'n, Diagnostic & Statistical Manual Of Mental Disorders (5th Ed. 2013) ..................................................................................5, 9, 10

Am. Psychological Ass'n, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70 Am. Psych. 832 (2015).........................8

Am. Psychological Ass'n, *Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science* (Feb. 2024), .....................................................................................15, 24

Am. Psychological Ass'n, *Resolution on Gender Identity Change Efforts* (2021)...9

AMA, *1.1.6 Quality*, Code of Medical Ethics .................................................11, 23

AMA Issue Brief, *Health Insurance Coverage for Gender-affirming Care of Transgender Patients* (2025).........................................................................14

AMA, *Health Care While Incarcerated H-430.986*, AMA PolicyFinder (2024) ..14

Amanda Valdes, Preeti Patel & Tushar Bajaj, *Estrogen Therapy*, StatPearls (Feb. 18, 2025)..............................................................................................................7

*Appropriations on Public Safety: Hearing Before the Subcommittee on Public Safety of the House Appropriations Committee*, 158th Ga. Gen. Assembly (2025)......25

Christina Carrega, *Family Gets $2.2 Million Settlement for Death of Georgia Inmate, Calls for Criminal Investigation*, CNN (Dec. 6, 2021)................................23, 24

Cindy Zhou et al, *Trends and Patterns of Testosterone Therapy Among US Male Medicare Beneficiaries, 1999–2014*, 203 J. Urology 1184 (2020)......................7

David Wickert & Maya T. Prabhu, *Transgender Discrimination Claims Cost Georgia Taxpayers Millions*, Atlanta J.-Const. (Feb. 24, 2025) ........................25

Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health 51 (2022)..................6

Elizabeth Weill-Greenberg & Meg O'Connor, *Georgia Prisons Won't Provide Gender-Affirming Care, Lawsuit Alleges*, The Appeal (Dec. 6, 2023)...............25

Ga. Dep't of Corr., *SOP 507.04.68*: *Management and Treatment of Transgender Offenders* (Feb. 1, 2022) ................................................................................6

*Gender Dysphoria*, Mayo Clinic (Jan 1, 2025)......................................................11

George R. Brown, *Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons With Gender Identity Disorder*, 12 Int'l J. Transgenderism 31 (2010) ...............................................................................................22

Guy T'Sjoen et al., *Endocrinology of Transgender Medicine*, 40 Endocrine Revs. 97 (2019) .................................................................................................14

Hilary Cass, Independent Review of Gender Identity Services for Children and Young People: Final Report 21 (Apr. 2024)...................................................20

Jennifer Aldrich, Jessica Kant & Eric Gramszlo, *Gender-Affirming Care, Incarceration, and the Eighth Amendment*, 25 AMA J. Ethics 407 (2023)..10, 22

Kellan E. Baker et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc'y 1 (2021) . 17, 18

Lucas Shelemy et al., *Systematic Review of Prospective Adult Mental Health Outcomes Following Affirmative Interventions for Gender Dysphoria*, 26 Int'l J. Transgender Health 480 (2024) ............................................................. 10, 11, 14

Jaclyn M. W. Hughto et al., *Social and Medical Gender Affirmation Experiences Are Inversely Associated with Mental Health Problems in a U.S. Non-Probability Sample of Transgender Adults*, 49 Archives Sexual Behavior 2635 (2020) ....... 12

Saikrishna Patibandla, Joseph Heaton & Htoo Kyaw, *Spironolactone*, StatPearls (July 4, 2023) ........................................................................................... 7

Sidhant Ochani, et. al., *Mental health implications of gender affirming care: bridging the communication and supportive gap*, 88 Annals of Med. & Surgery 554 (2026) ..................................................................................... 11

Stephen T. Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health 503 (2018) .................................................... 12

World Health Org., *HA60 Gender incongruence of adolescence or adulthood*, International Classification Of Diseases For Mortality & Morbidity Statistics (11th Rev. 2019) ............................................................................... 5

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017) ......................... 8, 11, 13, 23

Zahra Ghiasi et. al., *Physical and psychosocial challenges of people with gender dysphoria: a content analysis study*, 24 BMC Pub. Health (2024) ................... 10

Zoë Aldridge et al., *Long-Term Effect of Gender-Affirming Hormone Treatment on Depression and Anxiety Symptoms in Transgender People: A Prospective Cohort Study*, 9 Andrology 1808 (2021) ............................................... 14, 15

iv

**INTERESTS OF AMICI CURIAE**

*Amici Curiae* Jason S. Schneider, Arin Swerlick, Athena Sherman, Kyle Jones, Amanda Gillespie (collectively, "*Amici* Medical Providers" or "*Amici*") deliver evidence-based care to transgender and gender-diverse adults in the State of Georgia. *Amici* Medical Providers submit this brief to explain the medical necessity and clinical effectiveness of gender-affirming care, and the serious harms that Georgia Senate Bill 185 would inflict on incarcerated people in Georgia.

**Jason S. Schneider, M.D.**, is a board-certified internal medicine physician, Professor at Emory University School of Medicine, and Co-Founder of the Grady Memorial Hospital Gender Center. He provides comprehensive primary care to transgender and gender-diverse adults and serves on the Governing Council of the American Medical Association's LGBTQ+ Section.

**Arin Swerlick, M.D., M.P.H.**, is a board-certified family medicine physician and Assistant Professor at Emory University School of Medicine. She works full time at Emory University Student Health Services and provides primary care and gender-affirming care to adults.

**Athena D. F. Sherman, Ph.D, PHN, RN, CNE, FAAN**, is Assistant Professor at Emory University Nell Hodgson Woodruff School of Nursing who specializes in transgender and gender diverse health following violence exposure

1

and the integration of LGBTQ+ health content into nursing curricula for future clinicians.

**Kyle Jones, MSN, FNP-C**, is a primary care nurse practitioner with nine years of experience.  In addition to primary care, he also provides gender-affirming care to patients in Georgia.

**Amanda Gillespie, Ph.D.**, is Associate Professor of Otolaryngology at Emory University School of Medicine, Director of Speech Pathology, and Co-Director of the Emory Voice Center.  She provides gender-affirming voice therapy to patients in Georgia.

Together, *Amici* bring decades of research development, clinical education, and clinical experience treating adults with gender dysphoria, witnessing both the profound benefits of gender-affirming care and the devastating consequences of its denial.  *Amici* have a direct interest in preventing legislative interference with individualized medical judgment and ensuring that their patients continue to receive medically-necessary care.

## SUMMARY OF ARGUMENT

The Eighth Amendment requires the State to provide adequate medical care to the people it incarcerates.  That obligation does not permit the State to categorically withhold a recognized, effective treatment for a serious medical condition.  Georgia Senate Bill 185 ("S.B. 185") does exactly that.  It prohibits all

2

hormone therapy for incarcerated adults diagnosed with gender dysphoria, without regard to any individual patient's medical history, current treatment, or clinical needs.

This case is about medications that are commonly prescribed, well-studied, and inexpensive. Medical providers routinely prescribe hormones like estrogen, testosterone, and spironolactone to treat an array of medical conditions. Generic versions of these medications cost as little as a few dollars per month. Attempts to make this case about surgical procedures—which it is not—are merely a distraction. The core question posed by this case is whether doctors serving the Georgia Department of Corrections ("GDC") should be permitted to exercise their medical judgment, as they would outside of prison walls, to prescribe routine medications to treat a serious medical condition.

Gender dysphoria is recognized as a serious medical condition by the American Medical Association, American Psychiatric Association, American Psychological Association, the World Health Organization, and every major American medical organization. Left untreated, it often causes severe depression, anxiety, self-harm, and suicidality. Decades of clinical research and *Amici*'s own experience treating thousands of individuals confirm that hormone therapy is effective and, for many patients, the *only* effective treatment for gender dysphoria.

S.B. 185 replaces an individualized approach to diagnosis and treatment by a medical professional with a blanket prohibition against one form of medically valid treatment for people in a specific group.  Patients with gender dysphoria, however, are not interchangeable.  Some have received hormone therapy for decades; others never have.  Some have gone though surgical procedures that make hormonal treatment less necessary, while others have undergone surgical procedures that make continued hormonal treatment medically essential.  A statute that treats all of them identically is not a sound medical policy.

For at least the past decade, Georgia itself recognized this.  From 2015 to S.B. 185's passage, the GDC classified gender dysphoria as a "serious medical need[] which may not be ignored" and authorized hormone therapy when medical directors deemed it necessary.  Under the Eighth Amendment, the legislature cannot now override the medical judgment of its own professionals by fiat.

The human cost of this ban is not theoretical.  *Amici* have treated patients who, after being denied gender-affirming care, experienced severe depression, suicidal ideation, and self-harm.  *Amici* are dismayed but not surprised that some incarcerated individuals in Georgia have attempted self-castration rather than endure untreated gender dysphoria.  They also believe that the tragic death of Jenna Mitchell, a transgender person who died by suicide in GDC custody, may have been preventable had Georgia provided the necessary care.  *Amici* are perplexed that Georgia has spent

4

more than $4 million in settlements to defend the denial of gender-affirming care when providing that care would have cost far less.

The district court correctly held that an Eighth Amendment exception for political controversy would swallow the rule that incarcerated individuals are entitled to a baseline standard of medical care. This Court should affirm.

## ARGUMENT

I. **THE STANDARD OF CARE FOR ADULTS WITH GENDER DYSPHORIA REQUIRES AN INDIVIDUALIZED ASSESSMENT BY A MEDICAL PROVIDER AND, IF APPROPRIATE, HORMONE THERAPY**

This appeal asks whether the State can deny an incarcerated person access to standard medical care—not because a medical provider determined it was inappropriate, but because the legislature categorically banned it for persons in custody. The answer is no. The ban imposed by S.B. 185 contradicts science, medicine, and *Amici*'s professional experiences.

Gender dysphoria is a serious medical condition recognized by the leading diagnostic authorities.[1] Its treatment varies by individual and depends on an

---

[1] *See* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 451–53 (5th Ed. 2013) ("DSM-5"); World Health Org., *HA60 Gender incongruence of adolescence or adulthood*, International Classification of Diseases for Mortality and Morbidity Statistics (11th Rev. 2019) ("ICD-11").

individualized assessment by a medical professional.   For some adults, that assessment supports hormone therapy, typically in the form of oral or injectable medication.

Georgia once recognized this.  From 2015 until the passage of S.B. 185, the GDC's Standard Operating Procedures recognized gender dysphoria as a "serious medical need[] which may not be ignored," and authorized hormone therapy when the GDC's medical director deemed it medically necessary.[2]   The legislature's decision to override these medical judgments does not change the underlying reality: hormone therapy is the standard of care for certain adults with gender dysphoria.

To be clear, the hormone therapy at issue in this appeal involves medications that are ubiquitous in American medicine.   Estradiol, the primary estrogen prescribed as part of gender-affirming care, is the same drug prescribed to treat

---

Defendants and other amici have targeted the World Professional Association for Transgender Health's ("WPATH") Standards of Care for the Health of Transsexual, Transgender and Gender Nonconforming People.  Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health 51 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.  WPATH is one of the many sources that reflect the medical community's standard of care for transgender adults. Even if the Court were to disregard WPATH, the standard of care is supported by numerous other medical sources, including *Amici's* medical experience and judgment.

[2] Ga. Dep't of Corr., *SOP 507.04.68*: *Management and Treatment of Transgender Offenders* (Feb. 1, 2022).

menopausal symptoms, prevent postmenopausal osteoporosis, address hypogonadism, and provide palliative care for certain cancers.[3] Testosterone is routinely prescribed to address hypogonadism and treat symptoms such as fatigue, erectile dysfunction, and depression.[4] Spironolactone is regularly prescribed for heart failure, hypertension, and acne.[5] These are widely available generic medications that have been studied for decades and cost a fraction of what the State has spent litigating its withholding of these medications from people who need them. S.B. 185 restricts access to these medications when prescribed to treat gender dysphoria only; it does not restrict access to these medications for any other patient population.[6]

To be clear, *Amici* do not ask the Court to require the State provide gender-affirming surgery in a carceral setting. They merely ask the Court to recognize that

---

[3]  *See* Amanda Valdes, Preeti Patel & Tushar Bajaj, *Estrogen Therapy*, StatPearls (Feb. 18, 2025), https://www.ncbi.nlm.nih.gov/books/NBK541051/ (cataloging uses for estrogen therapy).

[4]  *See* Cindy Zhou et al., *Trends and Patterns of Testosterone Therapy Among US Male Medicare Beneficiaries, 1999–2014*, 203 J. Urology 1184, 1184 (2020) (identifying fatigue, erectile dysfunction, and depression among the symptoms prompting testosterone therapy).

[5]  *See* Saikrishna Patibandla, Joseph Heaton & Htoo Kyaw, *Spironolactone*, StatPearls (July 4, 2023), https://www.ncbi.nlm.nih.gov/books/NBK554421/ (noting that spironolactone is FDA-approved for the treatment of heart failure and hypertension, among other indications, and is prescribed off-label for acne).

[6]  *See* S.B. 185(e)(2).

GDC medical providers should be free to exercise individualized clinical judgment when treating patients with gender dysphoria, as they would for patients with any other serious medical condition.

## A.    Gender Dysphoria Is a Serious Medical Condition

Decades of scientific research and medical experience (including *Amici*'s) demonstrate that social transition and gender-affirming medical care can significantly relieve the distress of gender dysphoria.  For individuals for whom hormone therapy is indicated, the available clinical evidence and practice guidelines support its use as an effective treatment.[7]

### 1.    *The basics: sex, gender identity, and gender dysphoria*

At birth, most infants are assigned a sex, either male or female, based on the appearance of their external genitalia.  Gender identity is different.  It is "a person's deeply felt, inherent sense of being a girl, woman, or female; a boy, a man, or male; a blend of male or female; or an alternative gender."[8]  For most individuals, their sex assigned at birth, or assigned sex, matches their gender identity.  For transgender

---

[7]    *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3887–88  (2017).

[8]    Am. Psychological Ass'n, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70 Am. Psych. 832, 834 (2015).

individuals, their assigned sex does not align with their normatively expected gender identity.

Gender identity has biological bases.[9]  It is not merely a product of external influence nor subject to voluntary change.  In fact, leading medical authorities agree that efforts to change a person's gender identity against their will or desire are ineffective, can cause harm, and are unethical.[10]  Being transgender is not a medical condition requiring treatment.  "Gender dysphoria" describes the medical condition that occurs when individuals experience psychological distress because their internal gender identity does not match their external, physical attributes.[11]

### 2.    *Diagnosis and treatment of gender dysphoria*

The DSM-5's diagnosis of gender dysphoria in adults involves two major diagnostic criteria:

A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

---

[9]    Alessandra Daphne Fischer & Carlotta Cocchetti, *Biological Basis of Gender Identity*, The Plasticity Of Sex: The Molecular Biology and Clinical Features of Genomic Sex, Gender Identity & Sexual Behavior 89 (2020).

[10]    *See* Am. Psychological Ass'n, *Resolution on Gender Identity Change Efforts* (2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

[11]    DSM-5, *supra* note 1, at 452–53.

1. A marked incongruence between one's experienced/expressed gender and primary or secondary sex characteristics. . . .

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender. . . . .

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.

4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.[12]

Left untreated, gender dysphoria can cause significant distress including depression, anxiety, self-harm and suicidality.[13]  It can also impair an individual's

---

[12]  *Id.*

[13]  *See* Lucas Shelemy et al., *Systematic Review of Prospective Adult Mental Health Outcomes Following Affirmative Interventions for Gender Dysphoria*, 26 Int'l J. Transgender Health 480, 481–2 (2024); Jennifer Aldrich, Jessica Kant & Eric Gramszlo, *Gender-Affirming Care, Incarceration, and the Eighth Amendment*, 25 AMA J. Ethics 407, 408 (2023).

ability to function across all aspects of life, including work, and personal relationships.[14]

When properly diagnosed, gender dysphoria is highly amenable to treatment. The prevailing treatments, when applied on an individualized basis, are effective.[15] Not only is this documented in scientific literature and published data,[16] but *Amici* have witnessed this in thousands of patients over decades.

From the perspective of *Amici* and medical science, the overarching goal of treatment is to eliminate the distress of gender dysphoria.[17]  No two patients are the same.  Some of *Amici*'s patients with gender dysphoria have required hormone therapy for decades, while it is not medically necessary for others.  Some have coexisting conditions requiring careful management.  Some have undergone surgical interventions that make continued hormonal supplementation medically essential.

---

[14]  DSM-5, *supra* note 1, at 458 ("Relationship difficulties. . . are common, and functioning at school or work may be impaired."); *see* Zahra Ghiasi et al., *Physical and psychosocial challenges of people with gender dysphoria: a content analysis study*, 24 BMC Pub. Health, 3–9 (2024).

[15]  *See Gender Dysphoria*, Mayo Clinic (Jan 1, 2025), https://www.mayoclinic.org/diseases-conditions/gender-dysphoria/diagnosis-treatment/drc-20475262.

[16]  *See* Shelemy et al., *supra* note 13, at 495.

[17]  *See* Sidhant Ochani et. al., *Mental health implications of gender affirming care: bridging the communication and supportive gap*, 88 Annals of Med. & Surgery 554, 555 (2026).

Treating every individual with gender dysphoria the same regardless of individualized circumstances, as contemplated by S.B. 185, would not be responsible medicine and is certainly not how *Amici* treat their patients.[18]

Under applicable treatment guidelines, the standard of care for the treatment of gender dysphoria requires a combination of social transition and individualized medical intervention to facilitate the alignment of an individual's external presentation and gender identity.

Social transition has been shown to improve mental health.[19] Social transition involves changing appearance and social role, with change of signifiers of gender, including name and pronouns, and public presentation in the identified gender. Aligning one's presentation with gender identity allows individuals to see themselves—and to be recognized by others—consistent with that identity. Recognition of chosen name with social transition has been associated with

---

[18]  *See* Hembree et al., *supra* note 7, at 3870; AMA, *1.1.6 Quality*, Code of Medical Ethics (last accessed March 26, 2026), https://code-medical-ethics.ama-assn.org/ethics-opinions/quality ("AMA Code of Medical Ethics").

[19]  *See* Jaclyn M. W. Hughto et al., *Social and Medical Gender Affirmation Experiences Are Inversely Associated with Mental Health Problems in a U.S. Non-Probability Sample of Transgender Adults*, 49 Archives Sexual Behavior 2635, 2648 (2020).

12

decreases in depression and suicidality.[20]   In their own practices, *Amici* have observed that social transition is a critical step towards improved mental health.  For some individuals, social transition alone can adequately address gender dysphoria.  For others, meaningful relief requires medical interventions to align the body with gender identity.  These individuals may benefit from hormone therapy.

When clinically indicated after an individualized assessment, gender affirming hormone therapy often involves treatment with testosterone for transgender men and estrogen with testosterone suppression for transgender women.  The purpose of this treatment is to achieve physical changes that align, as closely as possible, with the individual's gender identity.  The treatment is straightforward and easily monitored.  For patients for whom hormone therapy is indicated as part of the medical treatment for gender dysphoria, the available clinical evidence and practice guidelines support its use as an effective treatment.[21]

**B.    Gender-Affirming Medical Care Is Safe and Effective**

Medical treatment for gender dysphoria has been studied for over half a century, and there is substantial evidence that gender-affirming medical care is safe

---

[20]   Stephen T. Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health 503 (2018).

[21]   Hembree et al., *supra* note 7, at 3869–70.

and effective.   This evidence includes studies showing improved mental health outcomes for transgender individuals who are treated with these interventions, and decades of clinical experience, including *Amici*'s.  There is no reason to discount these findings: The research and studies supporting medical care for gender dysphoria are the same type of evidence that the medical community routinely relies upon when treating other medical conditions.[22]

Leading U.S. medical organizations, including the American Medical Association and the American Psychological Association, endorse gender-affirming care as part of the accepted standard of care and as medically necessary for adults with gender dysphoria.[23]  The AMA advocates for "readily accessible gender-affirming care" for transgender individuals in the carceral system, including "the

---

[22] *See* Shelemy et al., *supra* note 13, at 482–85; Zoë Aldridge et al., *Long-Term Effect of Gender-Affirming Hormone Treatment on Depression and Anxiety Symptoms in Transgender People: A Prospective Cohort Study*, 9 Andrology 1808, 1810 (2021); Guy T'Sjoen et al., *Endocrinology of Transgender Medicine*, 40 Endocrine Revs. 97, 98–101 (2019).

[23] *See* AMA Issue Brief, *Health Insurance Coverage for Gender-affirming Care of Transgender Patients* (2025), https://www.ama-assn.org/system/files/transgender-coverage-issue-brief.pdf ("Standards of care and accepted medically necessary services that affirm gender or treat gender dysphoria may include . . . gender-affirming hormone therapy. . . . Every major medical association in the United States recognizes the medical necessity of transition-related care for improving the physical and mental health of transgender people and has called for health insurance coverage for treatment of gender dysphoria.").

14

continuation or initiation of hormone therapy without disruption or delay."[24] Similarly, the American Psychological Association opposes categorical bans on gender-affirming care, finding them "contrary to the principles of evidence-backed healthcare. . . ."[25]

The studies on gender-affirming medical care for treatment of gender dysphoria are consistent with decades of clinical experience of healthcare providers across the United States and around the world.  For example, one landmark study followed 178 transgender individuals who received hormone therapy over the course of eighteen months.  Depression scores decreased significantly after treatment.[26]

Over decades of collective medical practice, *Amici* have witnessed gender-affirming hormone therapy improve their patients' health and well-being.  Many patients show improvements in mental health, enhanced performance in work, enriched social functioning with peers, and stronger family relationships when they

---

[24] AMA, *Health Care While Incarcerated H-430.986*, PolicyFinder (2024), https://policysearch.ama-assn.org/policyfinder/detail/h-430?uri=%2FAMADoc%2FHOD-430.986.xml.

[25] Am. Psychological Ass'n, *Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science* (Feb. 2024), https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care ("Am. Psychological Ass'n Policy Statement").

[26] *See* Aldridge et al., *supra* note 22, at 1808 (finding that nearly a quarter of study participants were less likely to experience depression after hormone therapy).

experience relief from gender dysphoria. *Amici*'s colleagues locally, nationally, and internationally share in their experience and optimism.

Gender-affirming care follows the same informed-consent and risk-benefit protocols as every other field of medicine. To be sure, a treating medical provider cannot offer gender-affirming hormone therapy unless they have concluded, after weighing the risks and benefits of care, that treatment is appropriate. Patients are then advised of these risks and benefits, and must provide informed consent to a course of action before it can be undertaken. Treatment recommendations are made through individualized medical assessment rather than categorical rules. Between the half-century of research, the findings of every major American medical association, and *Amici*'s own experiences, *Amici* are not aware of any basis for categorically banning medically necessary gender-affirming hormone therapy.

### C. The State's Reliance on the Cass and Baker Reviews to Illustrate an "Ongoing Debate" Does Not Eliminate the Role of Clinical Judgment

Appellants point to the Cass and Baker systematic reviews as illustrating an ongoing debate among medical experts regarding the risks and benefits of hormone therapy.[27] From the perspective of *Amici*, Appellants' reliance on these systematic reviews is incorrect, as a matter of both text and context.

---

[27] *See* Defs-Appellants Opening Br. at 36–40.

The context matters.  From a clinical perspective, ongoing discussion in the medical literature is a normal feature of medical practice.  Many areas of medicine involve evolving evidence and methodological disagreement particularly when patient populations and clinical contexts vary.  In those circumstances, medical practice does not respond by categorically excluding treatments.  Instead, clinicians evaluate each individual patient, assess risks and benefits in light of their medical history and current presentation, and make treatment recommendations consistent with professional standards of care.  If the presence of debate alone were sufficient to justify categorical prohibitions on treatment, clinicians would be unable to provide care in many areas of medical practice.

1.    ***The Baker Review does not support categorical restrictions and underscores the limits of population-level evidence***

Appellants' textual reading of the Baker Review objectively misses the mark. That systematic review synthesizes an evolving evidence base; it does not direct categorical treatment rules.

The authors reviewed 20 studies examining associations between gender-affirming hormone therapy and mental health and quality-of-life outcomes.  They reported that "[h]ormone therapy was associated with increased [quality of life], decreased depression, and decreased anxiety[,]" but emphasized that "[c]ertainty in this conclusion is limited by high risk of bias in study designs, small sample sizes,

and confounding with other interventions."[28]  Importantly, the Baker Review did not conclude that hormone therapy is ineffective or harmful, nor did they recommend withholding treatment.  To the contrary, it explained that "[d]espite the limitations of the available evidence[,] . . . gender-affirming hormone therapy is likely associated with *improvements* in [quality of life], depression, and anxiety[,]" that "[n]o studies showed that hormone therapy harms mental health or quality of life among transgender people[,]" and that "[t]hese benefits make hormone therapy an essential component of care that promotes the health and well-being of transgender people."[29]  The Baker Review cautioned that methodological constraints made it difficult to "isolate the effects of hormone treatment" from other factors and called for future research using study designs better suited to that task.[30]

In clinical practice, such limitations do not preclude care; they require clinicians to exercise judgment and tailor treatment.  Properly understood, then, the Baker Review underscores the limits of population-level evidence and reinforces—rather than undermines—the role of clinical discretion in making patient-specific treatment decisions.

---

[28]  Kellan E. Baker et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc'y 1 (2021) ("Baker Review").

[29]  *Id*. at 13 (emphasis added).

[30]  *Id*. at 12–13.

Systematic reviews inform (but do not dictate) treatment decisions.  They can synthesize studies of varying design and quality and sometimes provide signals regarding potential benefits or harms associated with a treatment.  They are particularly valuable when randomized and controlled trials are difficult.  But they operate at the population level and cannot account for individual circumstances.  Physicians therefore must consider such literature alongside the patient-specific factors.  Treatment decisions ultimately require patient-specific medical judgment, not categorical rules.

2.    ***The Cass Review addresses pediatric care and does not translate to adult correctional care***

Appellants' reliance on the Cass Review is even less persuasive, since the Cass Review examines pediatric and adolescent care, not adult treatment in carceral settings.

Adult patients differ from adolescents in clinically significant ways, including physiological development, treatment history, comorbid conditions, and informed consent capacity.  Correctional medicine presents distinct clinical considerations that further underscore the inapplicability of the Cass Review's pediatric-focused findings.

Adult patients in custody frequently arrive with established treatment histories, spanning years or decades, that a clinician must evaluate and, absent a medical reason to do otherwise, continue.  Abruptly discontinuing hormone therapy

19

in this population carries physiological risks that do not arise in the pediatric context the Cass Review examined.[31]     The correctional setting also limits the non-pharmacological interventions, such as social transition and community-based support, that might supplement or, for some patients, substitute for hormone therapy.[32]

Even within its pediatric focus, the Cass Review's repeated emphasis on individualized, holistic assessment aligns with how medicine is practiced.     It cautions against one-size-fits-all approaches and does not justify categorical rules that override clinician judgment.[33]     That principle applies equally in carceral settings. The relevant inquiry remains patient-specific, and the standards that govern care outside of prison walls do not change inside them.     Moreover, incarcerated patients cannot seek alternative providers, self-pay for treatment, or otherwise mitigate the

---

[31]     *See* Pls.-Appellees' Br. at 24 (cataloging the physiological and psychological harms of suddenly suspending treatment, including "metabolic dysregulation; vasomotor instability; hormonal disequilibrium; mood destabilization and dysregulation; and musculoskeletal, neuroendocrine, cardiovascular, cardiometabolic, and neuropsychiatric effects").

[32]     *Id*. (noting that "other forms of treatment are less available" in prison, making "hormone care especially critical").

[33]     *See* Hilary Cass, Independent Review of Gender Identity Services for Children and Young People: Final Report 21, 28 (Apr. 2024) ("Cass Review") ("When conducting an assessment, it will be important that clinicians are mindful that presentations, pathways and outcomes for this cohort are very individual, and the focus needs to be on helping each person to find the best pathway for them.").

20

consequences of a categorical ban on their access to care—a dependency the Eighth Amendment exists to address.[34]　Correctional providers must therefore place even greater weight on individualized medical assessment and the continuity of established medical treatment.

Together with the Baker Review, the Cass Review underscores a basic principle of medical practice: individualized clinical judgment remains indispensable.

## II.　A BLANKET BAN ON HORMONE THERAPY HARMS *AMICI'*S PATIENTS, *AMICI'*S PROFESSION, AND GEORGIA

Amici ask the Court to consider the full ramifications of this appeal for patients, the practice of medicine, and the State of Georgia.

*First*, as discussed above, denying patients with gender dysphoria the ability to obtain gender-affirming medical care will significantly deteriorate their mental health, physical health, and stability.　*Amici* have had patients over the years who were unable to access gender-affirming care when it was medically indicated.　In many of these patients, delayed or denied care resulted in increased depression,

---

[34]　*See* Pls.-Appellees' Br. at 27 (noting that incarcerated persons "cannot by reason of the deprivation of [their] liberty, care for" themselves) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)).

anxiety, suicidal ideation and self-harm, increased substance use, and a deterioration in work performance.  These harms are only compounded in the carceral setting.[35]

Psychotherapeutic approaches alone do not alleviate such severe distress absent medical intervention.  *Amici* attest from their own experience that mental health treatments for gender dysphoria alone do not relieve the associated distress.

If a patient is currently receiving hormone therapy, a blanket policy withdrawing treatment will cause harm.  Continuity of care is a core principle of medical practice.  For patients receiving gender-affirming treatment, effectiveness depends on consistent provision of that care over time.  A patient's medical needs do not change based on geography or custodial status.  Whether a patient moves across jurisdictions or enters a correctional facility, providers must recommend continuation of medically-indicated treatment.  Abruptly discontinuing that care causes significant distress and places patients at risk.[36]

*Second*, S.B. 185 poses professional ethical conflicts for *Amici* and similarly-situated medical providers, including those in Georgia prisons.  Under the Georgia's

---

[35] *See* George R. Brown, *Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons With Gender Identity Disorder*, 12 Int'l J. Transgenderism 31, 38 (2010) ("Abrupt cessation of estrogen treatment upon incarceration, not infrequently reported by inmates, can also lead to emotional instability, a reoccurrence of severe gender dysphoria, hopelessness, and the potential for genital harm and/or SST."); Aldrich et al., *supra* note 13, at 410.

[36] Brown, *supra* note 35, at 38.

Medical Practice Act, which regulates the licensure and standards for physicians and other healthcare professionals, unprofessional conduct includes a departure from the "minimum standards of acceptable and prevailing medical practice. . . ."[37] For patients for whom gender-affirming medical care is indicated, the available clinical evidence and practice guidelines support its use as an effective treatment.[38] *Amici* should not be forced to choose between two untenable options: withholding medically indicated care in violation of professional ethics, or providing that care in violation of state law.

*Third*, *Amici* respectfully request that the Court consider the tragic and foreseeable consequences that Georgia has already experienced by denying gender-affirming care. As just one example, Jenna Mitchell's family is still recovering from her death.[39] GDC failed to treat Jenna's gender dysphoria and ignored her distress. A corrections officer then encouraged Jenna to take her own life, saying "OK, what are you waiting for, go for it."[40] When staff found her hanging, a GDC supervisor

---

[37] O.C.G.A. § 43-34-8; *see also* AMA Code of Medical Ethics, *supra* note 18 ("physicians . . . share the obligation to ensure that the care patients receive is safe, effective, patient centered, timely, efficient, and equitable.").

[38] Hembree et al., *supra* note 7, 3887–88.

[39] *See* Christina Carrega, *Family Gets $2.2 Million Settlement for Death of Georgia Inmate, Calls for Criminal Investigation*, CNN (Dec. 6, 2021), https://www.cnn.com/2021/12/06/us/georgia-prison-inmate-death-settlement.

[40] *Id*.

alerted to the emergency smirked, laughed, and walked away.  GDC paid $2.2 million to settle the case.[41]

Others continue to suffer.  In ongoing litigation, Jane Doe alleges that GDC's refusal to treat her "severe and overwhelming gender dysphoria" has resulted in "two castration attempts, multiple suicide attempts, and almost daily self-harm."[42]  A categorical ban will compound this suffering.

The legislature claims it can address the problem with psychiatrists and counselors.[43]  It cannot.  Psychotherapy is a critical treatment modality for many patients, but it does not address the underlying gender dysphoria, which when persistent can only be addressed by bringing a patient's body and sex characteristics into alignment with their gender identity, including through the provision of hormone therapy, where indicated for an individual.  If GDC's plan is to "treat" gender dysphoria by counseling individuals to identify with their assigned sex at birth, such therapies provide no benefit and only cause further harm.[44]  And further, GDC already struggles to hire enough mental health providers to meet current needs.

---

[41]  *Id.*

[42]  Compl. & Request for Relief at 2, ECF No. 1, *Doe v. Ga. Dep't of Corr.*, No. 1:23-cv-05578-MLB (N.D. Ga. Dec. 6, 2023).

[43]  *See* Defs.-Appellants' Opening Br. at 49.

[44]  Am. Psychological Ass'n Policy Statement, *supra* note 25.

On December 1, 2025, the CEO of Centurion, the State's medical and mental health contract provider, told the Georgia Legislature that the company has seen a dramatic decline in its ability to fill psychiatrist and counselor vacancies.[45]

No one benefits from this blanket ban. Patients like Jenna Mitchell and Jane Doe do not. Their families do not. Nor do the medical providers whose knowledge, training, experience, and judgment are displaced.[46]

Georgia's taxpayers do not benefit either. A 2025 article reports that the State has spent more than $4 million on settlements and legal fees arising from denying transgender individuals care.[47] The *Amici* States acknowledges that "the State will

---

[45] He testified: "Psychiatrists are in huge demand. Licensed counselors for mental health are in huge demand. So we believe we are at the front end, or in the middle of, what's sort of a spiral down in terms of this contract, right—our ability to retain the people with no raise since 2022 is catching up with us." *Appropriations on Public Safety: Hearing Before the Subcommittee on Public Safety of the House Appropriations Committee*, 158th Ga. Gen. Assembly (2025), https://www.youtube.com/live/RvdLk6b-wSM?si=k1dDJbAtEqLcWeG6&t=8307 (statement of Tim Harlin, CEO of Centurion Health, commencing at 2:18:27).

[46] *See* Elizabeth Weill-Greenberg & Meg O'Connor, *Georgia Prisons Won't Provide Gender-Affirming Care, Lawsuit Alleges*, The Appeal (Dec. 6, 2023), https://theappeal.org/georgia-prisons-wont-provide-gender-affirming-care-lawsuit-alleges/ ("The plaintiff, identified in court documents as Jane Doe, says she has been denied gender-affirming surgery even though three psychiatrists and a psychologist from GDC have determined she requires it.").

[47] *See* David Wickert & Maya T. Prabhu, *Transgender Discrimination Claims Cost Georgia Taxpayers Millions*, Atlanta J.-Const. (Feb. 24, 2025), https://www.ajc.com/politics/georgia-state-legislature/transgender-discrimination-claims-cost-georgia-taxpayers-millions/MMHWBIWCXBCENLCACHUO67XDYI/.

25

simply need to show the reasonableness of" denying hormone therapy "in the circumstances of every prisoner that challenges it" in court.[48]  That approach invites continued litigation and escalating costs.  Providing medically-indicated care would avoid those expenditures while better protecting patient health.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that this Court affirm the judgment of the district court.

---

[48]  States' *Amicus* Br., ECF No. 37, at 10.  The participating States' position is curious.  While on one hand they invite serial, individualized litigation, they then complain that "district courts cannot . . . forc[e] States to retain costly expert witnesses to explain the relevant evidence."  *Id.* at 22.  Litigation about medical issues almost always requires medical expertise.  Attorneys and judges are not doctors, and juries require expert assistance to weigh the evidence.

Respectfully submitted,

/s/Erica Perdomo
Erica Perdomo
QUINN EMANUEL URQUHART &
     SULLIVAN, LLP
2601 S. Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
ericaperdomo@quinnemanuel.com

Adelyn Curran
QUINN EMANUEL URQUHART &
     SULLIVAN, LLP
1200 Abernathy Road NE, Suite 1500
Atlanta, GA 30328
(770) 336-8721
adelyncurran@quinnemanuel.com

Andrew Canter
MITCHELL SHAPIRO GREENAMYRE &
   FUNT, LLP
881 Piedmont Avenue NE
Atlanta, Georgia 30309
(404) 301-8830
andrew@mitchellshapiro.com

*Counsel for Amici Medical Providers*

Dated: March 27, 2026

27

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the length limit requirements of Fed. R. App. P. 32(a)(7) because it contains 5400 words (based on the Microsoft Word word-count function) excluding the parts exempted by Fed. R. App. P. 32(f).

2.  This brief complies with typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

3.  Pursuant to Fed. R. App. P. 29(a)(4)(E), I certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the amici curiae or their counsel contributed money that was intended to fund preparing or submitting the brief. Amici received no funding for this work and have no conflicts of interest to declare. The views expressed are *Amici*'s own and not those of Emory University or any medical facility at which they may be employed. Counsel for *Amici* file this amicus brief with the consent of all parties pursuant to Fed. R. App. P. 29(a)(2).

Dated: March 27, 2026

 */s/ Erica Perdomo*
Erica Perdomo

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2026, the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system.  Service will be effectuated to all parties and counsel of record in this matter who are registered with the Court's CM/ECF system.

Dated: March 27, 2026

*/s/ Erica Perdomo*
Erica Perdomo

29