No. 25-14263

---

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

ISIS BENJAMIN, *et al.*,

*Plaintiffs-Appellees*,

v.

COMMISSIONER TYRONE OLIVER, in his official capacity, *et al.*,

*Defendants-Appellants*.

---

Appeal from the U.S. District Court for the Northern District of Georgia
No. 1:25-cv-04470 (Calvert, J.)

---

## BRIEF OF DR. KELLAN BAKER, AS *AMICUS CURIAE,* IN SUPPORT OF PLAINTIFFS-APPELLEES SEEKING AFFIRMANCE

---

Luke A. Barefoot
Thomas Kessler
Jack Massey
Noopur Sen (*pro hac vice*)
Ariel Sheffey (*pro hac vice*)
Saifeldeen Zihiri (*pro hac vice*)
CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
T: (212) 225-2000
tkessler@cgsh.com

T. Brandon Waddell
CAPLAN COBB LLC
75 14th St. NE #2700
Atlanta, GA 30309
T: (404) 596-5602
bwaddell@caplancobb.com

*Counsel for Amicus Curiae*

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 29-2, 26.1-1(a)(4), and 26.1-2(b), the undersigned counsel certifies that the following persons and parties may have an interest in the outcome of this case:

1.   Baker, Dr. Kellan E.

2.   Barefoot, Luke A.

3.   Barta, James A.

4.   Benjamin, Isis

5.   Bentley, Michael J.

6.   Bird, Brenna

7.   Bondurant Mixson & Elmore LLP

8.   Bradley Arant Boult Cummings LLP-MS

9.   Brown, Derek

10.  Calvert, Honorable Victoria Marie

11.  Caplan Cobb LLC

12.  Carr, Christopher M.

13.  Center For Constitutional Rights

14.  Centurion of Georgia LLC

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

15. Cleary Gottlieb Steen & Hamilton LLP

16. Consovoy McCarthy PLLC

17. Cox, Stephen J.

18. Doe, John

19. Drummond, Gentner

20. Early, Emily

21. Ezie, Andrea Chinyere

22. Felder, Korbin

23. Fitch, Lynn

24. Frankson, Michael Geoffrey

25. Griffin, Tim

26. Grouev, Zachary P.

27. Hanaway, Catherine L.

28. Harris, Jeffrey M.

29. Hilgers, Michael T.

30. Huff, Powell & Bailey LLC

31. Horton, Fantasia

32. Kairey, Julius

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

33.  Karasic, Dr. Dan

34.  Kautz, Keith G.

35.  Kessler, Thomas

36.  Knudsen, Austin

37.  Kobach, Kris W.

38.  Labrador, Raúl R.

39.  Madison, Naeomi

40.  Mardis, Dr. Marlah

41.  Marshall, Steve

42.  Massey, Jack

43.  McCuskey, John B.

44.  Murrill, Liz

45.  Montenegro, Steve

46.  Oliver, Tyrone

47.  Owen, Dr. Katherine Haynes

48.  Paxton, Ken

49.  Peterson, Warren

50.  Petrany, Stephen J.

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

51.  Rokita, Theodore E.

52.  Sauls, Randy

53.  Seals, Amanda Kay

54.  Sellers, Matthew

55.  Sen, Noopur

56.  Sheffey, Ariel

57.  State of Alabama

58.  State of Alaska

59.  State of Arkansas

60.  State of Idaho

61.  State of Indiana

62.  State of Iowa

63.  State of Kansas

64.  State of Louisiana

65.  State of Mississippi

66.  State of Missouri

67.  State of Montana

68.  State of Nebraska

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

69. State of North Dakota

70. State of Ohio

71. State of Oklahoma

72. State of South Carolina

73. State of Texas

74. State of Utah

75. State of West Virginia

76. State of Wyoming

77. Steeves, Jaden

78. The Arizona Legislature

79. Thompson, John Henry

80. Vinson, Kayla

81. Waddell, T. Brandon

82. Wilson, Alan

83. Wilson, Brynn

84. Wrigley, Drew H.

85. Wynne, Dr. Gerald

86. Wyrick, Rachael C.T.

*Benjamin, et al. v. Oliver, et al.*; No. 25-14263

87.  Yost, Dave

88.  Zarian, Michael A.

89.  Zhu, Celine

90.  Zihiri, Saifeldeen


Dated: March 27, 2026

*/s/ T. Brandon Waddell*
T. Brandon Waddell

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..................................................C-1

TABLE OF CONTENTS ..................................................................................... i

IDENTITY AND INTERESTS OF AMICUS CURIAE .........................................1

STATEMENT OF THE ISSUES .........................................................................4

SUMMARY OF THE ARGUMENT.....................................................................4

ARGUMENT .....................................................................................................8

I.    The District Court Rightfully Rejected Defendants-Appellants'
Mischaracterizations Of The Baker Review .........................................................8

II.   The Baker Review Underscores That Hormone Therapy Is A Clinically
Appropriate And Evidence-Backed Treatment For Adults with Gender
Dysphoria ......................................................................................................10

III.   Defendants-Appellants Mischaracterize The Findings Of The Baker
Review To Support The Inaccurate Assertion That Hormone Therapy For Adult
Gender Dysphoria Is Subject To Scientific Or Medical Controversy..................13

   A.   Defendants-Appellants Falsely Characterize The Evidence Supporting
   Hormone Therapy As Deficient .....................................................................13

   B.   Defendants-Appellants Misinterpret The Baker Review's Call For Further
   Research Into Hormone Therapy ....................................................................21

   C.   Defendants-Appellants Draw An Improper Parallel Between The Baker
   Review And The Cass Review.........................................................................23

CONCLUSION .................................................................................................25

CERTIFICATE OF COMPLIANCE....................................................................27

CERTIFICATE OF SERVICE ...........................................................................28

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*E.E.O.C. v. Pet Inc., Funsten Nut Div.*,
   No. 78-377-N, 1981 WL 27116 (M.D. Ala. Dec. 14, 1981) ...............................8

*Lebron v. Sec. of Fla. Dep't of Child. and Fam.*,
   772 F.3d 1352 (11th Cir. 2014) ........................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) .........................................................................................19

*McCasland v. Pro Guard Coatings, Inc.*,
   799 F. App'x 731 (11th Cir. 2020) ...................................................................6

**Rules and Statutes**

Fed. R. Evid. 803(18) ..........................................................................................5, 8

Fed. R. Evid. 803(18), advisory committee's note (1972) ...........................5-6, 8-9

**Other Authorities**

Anna Nobili, Cris Glazebrook & Jon Arcelus, *Quality of Life of Treatment-*
   *Seeking Transgender Adults: A Systematic Review and Meta-Analysis,*
   Reviews in Endocrine and Metabolic Disorders (2018) ...................................12

B.J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and*
   *Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical*
   *Trial*, JAMA Network Open (2023) ..................................................................17

Brian P. Kavanagh, *The GRADE System for Rating Clinical Guidelines*,
   PLoS Medicine (2009) ....................................................................................19

Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in*
   *Female-to-Male Transsexual Persons*, The Journal of Sexual Medicine
   (2014) ............................................................................................................17

David M. Doyle, Thomas Lewis & Manuela Barreto, *A Systematic Review of Psychosocial Functioning Changes After Gender-Affirming Hormone Therapy Among Transgender People*, Nature Human Behaviour (2023)..........23

David Moher et al., *Epidemiology and Reporting Characteristics of Systematic Reviews*, PLoS Med. (2007)............................................................11

Florence Ashley et al., *Randomized-Controlled Trials Are Methodologically Inappropriate in Adolescent Transgender Healthcare*, International Journal of Transgender Health (2023).................................................16

Gordon Guyatt et al., *Systematic Reviews Related to Gender-Affirming Care,* McMaster University (2025), https://hei.healthsci.mcmaster.ca/systematic-reviews-related-to-gender-affirming-care/.................................................................................21

Gordon H. Guyatt et al., *GRADE: An Emerging Consensus on Rating Quality of Evidence and Strength of Recommendations*, BMJ (2008)...............15

Jaclyn M. White Hughto & Sari L. Reisner *A Systematic Review of the Effects of Hormone Therapy on Psychological Functioning and Quality of Life in Transgender Individuals*, Transgender Health (2016).........................12

Jeremy Howick, The Philosophy of Evidence-Based Medicine (Wiley-Blackwell, 2011) ............................................................................15

K. K. H. Tan et al., *Unmet Need for Gender-Affirming Care as a Social Determinant of Mental Health Inequities*, J. Pub. Health (2023), https://doi.org/10.1093/pubmed/fdac131 ........................................16

Lucas Shelemy et al., *Systematic Review of Prospective Adult Mental Health Outcomes Following Affirmative Interventions for Gender Dysphoria*, International Journal of Transgender Health (2024) .........................................12

Luis H. Braga et al., *Randomized Controlled Trials - The What, When, How and Why*, Journal of Pediatric Urology (2025)...................................18

iii

Mohammad Hassan Murad et al., *Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes*, Clinical Endocrinology (2010)............................12

Padhraig S. Fleming et al., *High Quality of the Evidence for Medical and Other Health-Related Interventions Was Uncommon in Cochrane Systematic Reviews*, Journal of Clinical Epidemiology (2016).........................18

R.L. Moss et al., *The Role of Prospective Randomized Clinical Trials in Pediatric Surgery: State of the Art*, Journal of Pediatric Surgery (2001) ..........15

Rachana Desai et al., *Cigarette Smoking and Reasons for Leaving School Among School Dropouts in South Africa*, Tobacco Induced Diseases (2018) ...................................................................................................22

Sari L. Reisner, et al., *Gender-Affirming Hormone Therapy and Depressive Symptoms Among Transgender Adults*, JAMA Network Open (2025) .............23

Stefan Rowniak, Lindsay Bolt & Claire Sharifi, *Effect of Cross-Sex Hormones on the Quality of Life, Depression and Anxiety of Transgender Individuals: A Quantitative Systematic Review*, JBI Database of Systematic Reviews & Implementation Reports (2019) ...................................12

Taylah R. van Leerdam, Jeffrey D. Zajac & Ada S. Cheung, *The Effect of Gender-Affirming Hormones on Gender Dysphoria, Quality of Life, and Psychological Functioning in Transgender Individuals: A Systematic Review*, Transgender Health (2023) ................................................................12

Theodore E. Schall, Kaitlyn Jaffe & Jacob D. Moses, *Roles of Randomized Controlled Trials in Establishing Evidence-Based Gender-Affirming Care and Advancing Health Equity*, AMA J. Ethics (2024), https://doi.org/10.1001/amajethics.2024.684 .......................................16

Thomas R. Frieden, *Evidence for Health Decision Making - Beyond Randomized, Controlled Trials*, The New England Journal of Medicine (2017) .................................................................................................18

iv

Tim C. van de Grift et al., *Waiting for Transgender Care and its Effects on Health and Equality: A Mixed-Methods Population Study in the Netherlands*, EClinicalMedicine (2024), https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370%2824%2900236-0/fulltext? ...................................................................16

Waleed M. Sweileh, *Research Publications on the Mental Health of Transgender People: A Bibliometric Analysis Using Scopus Database (1992–2021)*, Transgender Health (2022) ...........................................................11

## IDENTITY AND INTERESTS OF AMICUS CURIAE[1]

Dr. Kellan E. Baker ("Dr. Baker" or "*Amicus*") is the Senior Advisor for Health Policy at the Movement Advancement Project, an independent, nonprofit think tank that provides rigorous research and communications insights to advance equality and opportunity for all.  Dr. Baker also currently holds academic appointments as affiliate faculty in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health and the Department of Health Policy and Management at the George Washington University Milken Institute School of Public Health.  Prior to his work at the Movement Advancement Project, Dr. Baker was the Executive Director and Chief Learning Officer of the Institute for Health Research and Policy at Whitman-Walker.  In this role, he oversaw a multi-million-dollar portfolio of research funded by the National Institutes of Health (the "NIH"), the Patient-Centered Outcomes Research Institute ("PCORI"), and other leading sponsors of scientific research.

In addition, Dr. Baker is currently the co-chair of the Presidential Advisory Council on HIV/AIDS and has served in an advisory capacity for numerous other

---

[1] The parties have consented to the filing of this brief.  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amicus curiae* states that no counsel for a party authored this brief in whole or in part, and no person—other than the *amicus* and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.

private and public entities, including the NIH National Advisory Council on Minority Health and Health Disparities; the National Academies of Sciences, Engineering, and Medicine; the Scientific Advisory Council for the United States Transgender Study; and the Sexual and Gender Minority Research Working Group of the NIH Council of Councils.  Cumulatively, Dr. Baker has over twenty years of experience as a nationally recognized leader in the fields of health policy and health services research.

Dr. Baker received his Ph.D. in Health Policy and Management from the Johns Hopkins Bloomberg School of Public Health, a Master of Public Health from the George Washington University Milken Institute School of Public Health, and a Master of Arts in International Development Studies from the George Washington University Elliott School of International Affairs.

Dr. Baker is the author of thirty-six peer-reviewed journal articles, numerous published reports, and four book chapters.  His articles have been published in high-impact journals such as *Journal of the American Medical Association*, *New England Journal of Medicine*, and *American Journal of Public Health*, among others.

Dr. Baker's systematic review, *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review* (the "Baker Review" or the "Review"), has been cited numerous times by Defendants-

2

Appellants in the proceedings below and before this Court in their attempt to

establish a factual dispute as to medically necessary care for adults with gender

dysphoria.  *See, e.g.,* Opening Br. of Appellants, Dkt. 26 at 17, 20–22, 24, 36–38,

41–42, and 44; State Defs.' Mot. for Partial Summ. J., R. 72 at 17, 19; State Defs.'

Opp. to Pls.' Mot. for Partial Summ. J., R. 80 at 9, 25; State Defs.' Reply in Supp.

of Mot. for Partial Summ. J., R. 93 at 9–10, 14.[2]  Defendants-Appellants also rely

on Dr. Hilary Cass's *Independent Review of Gender Identity Services for Children

and Young People* (the "Cass Review"), in which the Baker Review is cited and

discussed.  *See, e.g.,* R. 72-3 at 132, 177-178 (citing R. 72-2 at 2, 14 ); *see also,

e.g.,* Opening Br. of Appellants, Dkt. 26 at 20, 24–25, 38–40, 43.

Dr. Baker has an interest in ensuring that medical care for people with

gender dysphoria is appropriately informed by scientific research and that the

research is properly understood by the wider public.  Moreover, as the lead author

of the Baker Review, Dr. Baker has a unique interest in ensuring that, should the

Court depart from the approach taken by the District Court and consider his report,

his scholarship is properly understood by the Court free from

Defendants-Appellants' mischaracterizations.

---

[2] *Amicus* refers to materials filed on the appellate docket using the following format: Dkt-[docket number(s)].  Materials filed on the district court docket are cited with the corresponding pagination: R-[district court docket number(s)].  All page numbers refer to the page number generated by the respective court's electronic filing system.

## STATEMENT OF THE ISSUES

1.  Whether the academic treatises Defendants-Appellants submitted, without a corresponding expert to lay the foundation and provide further context, were not admissible evidence and could not be considered for purposes of creating a fact dispute as to deliberate indifference.

2.  Whether Defendants-Appellants mischaracterized the Baker Review in their attempt to create a factual dispute regarding the propriety of providing gender-affirming care to adults with gender dysphoria.

## SUMMARY OF THE ARGUMENT

Dr. Baker was the lead author of *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review* (2021), a research paper that identifies positive associations between hormone therapy and measures of mental health and quality of life for people with gender dysphoria across their lifespans.  Specifically, the Baker Review finds that the hormone treatments routinely prescribed by doctors to people with gender dysphoria are positively correlated with statistically significant and clinically meaningful improvements in mental health and quality of life.  The Review notes that these treatments have long been part of the widespread clinical consensus on medical care for people with gender dysphoria, have benefits that are supported by scientific evidence, and are neither novel nor controversial.

Defendants-Appellants heavily rely on the Baker Review to support their contention that hormone therapy for adults with gender dysphoria is somehow controversial or at odds with the consensus view on generally accepted medical practice—a conclusion with no basis in the Review.  Despite citing the Review at least thirty-nine times across their opening brief and the briefing below, Defendants-Appellants never contacted Dr. Baker to inquire, much less verify, whether their interpretations of the Baker Review were an accurate reflection of his scholarship and findings.  Had they done so, Dr. Baker would have corrected their fundamental misunderstanding of the Review's conclusions.  Unfortunately, the Court has been presented with deep mischaracterizations of the Review, particularly as to the strength of evidence supporting hormone therapy, without the benefit of any expert guidance to assist the Court in contextualizing the Review and Defendant-Appellants' mischaracterizations of it.  It is exactly this harm that the Federal Rules of Evidence seek to avoid by requiring academic reviews or "learned treatises" to be accompanied by "an expert witness on cross-examination or [] direct examination," failing which, the contents of such documents constitute inadmissible hearsay.  Fed. R. Evid. 803(18).  This rule is based on the "likelihood that the treatise will be misunderstood and misapplied without expert assistance and supervision."  Fed. R. Evid. 803(18), advisory committee's note (1972).  Courts have thus long relied on experts to inform judgments across a wide range of

5

scientific contexts, including the determination of acceptable methods of medical treatment. *See McCasland v. Pro Guard Coatings, Inc*., 799 F. App'x 731, 733 (11th Cir. 2020) ("[I]n cases where a [factfinder] is asked to assess complex medical or scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required").

Defendants-Appellants have twisted the fundamental conclusions of the Baker Review, which synthesizes decades of clinical research and practice establishing that hormone therapy *is* an essential component of the treatment of gender dysphoria, to support an argument diametrically opposed to what the Review actually finds. One of the grounds on which the District Court rightfully declined to consider the Review was precisely to avoid such "misinterpretation and misapplication" of a scientific treatise. Fed. R. Evid. 803(18), advisory committee's note (1972); Op., Order, and Permanent Inj., R. 94 at 14–18.

Dr. Baker respectfully submits this *amicus* brief to explain the findings of the Baker Review, should the Court decide to consider it, and to correct Defendants-Appellants' mischaracterizations. As detailed herein, the Baker Review demonstrates that hormone therapy is an evidence-based treatment for people with gender dysphoria that a clinician may appropriately prescribe based on individual medical need. Defendants-Appellants' characterizations to the contrary are incorrect and exemplify the risk of relying on medical literature without

6

accompanying expert testimony.  Based on his scholarship and decades-long expertise in the field, and in line with the conclusions of the Baker Review, Dr. Baker urges the Court to affirm the District Court's holding.

## ARGUMENT

### I.   The District Court Rightfully Rejected Defendants-Appellants' Mischaracterizations Of The Baker Review

Courts have long refused to consider scientific evidence without a competent expert to explain and contextualize it.  The Federal Rules of Evidence make clear that academic reviews, or "learned treatises," are inadmissible hearsay unless "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination."  Fed. R. Evid. 803(18).  This rule corrects for the "likelihood that the treatise will be misunderstood and misapplied without expert assistance and supervision."  Fed. R. Evid. 803(18), advisory committee's note (1972); *see also Lebron v. Sec. of Fla. Dep't of Child. and Fam.*, 772 F.3d 1352, 1371 (11th Cir. 2014) ("We are hard-pressed to ascribe significance to these studies without an appropriately credentialed expert to vet them");  *E.E.O.C. v. Pet Inc., Funsten Nut Div.,* No. 78-377-N, 1981 WL 27116, at *1 (M.D. Ala. Dec. 14, 1981) ("[T]his Court will not appropriate to itself the task of deciding the validity of statistical proof without the benefit of an expert witness' analysis of the matter") (citing *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620 (1974)).

In the District Court proceedings, Defendants-Appellants repeatedly "misunderstood and misapplied" the Baker Review.  Fed. R. Evid. 803(18), advisory committee's note (1972); *see* State Defs.' Opp'n to Mot. for Partial

Summ. J. and Entry of Permanent Inj., R. 80 at 25 (incorrectly citing to the Baker Review to claim it "is unproven and speculative" that "providing cross-sex hormones will improve mental health"); State Defs.' Reply in Supp. of Mot. for Partial Summ. J., R. 93 at 15 (incorrectly claiming that the Baker Review "speak[s] for [itself] in discussing the lack of reliable evidence showing any benefits from cross-sex hormones").[3]  The desire to avoid such "misunderst[anding] and misappli[cation]" is precisely why the District Court correctly declined to consider Defendants-Appellants' arguments with respect to the Baker Review as evidence of a material factual dispute.  *See* Fed. R. Evid. 803(18), advisory committee's note (1972);  Op., Order, and Permanent Inj., R. 94 at 17.  As the District Court explained, "even if the Court were to consider the Review[] as evidence in the abstract, creating a fact dispute with [it] would require the testimony of an expert to put the Review[] into context," which Defendants-Appellants failed to produce. Op., Order, and Permanent Inj., R. 94 at 17.

In their Opening Brief before this Court, Defendants-Appellants continue to entirely misapprehend the conclusions of the Baker Review in service of a position that is diametrically opposed to the medical facts and evidence clearly laid out in the Review itself.  The Baker Review is a scientific paper intended for an academic

---

[3] Defendants-Appellants' misinterpretations, and the actual conclusions of the Baker Review, are explained further *infra* Sections II–III.

audience.  Accordingly, it should not be assessed by a court of law without the aid of an expert to contextualize its significance, something Defendants-Appellants chose not to do below and cannot do for the first time on appeal.  Should the Court consider the Baker Review, it should reject the mischaracterizations of the Review put forth by Defendants-Appellants, for the reasons that follow.

II.  **The Baker Review Underscores That Hormone Therapy Is A Clinically Appropriate And Evidence-Backed Treatment For Adults with Gender Dysphoria**

The Baker Review was conducted in 2018–2020 by a team of researchers affiliated with Johns Hopkins University, led by Dr. Baker.  The Review analyzes psychological outcomes, including quality of life, associated with hormone therapy for people with gender dysphoria.  The development, execution, and reporting of the Baker Review followed standardized formats prescribed by an independent global network of health researchers and professionals.

The Baker Review assesses common medical treatments for patients with gender dysphoria: puberty-delaying medications for transgender adolescents of any gender, treatment with testosterone for transgender men, and treatment with estrogen and/or an anti-androgen for transgender women.  The Review synthesizes existing medical research on how these treatments impact psychological and health outcomes.

To arrive at their conclusions, the Review's researchers compiled scientific

10

studies focused on transgender health published between 1967 and 2020.  This search strategy initially returned more than 1,700 studies, indicative of the breadth and depth of scientific research on transgender healthcare conducted over decades in the United States and around the world.[4]  After isolating studies that assessed one or more of the key outcomes of quality of life, depression, anxiety, and death by suicide among people with gender dysphoria receiving gender-affirming hormone therapy, the Baker Review ultimately analyzed twenty studies reported across twenty-two publications, representing participants from at least ten countries and study sizes ranging from twenty to 1,331 participants.[5]  The volume and nature of evidence synthesized by the Review is comparable to industry-leading systematic reviews in other areas of medical care.[6]

The Baker Review concludes that hormone treatment is positively correlated with stability or improvement in measures of depression, anxiety, and quality of life among people with gender dysphoria.  Among studies included in the Review, none showed that these treatments were associated with *decreases* in any health outcomes, nor did any conclude that hormone therapy causes harm.  Significantly,

---

[4] Waleed M. Sweileh, *Research Publications on the Mental Health of Transgender People: A Bibliometric Analysis Using Scopus Database* (1992–2021), Transgender Health (2022), https://doi.org/10.1089/trgh.2022.0006.
[5] *See* R. 72-2 at 3–4 for a detailed description of the search and selection strategy.
[6] David Moher et al., *Epidemiology and Reporting Characteristics of Systematic Reviews*, 4 PLOS Med. e78 (2007).

11

the findings of the Baker Review echo those of previous systematic reviews on the topic,[7] and its findings have since been replicated by other reviews and individual studies.[8]

The Review demonstrates that hormone therapy for gender dysphoria is an evidence-based treatment that should be prescribed based on individual medical need.  As the Review notes, hormone therapy is "an essential component of care that promotes the health and well-being of transgender people," R. 72-2 at 14, which is to say, it is a medically necessary form of care for adults with gender dysphoria.

---

[7] *See, e.g.*, Mohammad Hassan Murad et al., *Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes*, 72 Clinical Endocrinology 214 (2010); Anna Nobili, Cris Glazebrook & Jon Arcelus, *Quality of Life of Treatment-Seeking Transgender Adults: A Systematic Review and Meta-Analysis,* 19 Reviews in Endocrine and Metabolic Disorders 199 (2018); Stefan Rowniak, Lindsay Bolt & Claire Sharifi, *Effect of Cross-Sex Hormones on the Quality of Life, Depression and Anxiety of Transgender Individuals: A Quantitative Systematic Review*, 17 JBI Database of Systematic Reviews & Implementation Reports 1826 (2019); Jaclyn M. White Hughto & Sari L. Reisner *A Systematic Review of the Effects of Hormone Therapy on Psychological Functioning and Quality of Life in Transgender Individuals*, 1 Transgender Health 21 (2016).

[8] *See, e.g.*, Lucas Shelemy et al., *Systematic Review of Prospective Adult Mental Health Outcomes Following Affirmative Interventions for Gender Dysphoria*, 26 International Journal of Transgender Health 480 (2024); Taylah R. van Leerdam, Jeffrey D. Zajac & Ada S. Cheung, *The Effect of Gender-Affirming Hormones on Gender Dysphoria, Quality of Life, and Psychological Functioning in Transgender Individuals: A Systematic Review*, 8 Transgender Health 6 (2023).

**III.    Defendants-Appellants Mischaracterize The Findings Of The Baker Review To Support The Inaccurate Assertion That Hormone Therapy For Adult Gender Dysphoria Is Subject To Scientific Or Medical Controversy**

Defendants-Appellants repeatedly cite to the Baker Review to support their argument that hormone therapy is a controversial treatment for adults with gender dysphoria.  Not only does that proposition find no home in the Baker Review, the Review's findings support precisely the opposite conclusion.

Defendants-Appellants mischaracterize the findings of the Baker Review in several ways.  In particular, Defendants-Appellants misunderstand the import of evidence labeled "low" strength, confusing this scientific term of art with the unrelated lay concept of unreliability.  Defendants-Appellants' fundamental misunderstanding of the Review's significance demonstrates the risk of relying on academic literature without the aid of expert testimony—a risk that courts, like the District Court, account for by declining to consider scientific evidence without credible expert testimony. *See* Op., Order, and Permanent Inj., R. 94 at 17–18.

**A. Defendants-Appellants Falsely Characterize The Evidence Supporting Hormone Therapy As Deficient**

Defendants-Appellants repeatedly mistake the Baker Review as concluding that there is only weak evidence supporting the medical benefits of hormone therapy for adults with gender dysphoria.  *See, e.g.,* Opening Br. of Appellants, Dkt. 26 at 17 (claiming that the Baker Review has been "sharply critical of the

13

strength of evidence underlying the treatment guidelines offered by advocacy groups such as WPATH"); *id*. at 39 (alleging the Review supports the notion that WPATH relied on "flawed" studies deemed as low quality).  Specifically, Defendants-Appellants seize on the fact that the Baker Review labels the quality of evidence in the studies analyzed as "low."  *See* Opening Br. of Appellants, Dkt. 26 at 17 (stating that the Baker Review found the strength of evidence low for hormone therapy benefits); *id*. at 36–39 (claiming the Baker Review found the strength of evidence low due to concerns about the studies).  In so doing, Defendants-Appellants fundamentally misunderstand the technical significance of evidence characterized as "low" strength, as used in the discipline of evidence-based medicine.  Such a characterization does *not* mean that a body of evidence is deficient or unreliable but rather is a reflection of the type of study design available to, and employed by, researchers in the field.

Evidence-based medicine tools assess the quality or "strength" of evidence according to specific evidence-rating scales, which usually provide four levels of evidence: high, moderate, low, and very low or insufficient.  Though the ratings can be adjusted up or down according to various elements of the study's methodology, evidence that comes from randomized controlled trials starts with a presumptive "high" rating, while evidence from observational studies starts with a

14

presumptive "low" rating.[9]  These presumptive ratings are applied even before a given study is fully assessed because of the emphasis these tools place on randomized controlled trials.

In the context of gender dysphoria research, as in many other medical fields, randomized controlled trials often are not possible.  In the abstract, randomized controlled trials are considered the "gold standard" in terms of scientific evidence quality, but many areas of medicine often cannot use them for ethical reasons.[10]  This is because randomized controlled trials typically involve withholding the relevant treatment from a subset of the study population and comparing that group's medical outcomes with the group that *does* receive treatment.  This type of study can only be performed ethically where researchers do not know at the outset of the trial whether the treatment works.  If there is existing evidence that the treatment *does* work, running a randomized controlled trial that withholds a treatment that works from a group of study participants would be contrary to medical ethics.  As a result, for treatments that have been previously shown to work, researchers must typically use study designs that yield "lower quality" data,

---

[9] Gordon H. Guyatt et al., *GRADE: An Emerging Consensus on Rating Quality of Evidence and Strength of Recommendations*, 336 BMJ 924 (2008).
[10] R.L. Moss et al., *The Role of Prospective Randomized Clinical Trials in Pediatric Surgery: State of the Art*, 36 Journal of Pediatric Surgery 1182 (2001); Jeremy Howick, The Philosophy of Evidence-Based Medicine (Wiley-Blackwell, 2011).

15

but do not involve withholding medical treatment from patients where medical science has already established the treatment to be beneficial.

Transgender health is one such area.  The body of scientific evidence and clinical expertise available in the field today indicates that providing gender-affirming treatment to adults with gender dysphoria is beneficial, while withholding treatment is harmful.[11]  As a result, longstanding principles of medical research ethics generally do not support the use of randomized controlled trials to test gender-affirming care for transgender populations.[12]  As discussed below, that does not diminish the analytic weight or scientific value of the evidence.

---

[11] In 2018, for instance, Dr. Baker reviewed all peer-reviewed articles published in English between 1991 and 2017 that assessed the effects of medical treatment reflecting the prevailing clinical consensus on various health-related outcomes among transgender people.  This 2018 review identified 55 primary research studies on this topic, of which 51 (93%) found that these treatments improve outcomes for transgender people, while 4 (7%) reported mixed or null findings.  The review found *no studies* concluding that treatment according to the widespread clinical consensus causes harm.  Further research has supported that withholding treatment is harmful.  *See* K. K. H. Tan et al., *Unmet Need for Gender-Affirming Care as a Social Determinant of Mental Health Inequities*, 45 J. Pub. Health e225 (2023), https://doi.org/10.1093/pubmed/fdac131; Tim C. van de Grift et al., *Waiting for Transgender Care and its Effects on Health and Equality: A Mixed-Methods Population Study in the Netherlands*, EClinicalMedicine (2024), https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370%2824%2900236-0/fulltext?.

[12] Theodore E. Schall, Kaitlyn Jaffe & Jacob D. Moses, *Roles of Randomized Controlled Trials in Establishing Evidence-Based Gender-Affirming Care and Advancing Health Equity*, 26 AMA J. Ethics E684 (2024), https://doi.org/10.1001/amajethics.2024.684.; Florence Ashley et al., *Randomized-Controlled Trials Are Methodologically Inappropriate in Adolescent Transgender Healthcare*, 25 International Journal of Transgender Health 1 (2023).

In addition to being unethical, randomized controlled trials are also often *infeasible* for studies of transgender health treatments.  Most randomized controlled trial designs require that study participants be unaware of whether they are receiving the treatment or a placebo.  This is typically impossible in the context of gender-affirming treatments, such as hormone interventions, that create visible physical effects, as it becomes obvious to study participants even over short periods of time whether they are assigned to the treatment or control group.

Therefore, much of the highest quality research evidence in transgender health is—according to the framework of ethical evidence-based medicine— designated as "low" quality.[13]  But this is a relative designation, not an absolute one.  Indeed, the majority of medical evidence across a wide variety of fields, including "state of the art" evidence in many fields, is based on study designs other

---

[13] A small number of randomized controlled trials using innovative study designs (*i.e.*, not placebo-controlled) have been conducted in transgender health.  The findings of these randomized controlled trials align with the overall conclusions of systematic reviews in this field.  *See* B.J. Nolan et al., *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, 6 JAMA Network Open (2023).  For example, a randomized controlled trial included in the Baker Review that compared different routes of testosterone administration for transgender men showed a statistically significant increase in quality of life relative to no treatment for all three routes of administration, with no difference across treatment arms.  *See* Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 The Journal of Sexual Medicine 3002 (2014).

than randomized controlled trials, such as observational studies.[14]  If this Court

finds "low" quality evidence to be an appropriate basis for denying treatment to

incarcerated individuals, states could just as easily deny life-saving treatments for

cancer or cardiovascular disease.  Indeed, a review of industry-standard guidelines

across fifty-two areas of medicine, including anesthesia, cancer, and cardiovascular

disease, showed that only 13.5% are based on evidence deemed "high" quality,

while more than half are based on evidence whose quality was rated "low" (31.7%)

or "very low" (24%).[15]  Similarly, fewer than one in six systematic reviews across

medical sectors found "high" quality evidence for a primary health outcome of

interest, and fewer than one in five reported "high" quality evidence for *any* health

outcome.[16]  Under Defendants-Appellants' argument, states could deny prisoners a

substantial number of medically necessary treatments based exclusively on the fact

that the clinical evidence supporting those treatments was technically classified as

low.

　　There is no research documenting a relationship between evidence scoring

---

[14] Luis H. Braga et al., *Randomized Controlled Trials - The What, When, How and Why*, 21 Journal of Pediatric Urology 397 (2025); Thomas R. Frieden, *Evidence for Health Decision Making - Beyond Randomized, Controlled Trials*, 377 The New England Journal of Medicine 465 (2017).

[15] Padhraig S. Fleming et al., *High Quality of the Evidence for Medical and Other Health-Related Interventions Was Uncommon in Cochrane Systematic Reviews*, 78 Journal of Clinical Epidemiology 34 (2016).

[16] *See id*. at 39.

highly in quality grading systems and improved patient care, nor is there an expectation or requirement that clinical guidelines and treatment protocols be based solely or chiefly on "high" strength evidence.[17]  As the Supreme Court has acknowledged, "medical professionals and researchers do not limit the data they consider to the results of randomized controlled trials or to statistically significant evidence."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 41 (2011) (citations omitted).

The Baker Review finds, consistently across the studies it analyzes, that the medical literature supports a positive association between hormone therapy and measures of quality of life, depression, and anxiety.  Indeed, *no* reviewed study found that these medications negatively impacted mental health outcomes, and most studies found substantial improvements in one or more of these indicators. Thus, though the Review classifies this body of evidence as "low" quality (meaning that it came from studies that were not randomized controlled trials), the overall consensus of the evidence supports the conclusion that hormone treatment is associated with better quality of life, decreased depression, and decreased anxiety for transgender people.  On this basis, the Review concludes that hormone therapy is an essential component of care for transgender people.

---

[17] Brian P. Kavanagh, *The GRADE System for Rating Clinical Guidelines*, 6 PLoS Medicine (2009).

Nonetheless, Defendants-Appellants misleadingly assert that the "low" strength evidence grades assigned to studies in the Baker Review imply that hormone therapy is a controversial treatment that somehow cannot be considered part of generally accepted clinical practice. *See, e.g.,* Opening Br. of Appellants, Dkt. 26 at 20 (claiming that the Baker Review "cast[s] serious doubt on the claimed benefits of cross-sex hormones."); *id.* at 21–22 (characterizing the Baker Review as a "landmark systematic review[] questioning the evidence supporting cross-sex hormonal interventions"). In so doing, Defendants-Appellants conflate the scientific analysis of "low" strength evidence with the lay concepts of unreliability or uncertainty, when, in fact, the majority of widely accepted medical science and clinical practice are derived from evidence not deemed "high" strength.

Moreover, evidence from medical research at large is only one component of the development and application of clinical practice guidelines. Clinical care always requires consideration of multiple factors, including expert clinical judgment and individualized evaluations and assessments of patient need. In the context of "low" quality evidence, these other factors become more important—not less. In fact, the "father of evidence-based medicine," Dr. Gordon Guyatt, has expressed serious concerns about the growing misuse of concepts from evidence-based medicine to support restrictions on care for transgender people. Specifically,

20

he and his coauthors write:

> It is profoundly misguided to cast health care based on low-certainty evidence as bad care or as care driven by ideology, and low-certainty evidence as bad science. Many of the interventions we offer are based on low certainty evidence, and enlightened individuals often legitimately and wisely choose such interventions. Thus, forbidding delivery of gender-affirming care and limiting medical management options on the basis of low certainty evidence is a clear violation of the principles of evidence-based shared decision-making and is unconscionable. The appropriate use of our work is in ensuring patients receive needed care[.][18]

In short, Defendants-Appellants' reliance on the Baker Review to cast doubt on the appropriateness of hormone therapy reflects a fundamental misunderstanding of ethical evidence-based medicine. Contrary to Defendants-Appellants' claims, the Baker Review confirms the widespread clinical consensus that hormone therapy is a medically necessary component of treatment for adults with gender dysphoria.

## B. Defendants-Appellants Misinterpret The Baker Review's Call For Further Research Into Hormone Therapy

Defendants-Appellants distort the Baker Review's call for further research. *See* Opening Br. of Appellants, Dkt. 26 at 38 (citing R. 72-2 at 14) (arguing that "[t]he district court concluded that the medical necessity of cross-sex hormones is

---

[18] Gordon Guyatt et al., *Systematic Reviews Related to Gender-Affirming Care*, McMaster University (2025), https://hei.healthsci.mcmaster.ca/systematic-reviews-related-to-gender-affirming-care/.

[] far beyond dispute" while the Baker Review concludes that "[m]ore research is needed to further explore the relationship between hormonal interventions and [quality of life], death by suicide, and other psychological outcomes in transgender-identifying persons."). Scientific research papers routinely include a call for further research. An acknowledgment that further study would be beneficial simply reflects the goal of building on a baseline of fundamental knowledge to continue to further refine our understanding. It is in no way a call for a moratorium on hormone therapy for adults with gender dysphoria—a treatment that the existing research has already shown to benefit these patients.[19]

Indeed, the very paragraph cited by Defendants-Appellants ends with the conclusion that hormone therapy is "an essential component of care." *See* R. 72-2 at 14 ("our review indicates that gender-affirming hormone therapy is likely associated with improvements in [quality of life], depression, and anxiety. . . . These benefits make hormone therapy an essential component of care that promotes the health and well-being of transgender people."). Moreover, since the Baker Review was published, more research has explored the relationship between

---

[19] As an analogy, a study on cigarette smoking among high school dropouts claiming that "more research is needed to further explore the relationship between tobacco smoking and reasons for leaving school," would not mean the authors encourage high schools to stop intervening when students smoke tobacco. *See* Rachana Desai et al., *Cigarette Smoking and Reasons for Leaving School Among School Dropouts in South Africa*, 16 Tobacco Induced Diseases 362 (2018).

hormone therapy and psychological outcomes, reaffirming that hormone therapy is a medically necessary component of care for many adults with gender dysphoria.[20]

### C. Defendants-Appellants Draw An Improper Parallel Between The Baker Review And The Cass Review

Defendants-Appellants also rely on Dr. Hilary Cass's *Independent Review of Gender Identity Services for Children and Young People*. *See, e.g.,* Opening Br. of Appellants, Dkt. 26 at 20, 38–44. The Court should reject consideration of the Cass Review for the reasons discussed in Section I *supra*: Without a competent expert to explain and contextualize scientific evidence, courts rightfully refuse to consider it, as the Federal Rules of Evidence require. Otherwise, courts risk the misapplication and misinterpretation of scientific literature, a concern made evident by Defendants-Appellants' mischaracterization of the Baker Review.

If the Court does consider the Cass Review, it should reject the parallel that Defendants-Appellants improperly attempt to draw between the Cass Review and the Baker Review. For example, Defendants-Appellants argue that the Cass Review "built on the Baker Review's critiques" of hormone treatment and assert that the Baker Review "questioned the efficacy" of hormone therapy and

---

[20] *See, e.g.,* David M. Doyle, Thomas Lewis & Manuela Barreto, *A Systematic Review of Psychosocial Functioning Changes After Gender-Affirming Hormone Therapy Among Transgender People*, 7 Nature Human Behaviour 1320 (2023); Sari L. Reisner, et al., *Gender-Affirming Hormone Therapy and Depressive Symptoms Among Transgender Adults*, 8 JAMA Network Open (2025). https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2831643.

denounced studies rated "low quality" as "flawed."  Opening Br. of Appellants, Dkt. 26 at 39.  But as explained in Sections II and III(A)–(B) *supra*, the Baker Review says no such thing—it *affirms* hormone therapy as an essential component of care for people with gender dysphoria.  *See supra* Sections II–III(A)–(B).  Even the Cass Review bolsters this point, finding that hormone therapy for transgender adults is a "well-established practice that has transformed the lives of many transgender people."  R. 72-3 at 183.  Furthermore, unlike the Baker Review, the Cass Review's focus was providing recommendations regarding the efficacy of hormone therapy for "children and young people," and it expressly acknowledges that "[t]here are different issues involved in considering gender care for children and young people than adults."  R. 72-3 at 27.  Defendants-Appellants omit this critical difference throughout their brief, further evidencing precisely why courts require expert testimony to contextualize scientific literature.

**CONCLUSION**

In light of the foregoing, Dr. Baker respectfully requests that this Court affirm the District Court's judgment that the academic treatises Defendants-Appellants submitted, without a corresponding expert to lay the foundation and provide further context, were not admissible evidence and could not be considered for purposes of creating a fact dispute as to deliberate indifference.  In the alternative, should this Court decide to consider those academic treatises, Dr. Baker respectfully requests that the Court conclude that Defendants-Appellants mischaracterized the Baker Review—which concluded that hormone therapy is an essential component of care for people with gender dysphoria—in their attempt to create a factual dispute regarding the propriety of providing gender-affirming care to adults with gender dysphoria.

Dated: March 27, 2026

Respectfully submitted,

/s/ Luke A. Barefoot
Luke A. Barefoot
Thomas Kessler
Jack Massey
Noopur Sen (*pro hac vice*)
Ariel Sheffey (*pro hac vice*)
Saifeldeen Zihiri (*pro hac vice*)
CLEARY GOTTLIEB
STEEN & HAMILTON LLP

25

One Liberty Plaza
New York, NY 10006
T: (212) 225-2000
F: (212) 225-3999
lbarefoot@cgsh.com
tkessler@cgsh.com
jamassey@cgsh.com
nsen@cgsh.com
asheffey@cgsh.com
szihiri@cgsh.com


*/s/ T. Brandon Waddell*
T. Brandon Waddell
CAPLAN COBB LLC
75 14th St. NE #2700
Atlanta, GA 30309
T: (404) 596-5602
F: (404) 596-5604
bwaddell@caplancobb.com

26

# CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 27 and 32, I certify that this motion is set in 14-point Times New Roman, a proportionately spaced font, and as, calculated by Microsoft Word, contains 5,477 words. I further certify that this motion is virus free, as determined by Windows Security – Virus & Threat Protection.

Dated: March 27, 2026

*/s/ T. Brandon Waddell*
T. Brandon Waddell

## CERTIFICATE OF SERVICE

I hereby certify that today I electronically filed this brief using the appellate ECF system and that all participants are registered ECF users and will be served via that platform.

Dated: March 27, 2026

/s/ T. Brandon Waddell
T. Brandon Waddell